**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| X CORP.,<br><br>    Plaintiff,<br><br>    v.<br><br>NATIONAL MUSIC PUBLISHERS'<br>ASSOCIATION, INC.; ABKCO MUSIC,<br>INC.; ANTHEM ENTERTAINMENT L.P.;<br>BIG MACHINE MUSIC, LLC; BMG<br>RIGHTS MANAGEMENT (US) LLC;<br>COLGEMS-EMI MUSIC INC.; CONCORD<br>MUSIC GROUP, INC.; DOWNTOWN<br>MUSIC PUBLISHING LLC; EMI APRIL<br>MUSIC INC.; EMI BLACKWOOD MUSIC<br>INC.; EMI CONSORTIUM MUSIC<br>PUBLISHING, INC.; EMI CONSORTIUM<br>SONGS, INC.; EMI ENTERTAINMENT<br>WORLD INC.; EMI FEIST CATALOG<br>INC.; EMI MILLS MUSIC INC.; EMI U<br>CATALOG INC.; FAMOUS MUSIC LLC;<br>HIPGNOSIS SONGS GROUP, LLC;<br>JOBETE MUSIC CO., INC.; KOBALT<br>MUSIC PUBLISHING AMERICA, INC.;<br>LYRIC COPYRIGHT SERVICES, LP;<br>MAYIMBA MUSIC, INC.; PAYDAY<br>MUSIC PUBLISHING, LLC; PEER<br>INTERNATIONAL CORPORATION;<br>PEERMUSIC, LTD.; PEERMUSIC III,<br>LTD.; PEERTUNES, LTD.; POLYGRAM<br>PUBLISHING, INC.; RESERVOIR MEDIA<br>MANAGEMENT, INC.; SCREEN GEMS-<br>EMI MUSIC INC.; SONGS OF PEER, LTD.;<br>SONGS OF UNIVERSAL, INC.; SONY<br>MUSIC PUBLISHING (US) LLC;<br>SOUTHERN MUSIC PUBLISHING CO.,<br>INC.; STONE AGATE MUSIC; STONE<br>DIAMOND MUSIC CORP.; THE<br>ROYALTY NETWORK, INC.;<br>UNIVERSAL MUSIC CORP.; UNIVERSAL<br>MUSIC – MGB NA LLC; UNIVERSAL<br>MUSIC – Z TUNES LLC; UNIVERSAL | Civil Action No. _____<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

MUSICA, INC.; WARNER CHAPPELL
MUSIC, INC.; WIXEN MUSIC
PUBLISHING, INC.,

    Defendants.

## INTRODUCTION

1.      X Corp. ("X") brings this suit to stop the harm to X and its users—and to recover the damages X has suffered—from the anticompetitive conduct of the National Music Publishers' Association, Inc. ("NMPA"), and music publishers whom NMPA represents (each a "Music Publisher" and, collectively and together with NMPA, "Defendants").[1]

2.      Founded in 2006, X is a social media platform that provides an outlet for people to engage in free speech. Users can share their views, engage with the views of others, and follow current events. X's platform allows users to publish text, photos, and videos in posts that other users may view and interact with. Digital platforms like X can also be a forum to interact with music in different ways, such as by viewing user-generated videos that include music. Such platforms may choose to license copyright-protected music.

3.      Rather than engage in a competitive process and individually negotiate a license for their catalogs, the Music Publishers colluded through NMPA in a concerted refusal to deal

---

[1] The Music Publishers are ABKCO Music, Inc.; Anthem Entertainment L.P.; Big Machine Music, LLC; BMG Rights Management (US) LLC; Colgems-EMI Music Inc.; Concord Music Group, Inc.; Downtown Music Publishing LLC; EMI April Music Inc.; EMI Blackwood Music Inc.; EMI Consortium Music Publishing, Inc.; EMI Consortium Songs, Inc.; EMI Entertainment World Inc.; EMI Feist Catalog Inc.; EMI Mills Music Inc.; EMI U Catalog Inc.; Famous Music LLC; Hipgnosis Songs Group, LLC; Jobete Music Co., Inc.; Kobalt Music Publishing America, Inc.; Lyric Copyright Services, LP; Mayimba Music, Inc.; Payday Music Publishing, LLC; Peer International Corporation; Peermusic, Ltd.; Peermusic III, Ltd.; Peertunes, Ltd.; Polygram Publishing, Inc.; Reservoir Media Management, Inc.; Screen Gems-EMI Music Inc.; Songs of Peer, Ltd.; Songs of Universal, Inc.; Sony Music Publishing (US) LLC; Southern Music Publishing Co., Inc.; Stone Agate Music; Stone Diamond Music Corp.; The Royalty Network, Inc.; Universal Music Corp.; Universal Music – MGB NA LLC; Universal Music – Z Tunes LLC; Universal Musica, Inc.; Warner Chappell Music, Inc.; and Wixen Music Publishing, Inc.

with X independently. The object of this scheme is to coerce X into taking licenses to musical works from the industry as a whole, denying X the benefit of competition between music publishers—a goal that is in keeping with NMPA President and CEO David Israelite's admonition that the music-publishing industry should "work together 'to expand the pie,' and not turn[] on one another to try and get a bigger piece of the pie."

4.      Initially, Universal, Sony, and Warner Chappell—the three largest Music Publishers in the United States (the "Majors")—declined to participate in the conspiracy orchestrated by NMPA and the remaining Music Publishers (the "Non-Majors"). But in doing so, Warner Chappell made clear it was aware of the scheme and threatened X that it would join in the effort if X would not take a license from it. When X did not take licenses from the Majors, they joined the conspiracy to leverage collective monopoly power and coerce X into acquiring licenses from *all* Music Publishers at supracompetitive rates.

5.      As part of this conspiracy, Defendants weaponized the Digital Millennium Copyright Act (the "DMCA") against X, using the DMCA as a pretext for their extortionate campaign. The DMCA protects online platforms like X when their users post copyright-protected material to the platform. Under the statute's safe harbor, a platform will not be liable for users' infringing posts if it has adopted a policy of (i) removing infringing content upon being notified by the copyright holder and (ii) deplatforming repeat infringers. A platform therefore does not need to license all the copyrighted musical works that its users may post and instead may choose to rely on the statutory safe harbor. X—which has instituted a robust DMCA-compliance policy—has long relied on the safe harbor.

6.      X does not need to license works from all Music Publishers—it could instead license from only a subset of Music Publishers. Indeed, X benefits from a music license only to

the extent the licensed musical compositions would, for instance, generate a critical mass of conversation that draws new users to the platform, and even then the benefit may be outweighed by the cost of the license.

7.      To coerce X into negotiating licenses with all Music Publishers, Mr. Israelite emailed X on behalf of "all music publishers" in October 2021 and threatened that NMPA would soon launch "a massive program" to inundate X with DMCA takedown notices "on a scale larger than any previous effort in DMCA history." That program, Mr. Israelite warned, would harm X by "quickly turn[ing] many of [X's] most popular users into repeat infringers," requiring X to deplatform them.

8.      NMPA also made clear that X could make this all go away—for a price. Mr. Israelite explained that X could avoid a coordinated takedown-notice barrage if it agreed to do "what many other social media companies have done" and "develop a partnership" with NMPA and the Music Publishers to license their musical compositions. NMPA offered that "*we*"—i.e., NMPA on the Music Publishers' behalf—would be "open" to "engaging" with X "at any point" during its "massive" takedown program (emphasis added).

9.      True to its threat, NMPA then began sending takedown notices on behalf of all the Non-Majors. In the first year of Defendants' scheme, NMPA sent notices weekly, totaling thousands of pages. In the first year alone, the notices identified over 200,000 purportedly infringing posts, including from X's most popular users. The purportedly infringing content includes the same kinds of content that NMPA's lawyers and executives—including Mr. Israelite—have *themselves* reposted on X. This is unsurprising, given that NMPA's takedown notices have targeted posts that are not subject to any legitimate claim of infringement.

10.     Defendants nevertheless continue to serve their baseless takedown notices in a

transparent effort to flex their collective monopoly power. Their goal, as Mr. Israelite made plain at the outset, is to coerce X into obtaining a license from all Music Publishers at inflated rates that do not reflect the benefit of competition between the Music Publishers for licensing. Because X has resisted Defendants' attempt to force it to buy industrywide licenses it does not need, it continues to be buried in hundreds of pages of takedown notices nearly every week, each listing hundreds (and, in many cases, thousands) of instances of allegedly infringing material.

11.     Since the Majors joined the conspiracy, none of the Music Publishers have moved forward with individual licensing negotiations with X. Moreover, discussions between X and certain Music Publishers about settling a case they brought against X in Tennessee have confirmed that there is no barrier—other than an anticompetitive conspiracy—to X negotiating individual licenses. Indeed, in the context of discussing a resolution of the Tennessee litigation—and only in that context—some of the Music Publishers have been willing to negotiate a litigation settlement on an individual basis.

12.     As a result of Defendants' anticompetitive conduct and collective exercise of monopoly power, X has been denied the ability to acquire a U.S. musical-composition license from any individual Music Publisher on competitive terms.

13.     In a competitive market for licenses to copyrighted musical compositions, the Music Publishers would compete by, for instance, offering better royalty rates or novel licensing terms to reach a licensing agreement with X. In the actual world, the Music Publishers collude, rather than compete, to attempt to force X to take industrywide licenses, harming not just consumers and X users, who risk having their accounts suspended because of Defendants' pretextual takedown notices, but also X, which suffers ongoing harm from Defendants' coordinated and coercive campaign—just as NMPA promised.

14.     X's users are also harmed because they are denied content they want when X is forced to remove music-related posts due to baseless takedown notices. Music is among the most popular topics of discussion on X, and some of X's most committed users heavily engage with X music communities.

15.     Collusion among publishers also harms musicians, who have criticized NMPA for "play[ing] only for the publishers' team" to their detriment. This harm is particularly acute for up-and-coming musicians, who rely on X and its music communities to build an audience and launch their careers. But it also applies more broadly to established musicians, who rely on X exposure to grow and engage with their fanbase and are harmed by the anticompetitive scheme.

16.     Unless the Court enjoins this unlawful conduct, Defendants will continue to thwart competition in the market for licenses to copyrighted musical compositions, and both X and its users will continue to suffer the anticompetitive consequence.

17.     X also seeks damages to compensate it for the harm Defendants' ongoing anticompetitive scheme continues to cause.

### **PARTIES**

18.     Plaintiff X Corp. is a corporation organized and existing under the laws of Nevada, with its principal place of business in Bastrop, Texas. X Corp. owns and operates the social media platform X (formerly known as Twitter), accessible through X.com, twitter.com, and various mobile applications. X Corp. merged with Twitter, Inc. in April 2023, and was acquired by X.AI Holdings Corp. in March 2025.

19.     Defendants are 18 Music Publishers and their affiliates—companies that encompass nearly the entirety of the U.S. music-publishing industry—and NMPA, the largest trade association of music publishers in the United States.

20.     Defendant NMPA is a trade organization with its principal place of business in Washington, DC. NMPA represents "all American music publishers and their songwriting partners." According to NMPA's President and CEO, David Israelite, "[t]aken together, compositions owned or controlled by NMPA members account for the vast majority of musical compositions licensed . . . in the United States."

21.     Defendant ABKCO Music, Inc. ("ABKCO") is a corporation organized and existing under the laws of New York with its principal place of business in New York, New York.

22.     Defendant Anthem Entertainment L.P. is an Ontario limited partnership with its principal place of business in Toronto, Ontario, Canada.

23.     Defendant Big Machine Music, LLC ("Big Machine") is a Delaware limited liability company with its principal place of business in Nashville, Tennessee.

24.     Defendant BMG Rights Management (US) LLC ("BMG") is a Delaware limited liability company with its principal place of business in New York, New York.

25.     Defendant Colgems-EMI Music Inc. ("Colgems") is a Delaware corporation with its principal place of business in New York, New York.

26.     Defendant Concord Music Group, Inc. ("Concord") is a Delaware corporation with its principal place of business in Nashville, Tennessee.

27.     Defendant Downtown Music Publishing LLC ("Downtown") is a Delaware limited liability company with its principal place of business in New York, New York.

28.     Defendant EMI April Music Inc. ("EMI April") is a Connecticut corporation with its principal place of business in New York, New York.

29.     Defendant EMI Blackwood Music Inc. ("EMI Blackwood") is a Connecticut

corporation with its principal place of business in New York, New York.

30.    Defendant EMI Consortium Music Publishing, Inc. ("EMI Consortium Music") is a New York corporation with its principal place of business in New York, New York.

31.    Defendant EMI Consortium Songs, Inc. ("EMI Consortium Songs") is a New York corporation with its principal place of business in New York, New York.

32.    Defendant EMI Entertainment World Inc. ("EMI Entertainment") is a Delaware corporation with its principal place of business in New York, New York.

33.    Defendant EMI Feist Catalog Inc. ("EMI Feist") is a New York corporation with its principal place of business in New York, New York.

34.    Defendant EMI Mills Music Inc. ("EMI Mills") is a New York corporation with its principal place of business in New York, New York.

35.    Defendant EMI U Catalog Inc. ("EMI U") is a New York corporation with its principal place of business in New York, New York.

36.    Defendant Famous Music LLC ("Famous") is a Delaware limited liability company with its principal place of business in New York, New York.

37.    Defendant Hipgnosis Songs Group, LLC ("Hipgnosis") is a Delaware limited liability company with its principal place of business in Encino, California.

38.    Defendant Jobete Music Co., Inc. ("Jobete") is a Michigan corporation with its principal place of business in New York, New York.

39.    Defendant Kobalt Music Publishing America, Inc. ("Kobalt") is a Delaware corporation with its principal place of business in New York, New York.

40.    Defendant Lyric Copyright Services, LP (publicly known as Spirit Music Group ("Spirit")) is a Delaware corporation with its principal place of business in New York,

New York.

41.    Defendant Mayimba Music, Inc. ("Mayimba") is a New York corporation with its principal place of business in Pomona, New York.

42.    Defendant Payday Music Publishing, LLC is a New York limited liability company with its principal place of business in New York, New York

43.    Defendant Peer International Corporation ("Peer International") is a New Jersey corporation with its principal place of business in New York, New York.

44.    Defendant Peermusic, Ltd. ("Peermusic") is a New York corporation with its principal place of business in New York, New York.

45.    Defendant Peermusic III, Ltd. ("Peermusic III") is a Delaware corporation with its principal place of business in New York, New York.

46.    Defendant Peertunes, Ltd. ("Peertunes") is a Delaware corporation with its principal place of business in New York, New York.

47.    Defendant Polygram Publishing, Inc. ("Polygram") is a Delaware corporation with its principal place of business in Santa Monica, California.

48.    Defendant Reservoir Media Management, Inc. ("Reservoir") is a Delaware corporation with its principal place of business in New York, New York.

49.    Defendant Screen Gems-EMI Music Inc. ("Screen Gems") is a Delaware corporation with its principal place of business in New York, New York.

50.    Defendant Songs of Peer, Ltd. ("Songs of Peer") is a Delaware corporation with its principal place of business in New York, New York.

51.    Defendant Songs of Universal, Inc. ("Songs of Universal") is a California corporation with its principal place of business in Santa Monica, California.

52.     Defendant Sony Music Publishing (US) LLC ("Sony Music Publishing") is a Delaware limited liability company with its principal place of business in New York, New York.

53.     Defendant Southern Music Publishing Co., Inc. (together with Peer International, Peermusic, Peermusic III, Peertunes, and Songs of Peer, "Peer") is a New York corporation with its principal place of business in New York, New York.

54.     Defendant Stone Agate Music ("Stone Agate") is a division of Jobete.

55.     Defendant Stone Diamond Music Corp. (together with Colgems, EMI April, EMI Blackwood, EMI Consortium Music, EMI Consortium Songs, EMI Entertainment, EMI Feist, EMI Mills, EMI U, Famous, Jobete, Screen Gems, Sony Music Publishing, and Stone Agate, "Sony") is a Michigan corporation with its principal place of business in New York, New York.

56.     Defendant The Royalty Network, Inc. is a New York corporation with its principal place of business in New York, New York.

57.     Defendant Universal Music Corp. ("Universal Music Corp.") is a Delaware corporation with its principal place of business in Santa Monica, California.

58.     Defendant Universal Music – MGB NA LLC ("Universal Music MGB") is a California limited liability company with its principal place of business in Santa Monica, California.

59.     Defendant Universal Music – Z Tunes LLC ("Universal Music Z Tunes") is a New York limited liability company with its principal place of business in Santa Monica, California.

60.     Defendant Universal Musica, Inc. (together with Polygram, Songs of Universal, Universal Music Corp., Universal Music MGB, and Universal Music Z Tunes, "Universal") is a Florida corporation with its principal place of business in Santa Monica, California.

61.    Defendant Warner Chappell Music, Inc. ("Warner Chappell") is a Delaware corporation with its principal place of business in Los Angeles, California.

62.    Defendant Wixen Music Publishing, Inc. is a California corporation with its principal place of business in Calabasas, California.

63.    NMPA's Board of Directors mostly consists of directors and executives from the leading Music Publishers in the industry:

- *ABKCO.* Jody Klein (Owner and CEO);

- *Big Machine.* Mike Molinar (President);

- *BMG.* Keith Hauprich (General Counsel and Executive Vice President);

- *Concord.* Jim Selby (Chief Publishing Executive);

- *Kobalt.* Laurent Hubert (CEO);

- *Mayimba.* Marti Cuevas (Founder and President);

- *Peer.* Ralph Peer, II (Executive Chair);

- *Reservoir.* Golnar Khosrowshahi (Founder and President);

- *Sony.* Jon Platt (Chairman and CEO);

- *Spirit.* Jon Singer (Chairman);

- *Universal.* Jody Gerson (Chairman & CEO); and

- *Warner Chappell.* Carianne Marshall (Co-Chair and COO).

## JURISDICTION AND VENUE

64.    The Court has subject-matter jurisdiction over X's federal claims under 15 U.S.C. § 4 and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over X's state-law claims under 28 U.S.C. § 1367.

65.    The Court has personal jurisdiction over Defendants under 15 U.S.C. § 22.

Alternatively, the Court has personal jurisdiction over Defendants under Texas's long-arm statute, Tex. Civ. Prac. & Rem. Code § 17.042, because Defendants transact a substantial volume of business in Texas, including but not limited to the selling of licenses to copyrighted musical compositions.

66.    Defendants, through the violations described in this Complaint, have also committed torts against X in the state of Texas. Each Defendant, through its participation in the conspiracy alleged in this Complaint and otherwise, has substantial contacts with the United States and with this District, including operating offices and selling licenses to musical compositions. The members of the conspiracy committed substantial acts in furtherance of that unlawful scheme within the United States. And their unlawful conspiracy has had, and continues to have, foreseeable effects in the United States, including in this District.

67.    Venue is proper in this District under 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391 because Defendants transact a substantial volume of business in the Northern District of Texas, including but not limited to selling licenses to copyrighted musical compositions to customers located in the Northern District of Texas. NMPA describes itself as the "voice of both small and large music publishers" and is the "leading advocate" for publishers "in every area where publishers do business." NMPA has over 800 members and, upon information and belief, has one or more members in the Northern District of Texas. Defendants also avail themselves to Northern District Texas residents by offering websites that allow Northern District Texas residents to request quotes for licensing terms. A substantial portion of the affected interstate trade and commerce described herein has been carried out in this District. Defendants' conduct has harmed the U.S. market for licenses to copyrighted musical compositions, including harming customers within this District.

68.    X has standing to bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

69.    Because Defendants sell licenses to copyrighted music throughout the United States, across state lines, and internationally, their conduct substantially affects interstate commerce.

## FACTUAL ALLEGATIONS

70.    Music is among the most popular topics of discussion on X.

71.    To profit from the fact that music is such a popular topic on X, the Music Publishers have banded together to try to force X to purchase *industrywide* licenses—refusing to deal individually with X.

72.    In carrying out this anticompetitive scheme, the Music Publishers have relied on NMPA, a trade association for music publishers. Defendants' conduct here is part of a broader playbook that they have used to extract industrywide licenses at supracompetitive prices from other online platforms.

### A.    Defendants Coordinate Against Multiple Platforms To Extract Industrywide Licenses

73.    NMPA has expressly called on the music industry to work together to extract greater compensation. During a keynote interview at NMPA's 2016 Annual Meeting, David Israelite, NMPA's President and CEO, "urged the entire music industry to work together 'to expand the pie,' and not turn[] on one another to try and get a bigger piece of the pie." Other speakers likewise "urged the industry to pull together to fight for fair compensation from digital music service providers."

74.    Defendants have acted on these calls, working together to "expand the pie" and require licenses for *all* Music Publishers rather than "turn on one another" by competing.

13

75.    Just before the 2016 Annual Meeting, for example, NMPA and Spotify announced a "landmark agreement allowing independent and major publishers to claim and receive royalties for certain compositions used on Spotify." Mr. Israelite made clear industrywide deals are the goal: "I am thrilled that through this agreement *both independent and major publishers* and songwriters will be able to get what is owed to them. We must continue to push digital services to properly pay for the musical works that fuel their businesses and after much work together, we have found a way for Spotify to quickly get royalties to the right people. I look forward to *all NMPA members being paid what they are owed*, and I am excited about the creation of a better process moving forward" (emphasis added).

76.    Through collusive schemes similar to the joint "takedown notices" Defendants have deployed against X, Defendants have acted together to force platforms to take industrywide licenses.

77.    The DMCA amended U.S. copyright law to address new copyright challenges that arose with the advent of the internet. The DMCA does not require online platforms to obtain licenses from copyright owners on behalf of their users. Instead, the DMCA created a notice-and-takedown process through which copyright owners could inform online service providers about infringing material so it can be removed.

78.    This notice-and-takedown regime provides a statutory safe harbor: when a copyright holder provides the platform with "notification of claimed infringement," the platform is liable only if it fails to "respond[] expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity." 17 U.S.C. § 512(c)(1)(C). To qualify for that safe harbor, an online platform need not "monitor[] its service or affirmatively seek[] facts indicating infringing activity." *Id.* § 512(m).

79.    To comply with the DMCA, X has instituted a robust process for copyright owners to submit takedown notices. In particular, as set forth on its website, X responds to valid copyright complaints submitted under the DMCA when received, including removing or restricting "access to allegedly infringing material," if necessary. If X removes or restricts access to content based on a copyright complaint, X "will make a good faith effort to contact the affected account holder concerning the removal or restriction of access, including [providing] a full copy of the complaint, along with instructions for filing a counter-notice."

80.    X has also instituted a "Repeat Infringer Policy," pursuant to which it may suspend an account if multiple copyright complaints are received about an account, or other evidence suggests a pattern of repeat copyright infringement. Users suspended under that policy may appeal the suspension through X's website.

81.    Defendants have banded together to force industrywide agreements, including in at least one previous instance by weaponizing the DMCA's takedown process. Around May 2020, Amazon's Twitch, a livestreaming service, received a sudden influx of DMCA takedown notices from NMPA on behalf of music publishers related to clips with background music that was purportedly copyright-protected.

82.    These takedown notices involved thousands of DMCA notifications each week. In contrast, before May 2020, Twitch reported that it received fewer than 50 music-related DMCA notifications *each year*. Twitch stated publicly to users, "We were as surprised by this sudden avalanche of notifications as many of you were."

83.    In response, Twitch announced that it had deleted en masse thousands of clips and videos, leading to a tremendous backlash from its users and Twitch to ultimately issue an apology. In parallel, Twitch rolled out a product in October 2020 called Soundtrack, a pre-

approved list of songs from certain small and medium music publishers that creators could play during their streams.

84.    But Twitch had not licensed music from *all* NMPA music publishers and in May 2021, NMPA sent Twitch another wave of takedown notices.

85.    NMPA made clear the purpose of these takedown notices. In June 2021, Mr. Israelite boasted about "launch[ing] a major ramp-up of its takedown campaign against Amazon-owned Twitch" at his annual State of the Industry speech, commenting that "Twitch's users have paid the price for the platform's failure to license music." Mr. Israelite emphasized that the "music publishing industry is strong" and questioned whether licensees were getting too much of a "bargain."

86.    Ultimately, in late September 2021—nearly 18 months into NMPA and the music publishers' coordinated attack—Twitch announced a deal with NMPA to "build productive partnerships between the service and music publishers." Mr. Israelite would later cite Twitch's capitulation to the takedown scheme in his correspondence threatening X.

87.    Defendants also targeted Roblox, another online gaming platform. An op-ed from Mr. Israelite on June 30, 2021, proclaimed that "Roblox and Twitch Are Gaming the System Against Songwriters." The article highlighted Roblox's massive growth and valuation and claimed that users on its platform incorporate copyrighted music when building their own games. "When confronted with the need to license in order to protect itself and its users," Mr. Israelite wrote, "Roblox thus far has been defiant."

88.    Mr. Israelite further wrote that Roblox had recently entered into a licensing deal with Defendant BMG and that "it is clear that the company knows it actually needs licenses to use, distribute and make money off of the music on its platform. This is why NMPA, together

with major and independent publishers and a prominent writer and artist, filed a complaint on June 9 seeking $200 million in damages for Roblox's blatant copyright infringement of hundreds, if not ultimately thousands[,] of works."

89.    That lawsuit ended in September 2021, when Roblox and NMPA settled the claims against Roblox and set up "an industry-wide opt-in open to all eligible NMPA publishers" to negotiate go-forward music-licensing deals. "The agreement," NMPA announced, "expands Roblox's existing relationships with major publishers to *the entire publishing industry*" (emphasis added). Mr. Israelite would later cite Roblox's capitulation in his correspondence threatening X.

90.    Defendants also colluded against Peloton, a company that provides interactive at-home fitness equipment and content. Peloton was approached by NMPA in 2018 to engage in joint licensing on behalf of NMPA's members. While Peloton had taken licenses to works from some music publishers, Peloton had no business need for music licenses from all NMPA members and had accordingly not licensed their musical compositions.

91.    When Peloton attempted to negotiate for additional musical composition licenses on an individual basis from some music publishers—including with Defendants Reservoir, Downtown, and Peer—NMPA refused to allow such individual negotiations. When Peloton attempted to negotiate with individual music publishers without NMPA in early 2019, all of those publishers ended negotiations with Peloton at nearly the same time.

92.    Similarly, in or around May 2025, NMPA "flex[ed] [its] muscle" in securing industrywide licensing agreements from Snap. In particular, Snap set aside an industrywide pool to compensate NMPA member music publishers.

**B.    Defendants Turn Their Conspiracy Against X**

93.    With Defendants' schemes against others wrapped up, Defendants turned

their attention to X.

### 1. *NMPA Threatens To Weaponize The DMCA Against X To Extract Industrywide Licenses*

94.    On October 6, 2021, Mr. Israelite, on behalf of "all music publishers . . . in the United States," sent an email to X threatening "a massive program of notices to [X] under the Digital Millennium Copyright Act"—a campaign he threatened would "be on a scale larger than any previous effort in DMCA history."

95.    The email warned that the takedowns would "quickly turn many of [X's] most popular users into repeat infringers"—a status that forces X to deplatform users under its policies.

96.    Because X expeditiously removes posts once it receives takedown notices, NMPA's efforts to force X to remove posts and potentially deplatform its "most popular users" would harm not just the users removed but also X itself, diminishing the value of the platform to the rest of X's users and decreasing X's advertising revenue in the process.

97.    Mr. Israelite made clear that this harm could be avoided by entering into industrywide licensing discussions. He told X that NMPA preferred to "develop a partnership, similar to what many other social media companies have done, including YouTube, Facebook, Instagram, TikTok, Snap, Twitch, Triller, Roblox, etc." He also noted that "[e]ach of these partnerships began with a conversation similar to this" and said that "*we* are open to starting a conversation" with X "at any point" during the "massive" takedown campaign he promised to wage (emphasis added).

### 2. *NMPA And Non-Majors Follow Through On NMPA's Threat*

98.    When X did not take NMPA up on licensing negotiations on behalf of the music-publishing industry, NMPA and the Non-Majors made good on their threat.

99.    Starting in December 2021, NMPA began bombarding X with takedown notices virtually *every single week* related to *thousands* of posts that allegedly infringed the Non-Majors' copyrights.

100.    In the first year alone, these takedown notices identified over 200,000 X posts:

- December 16, 2021: 169 page notice with over 2,400 X posts;

- December 23, 2021: 374 page notice with over 3,800 X posts;

- December 29, 2021: 358 page notice with over 3,600 X posts;

- January 4, 2022: 247 page notice with over 2,500 X posts;

- January 10, 2022: 358 page notice with over 3,600 X posts;

- January 19, 2022: 462 page notice with over 4,500 X posts;

- January 24, 2022: 314 page notice with over 3,100 X posts;

- February 1, 2022: 291 page notice with over 2,800 X posts;

- February 8, 2022: 1,159 page notice with over 6,500 X posts;

- February 15, 2022: 281 page notice with over 3,400 X posts;

- February 21, 2022: 448 page notice with over 5,500 X posts;

- March 1, 2022: 555 page notice with over 5,400 X posts;

- March 7, 2022: 336 page notice with over 4,200 X posts;

- March 15, 2022: 231 page notice with over 2,100 X posts;

- March 22, 2022: 356 page notice with over 3,400 X posts;

- March 28, 2022: 217 page notice with over 2,100 X posts;

- April 5, 2022: 674 page notice with over 6,700 X posts;

- April 12, 2022: 278 page notice with over 2,700 X posts;

- April 19, 2022: 288 page notice with over 2,800 X posts;

- April 26, 2022: 158 page notice with over 1,500 X posts;

- May 3, 2022: 84 page notice with over 800 X posts;

- May 10, 2022: 126 page notice with over 1,200 X posts;

- May 16, 2022: 161 page notice with over 1,500 X posts;

- May 24, 2022: 211 page notice with over 2,100 X posts;

- May 31, 2022: 384 page notice with over 3,600 X posts;

- June 6, 2022: 330 page notice with over 3,200 X posts;

- June 13, 2022: 484 page notice with over 4,800 X posts;

- June 22, 2022: 370 page notice with over 3,700 X posts;

- June 28, 2022: 325 page notice with over 3,200 X posts;

- July 5, 2022: 432 page notice with over 4,300 X posts;

- July 12, 2022: 492 page notice with over 4,900 X posts;

- July 18, 2022: 388 page notice with over 3,900 X posts;

- July 26, 2022: 587 page notice with over 5,900 X posts;

- August 2, 2022: 332 page notice with over 3,300 X posts;

- August 8, 2022: 308 page notice with over 3,100 X posts;

- August 16, 2022: 711 page notice with over 7,100 X posts;

- August 22, 2022: 581 page notice with over 5,800 X posts;

- August 29, 2022: 547 page notice with over 5,400 X posts;

- September 7, 2022: 666 page notice with over 6,600 X posts;

- September 13, 2022: 520 page notice with over 5,200 X posts;

- September 19, 2022: 252 page notice with over 2,500 X posts;

- September 27, 2022: 261 page notice with over 2,600 X posts;

- October 4, 2022: 471 page notice with over 4,700 X posts;

- October 11, 2022: 376 page notice with over 3,800 X posts;

- October 18, 2022: 570 page notice with over 5,700 X posts;

- October 25, 2022: 260 page notice with over 2,600 X posts;

- October 31, 2022: 407 page notice with over 4,000 X posts;

- November 8, 2022: 398 page notice with over 2,300 X posts;

- November 15, 2022: 918 page notice with over 5,400 X posts;

- November 22, 2022: 783 page notice with over 3,800 X posts;

- November 29, 2022: 1,062 page notice with over 6,300 X posts; and

- December 7, 2022: 1,034 page notice with over 6,100 X posts.

101.    And since the scheme began, the takedown notices have caused X to suspend more than 50,000 users because of claims of copyright infringement.

102.    As NMPA promised would be the case, these notices included allegedly infringing material from some of X's top users with millions of followers. The notices covered a range of popular accounts from creators like Logan Paul, the Kansas City Chiefs and the Detroit Lions football teams, bands Linkin Park and BTS, and media outlets like E! News, ESPN FC, and Golf Digest.

103.    This resulted in posts from popular accounts being taken down. For example:

**Figure 1**









### 3. *The Majors Join The Conspiracy*
### *After Failing To Secure Individual Licenses*

104.    Warner Chappell, Sony, and Universal are the three largest music publishers. Together, they represent 60% or more of the market for licenses to copyrighted musical compositions and own or control the publishing rights to the vast majority of today's popular songs.

105.    Works by those Majors were not included in the first year of takedown notices, and one of them approached X to try to secure individual licenses. In May 2021, Warner Chappell emailed X an initial "experimental license proposal."

106.    But after X failed to obtain a license from the Non-Major Music Publishers in the wake of NMPA's abusive takedown notices, the Majors joined the conspiracy to collectively exercise monopoly power through NMPA against X.

107.    Warner Chappell's correspondence with X is telling. A Warner Chappell Senior Vice President ("SVP") emailed X in March 2022—three months after NMPA sent its first takedown notice. The Warner Chappell SVP acknowledged that X had been negotiating licenses with record labels and sought "to ensure that [publishers were] not being treated as an afterthought." She added that "any music framework and licensing scheme will also require the input of music publishers" and thus sought to avoid "a licensing framework that won't be approved by publishers." The Warner Chappell SVP made plain, in other words, that Music Publishers—collectively—held a veto right over whatever licensing agreement X might strike with record labels.

108.    The Warner Chappell SVP's email continued, "[W]e haven't been participating in the NMPA takedowns, but that has been based on the understanding that [X] would be engaging with us simultaneously with the label discussions." An X employee responded the same day:

"[W]e are in the initial steps of our licensing strategy and are implementing it as quickly as we can." When negotiations failed to materialize, the Warner Chappell SVP emailed in May 2022 and again leveraged NMPA's takedown scheme: "As I mentioned, we've chosen not to be involved in any NMPA takedown activities *to date* as we have been hopeful that [X] would engage with us as they develop their music strategy, but we are getting regular inquiries from senior management about [X's] licensing status" (emphasis added).

109.    The Warner Chappell SVP's email was clear: if X did not start engaging with Warner Chappell quickly, Warner Chappell would join the conspiracy—operating through NMPA to attempt to force X to take industrywide musical composition licenses and burdening X with takedown notices until X accepted the extortionate proposal Mr. Israelite had made on behalf of "all music publishers."

110.    By early 2023, when none of the Majors had secured a musical-composition license agreement, they each joined the conspiracy to extract industrywide licenses. From that point on, NMPA's takedown notices began including posts allegedly infringing on works by each of the Majors.

111.    From when the Majors joined the conspiracy to date, NMPA has sent thousands of pages of takedown notices, identifying nearly 500,000 posts allegedly infringing on copyrights of the Majors, as well as the Non-Majors.

### 4.  *The Music Publishers Sue X As They Continue Their Barrage Of Takedown Notices*

112.    In June 2023, the Music Publishers sued X for copyright infringement based on theories of direct, contributory, and vicarious infringement.

113.    Such a suit was not previewed to X, including in any of the NMPA takedown notices, even the notice NMPA sent the day before the complaint was filed. Instead, the

24

takedown notices had followed the same routine DMCA takedown structure—requests to X to remove infringing material posted by a user.

114.    Although some of the Music Publishers have engaged with X individually in the context of potentially settling that copyright case—confirming that it would be possible for X to negotiate a commercial license individually rather than collectively absent an illegal conspiracy—X still has not been afforded an opportunity to move forward with individual license negotiations with the Music Publishers since the Majors joined the conspiracy. Instead, NMPA continues to undertake its takedown scheme on behalf of "all music publishers."

115.    With their complaint, the Music Publishers filed an "Exhibit A" that listed approximately 1,700 works that they said X had infringed—less than the approximately 2,300 songs covered in NMPA's takedown notices through June 2023, which has since ballooned to more than 3,000 songs.

116.    In March 2024, the U.S. District Court for the Middle District of Tennessee dismissed most of the claims against X, holding that the Music Publishers did not plausibly allege that X actually transmitted the protected works or that X had control over what its users posted on the platform. The remaining claim proceeded under a contributory-infringement theory based on three narrow grounds: "(1) providing more lenient copyright enforcement to 'verified' users; (2) failing to act on takedown notices in a timely manner; and (3) failing to take reasonable steps in response to severe serial infringers."

### 5.    *NMPA Continues To Harass X With Baseless Takedown Notices*

117.    As Mr. Israelite acknowledged at the outset of the scheme, NMPA's blunderbuss takedown notices are designed to injure X in order gain leverage and pressure X into negotiating with all of the Music Publishers, not to vindicate the Music Publishers' copyrights.

118.    Given X's refusal to acquiesce to Defendants' conspiracy by engaging in

licensing discussions with the industry as a whole, Defendants have continued their takedown blitz. In particular, NMPA—on the Music Publishers' behalf—continues to this day to send near *weekly* notices to remove thousands of posts.

119.    Yet, despite their claims of infringement, NMPA's own executives have posted or reposted material just like material subject to these takedown notices.

120.    For example, the takedown notices cite posts showing X users deploying software to remix songs (with audio of the songs playing) to which the Music Publishers purportedly own the copyrights. But before NMPA started sending takedown notices to X, an NMPA Senior Vice President of Legal & Business Affairs promoted precisely such a post: the lawyer reposted a post by "KylePlantEmoji" (i.e., posted KylePlantEmoji's content onto her own X page) in which KylePlantEmoji used software to remix songs by Nelly and Papa Roach:

**Figure 2**



121.    The NMPA lawyer did not report this post as infringing a copyright. Quite the

opposite: the lawyer *supported* the video by reposting it on her own feed.

122.    The same NMPA lawyer also posted a video by "WeRateDogs" that contains a video of dogs accompanied by Randy Newman's musical composition "You Got a Friend in Me." This post is similar to other posts in NMPA's takedown notices sent to X that included videos of dogs playing accompanied by popular music. Again, the actions of the NMPA lawyer—to *promote* the post and not report it—shows that NMPA's own lawyers did not actually view analogous X posts in the takedown notices as problematic.

**Figure 3**



123.    NMPA's takedown notices have included X posts of fan videos from concerts. Far from condemning these posts, NMPA lawyers and executives endorsed and promoted this use of music by X's users by reposting videos of live music performances posted by fans. Mr.

Israelite's re-post of a live performance by Brandi Carlile singing "A Case of You" in its entirety is illustrative:

**<u>Figure 4</u>**



124.    Not only have NMPA's takedown notices claimed content similar to that posted by NMPA executives and lawyers was infringing, but they have also forced X to remove posts that are not subject to copyright protection by issuing takedown notices as to such posts.

125.    For example, on March 29, 2025, NMPA issued a takedown notice as to a post of a video of a high school's sports-award ceremony:

**Figure 5**



126.    The video subject to this takedown notice shows a high school auditorium, as the host of the ceremony describes the accolades of the "male athlete of the year" for over a minute. After the winner's name is announced, music plays briefly until the athlete takes the award and walks off the stage. Although there is no reasonable basis for censoring this video focused on a high school athlete's achievement based on the *de minimis*, non-commercial use of background music in the video, X had to take it down because of Defendants' scheme.

127.    Other posts that were in the NMPA takedown notices are likewise not subject to any legitimate copyright claim. Through their baseless takedown notices, Defendants have forced X to take down other content with incidental background music, such as a video of a football team arriving to a stadium with the stadium's music playing and a video that spotted a premier soccer player in a music-playing nightclub:

**Figure 6**

 

128.    These examples for which NMPA claimed infringement demonstrate that the takedown campaign orchestrated by NMPA on behalf of the Music Publishers is pretext. It is not driven by a genuine interest in redressing copyright grievances; it is an attempt to force X into taking industrywide licenses it does not need.

**C.    Defendants' Conspiracy Leverages Their Market
And Monopoly Power To Force Industrywide Licensing**

129.    Although they are competitors, the Music Publishers have joined together to exploit their combined market power (and, after the Majors joined, their combined monopoly power) to force X to make an all-or-nothing choice: either take licenses from all the Music Publishers or else face a targeted attack—including on its most popular users.

130.    Defendants have admitted that this is the purpose of their conspiracy. Speaking on behalf of NMPA and its co-conspirators, Mr. Israelite told X that "*we* are open to starting a

conversation" about musical composition licensing (emphasis added), just as Defendants had done with TikTok, Facebook, Instagram, YouTube, Twitch, Roblox, and Snap. These companies, according to the Music Publishers, "all pay fees" to every Music Publisher. If X was not willing to pay each Music Publisher, the Music Publishers would target and harm X.

131.    After news broke that Elon Musk would buy X, Mr. Israelite renewed his message to X's soon-to-be owner:

**Figure 7**



132.    Mr. Israelite's message on behalf of the industry as a whole takes on even more significance given the dynamics of the industry and the behavior of NMPA and Music Publishers.

1.    ***The Market For Licenses To Copyrighted Musical Compositions Is Highly Concentrated***

133.    The highly concentrated nature of the market provides the Music Publishers with the ability and incentive to collude: by doing so, they can exercise monopoly power.

134.    The Music Publishers consist of 18 distinct publishers, which are all members of NMPA, and all own the copyrights to catalogs of thousands—and, in some instances, millions—of songs. Together, the Music Publishers own more than a 90% share of copyrighted music in the United States. The collective market share of the five largest Music Publishers—the Majors, Kobalt, and BMG—exceeds 70%.

135.    As NMPA acknowledged at its 2023 Annual Meeting, NMPA represents 95.7%

of U.S. music publishers—virtually the entire United States music-publishing industry.

136.    By joining together, as they have done against X, the Music Publishers have the power to control prices and output of the entire market.

### 2. Music Publishers Have Myriad Opportunities To Set A Collective Strategy

137.    The Music Publishers control NMPA. Executives from the Music Publishers (including an executive from each of the Majors) control 12 of NMPA's 21 board seats.

138.    NMPA has also long served as a vehicle for coordination between music publishers. NMPA's role has been to discourage music publishers from "turning on one another to try and get a bigger piece of the pie." Indeed, NMPA promotes its role in organizing collective negotiations on its website, stating that it is "the voice" of music publishers.

139.    The Music Publishers have had many opportunities to meet and coordinate their licensing strategy at trade-association meetings across the country, including at in-person events organized by NMPA.

140.    NMPA organizes an Annual Meeting, four annual Board Meetings, and a host of other events aimed at "inform[ing] the industry." One of NMPA's recent events was held at the exclusive Riviera Country Club outside Los Angeles.

141.    NMPA has organized the following events, in addition to the annual board meetings and private gatherings involving two or more Defendants that are not publicized[2]:

---

[2] The dates of NMPA's quarterly board meetings are not publicized and are therefore not included in Figure 8.

**Figure 8**

| Date | NMPA Event | Location |
|---|---|---|
| June 9, 2021 | NMPA Annual Meeting | Virtual |
| October 19, 2021 - October 20, 2021 | Town Hall | Virtual |
| May 9, 2022 | S.O.N.G.S. Foundation Spring Golf Tournament | Los Angeles, California |
| June 15, 2022 | NMPA Annual Meeting | New York, New York |
| October 12, 2022 | Gold & Platinum Gala | Nashville, Tennessee |
| October 13, 2022 | S.O.N.G.S. Foundation Fall Golf Tournament | Nashville, Tennessee |
| February 1, 2023 | NMPA + Billboard Grammy Week Showcase | Los Angeles, California |
| May 15, 2023 | S.O.N.G.S. Foundation Spring Golf Tournament | Los Angeles, California |
| June 14, 2023 | NMPA Annual Meeting | New York, New York |
| October 25, 2023 | Gold & Platinum Gala | Nashville, Tennessee |
| January 31, 2024 | NMPA + Billboard Grammy Week Showcase | Los Angeles, California |
| April 15, 2024 | S.O.N.G.S. Foundation Spring Golf Tournament | Los Angeles, California |
| June 12, 2024 | NMPA Annual Meeting | New York, New York |
| October 24, 2024 | Gold & Platinum Gala | Nashville, Tennessee |
| March 31, 2025 | S.O.N.G.S. Foundation Spring Golf Tournament | Los Angeles, California |
| June 11, 2025 | NMPA Annual Meeting | New York, New York |

### 3. *The Music Publishers Exchange Competitively Sensitive Information*

142.    The high market concentration in the market for licenses to copyrighted musical compositions and the recurring NMPA meetings, golf excursions, and other NMPA events provide the Music Publishers ample opportunity to exchange competitively sensitive information, including information about licensing negotiations.

143.    The Music Publishers have also exchanged sensitive pricing information through most-favored nation ("MFN") clauses.

144.    MFN clauses, by design, ensure that no later licensor will receive better economic terms than a licensor with an MFN clause. For instance, if Music Publisher A has such an MFN clause with a licensee and that licensee then negotiates a license with Music Publisher B with higher licensing fees than Music Publisher A had secured (for example, because Music Publisher B offers a higher-quality music catalog), the licensee will have to "true up" its licensing arrangement with Music Publisher A to match the fee given to Music Publisher B. These MFNs thus artificially raise prices for licenses and ensure that Music Publishers enjoy identical economic benefits.

145.    The MFNs used by Music Publishers also facilitate an exchange of pricing information that fosters Music Publishers' ability to set supracompetitive licensing fees.

### 4. *The Music Publishers' Conduct Makes No Economic Sense*

146.    Absent a common understanding, the Music Publishers would compete to secure musical composition licenses with X—by offering more favorable royalty rates or other terms or negotiating sooner and gaining a first-mover advantage.

147.    Despite NMPA's insistence that X obtain licenses from all its members, X is not interested in licensing musical compositions from every Music Publisher. Unlike music-streaming platforms, X does not need licenses to all or even most musical compositions to

provide a compelling experience for its users, and it is therefore unreasonable and uneconomical for X to pay all Music Publishers for licenses. Accordingly, in a competitive market, the Music Publishers would compete heavily to secure one of the limited licensing agreement slots, such as by offering competitive pricing or innovative licensing terms.

148.    This is not what happened. Despite their purported concerns about copyright infringement on X's platform and interest in licensing their catalogs, *none* of the Non-Majors engaged in license negotiations with X after NMPA's October 2021 email. And for their part, the Majors' conduct of being willing to engage with X for purposes of discussing settlement of the Tennessee lawsuit demonstrates that they would negotiate individually with X absent their participation in the conspiracy they joined in 2023.

149.    Moreover, Defendants' joint takedown scheme makes no economic sense if the Music Publishers were sincere about enforcing their rights.

150.    The Music Publishers are better resourced than NMPA to monitor for infringement and administer takedown notices. For instance, Warner Chappell's publishing business made $958 million in revenue and $139 million in operating profit in 2022, and yet is relying on NMPA and its paltry $68,000 information-technology budget to pursue its takedown-notice campaign against X.

151.    Sharing NMPA's resources to pursue takedowns makes economic sense only if the objective is not actually to enforce an individual Music Publisher's copyrights. Instead, such joint behavior through NMPA can make economic sense only if the objective is to facilitate coordination among competing Music Publishers and target X's most popular users so as to apply maximum pressure to X to negotiate with them collectively.

### 5. *Defendants' Scheme Inhibits Defections From The Conspiracy*

152.    Additionally, the takedown scheme discourages any Music Publisher to leave the

scheme and negotiate individually with X.

153.    The Music Publishers know which works from which Music Publishers are included in NMPA's weekly takedown notices.

154.    Any Music Publisher whose works stop appearing in the takedown notices will create immediate suspicion, including the possibility that the Music Publisher stopped sending takedowns as a prelude to an individualized negotiation for an X license.

155.    And in fact, no Music Publisher's works have stopped appearing in the takedown notices.

### 6. *The Music Publishers' Scheme Departs From Prior Practice*

156.    Before December 2021, X had *never* received joint DMCA takedown notices from any subset of the Music Publishers, let alone the majority of them. Instead, each Music Publisher sent takedown notices pertaining to its own copyrighted materials. These takedown notices were sporadic—for example, X received a takedown notice from Universal in May 2019 that identified 25 allegedly infringing posts and a notice from Warner Chappell around the same time that flagged only one allegedly infringing post.

157.    The takedown scheme carried out by NMPA on behalf of "all music publishers" was a departure from this prior practice that allowed the Music Publishers to increase the burden and impact of its notices on X and its top users. Any individual Music Publisher could not effectively target X and its top users because a particular X user may not have used music from that Music Publisher's catalog. The breadth of Music Publishers' combined catalogs allowed NMPA and the Music Publishers to target the X users who are the most popular and generate the most ad revenue for X. There were no changes to the types of content users post on X that would explain the change in behavior that occurred in December 2021. X's users were still sharing their thoughts through text, photos and videos, just as they had done before December 2021. The only

thing that changed was that NMPA and the Non-Majors (and eventually all Defendants) decided to enter into a conspiracy to force X to take industrywide licenses.

158.    Working together also allowed the Music Publishers to ensure that they could include thousands of purportedly infringing posts each week. Indeed, by pooling resources, the Music Publishers compiled a war chest of copyrighted music, enabling NMPA to identify thousands of allegedly infringing posts in any given week.

### 7.    *The Music Publishers Share A Common Motive*

159.    The Music Publishers share a common motive in refraining from dealing individually with X: because X was not interested in licensing from the entire industry, the Music Publishers' collusion ensured they could all obtain licenses, rather than a select few.

160.    Moreover, by refusing to deal individually, the Music Publishers would not risk undermining one another's licensing profits by competing against one another to offer the best terms, allowing them to enjoy supracompetitive prices for their licenses.

### D.    Defendants' Conspiracy Harms Competition And X

### 1.    *Relevant Markets*

161.    Licenses to copyrighted musical compositions are a relevant antitrust product market.

162.    Music publishers provide licenses to musical compositions (also called licenses to musical works or publishing rights). They earn revenue from developing the rights to pieces of music and licensing those rights for use. Universal, for example, describes music publishing as "signing, administering and acquiring rights to musical compositions and licensing them for use in different formats."

163.    Music publishers secure rights to music by entering into exclusive agreements with musicians and also by acquiring catalogs of music they can represent. In conjunction with

developing or acquiring music, music publishers secure and manage copyrights for the music in their catalogs. Once a music publisher has a catalog of copyrighted music, the music publisher actively manages the rights to that music, including through the sale of licenses. Music publishers generate revenue by pitching their song rights to potential customers who use musical compositions, and then granting customers licenses to use those compositions, for which customers pay fees.

164.    The Music Publishers recognize that there is a "licensing market" in which licensee-customers "pay fees for the use of musical compositions." So does NMPA, which calculates market shares based on music publishers' "music publishing revenue," which includes the "licensing revenue, derived from the distribution or other exploitation in the United States of America of all musical works owned, controlled, or administered" by music publishers. According to the Music Publishers, customers in the market for licenses to copyrighted musical compositions include digital platforms such as TikTok, Facebook, Instagram, YouTube, and Snap, all of which, like X, allow users to post or share user-generated content.

165.    Other industry sources likewise recognize that there is a product market for licenses to copyrighted musical compositions. For example, the U.S. Copyright Office has described a "music publishing market," in which music publishers license musical compositions and collect royalties for doing so. The U.S. Copyright Office identified Sony, Warner Chappell, Universal, Kobalt, and BMG as competitors in this market. *Music Business Worldwide*—a leading music-industry publication—has similarly described in its articles a "music publishing market" that includes Sony, Warner Chappell, Universal, Kobalt and BMG.

166.    Licenses to copyrighted musical compositions in the United States are not reasonably interchangeable with other sources of music, such as music that is in the public

domain, copyright-free music, or AI-generated music. Customers of licenses for copyrighted music are seeking popular music. One customer, for example, promoted its licensing agreement with Sony as providing its users with Sony's "massive catalog of current hits." Other platforms have issued press releases that promote their licenses with music publishers as providing their users access to the most popular and commercially successful musical compositions. This is because popular music drives more engagement than other types of music.

167.    Alternatives to licenses to copyrighted musical compositions do not offer access to "widely popular songs" that will create significant engagement with users and listeners and are not reasonable substitutes. None of these types of music provides customers access to the popular musical compositions that drive user engagement. All or nearly all of the *Billboard* Top 100 songs for each year since at least 2020 are licensable compositions.

168.    Licenses to sound recordings are a complement to, not a substitute for, licenses to copyrighted musical compositions. Sound-recording rights are the intellectual property rights to the fixed embodiment of sounds resulting from a particular recorded performance of a musical composition. Licenses to copyrighted musical compositions, on the other hand, offer the right to use a musical composition in any medium and without relation to how the original composition was performed.

169.    A license to a sound recording does not provide the licensee unencumbered rights to use that sound recording. If the licensee of the sound recording wants to play that sound recording publicly (e.g., on a digital radio station) or include the sound recording in a video, the licensee would need to license the rights to the musical composition *in addition to* licensing the sound recording. Licenses to the sound recording alone do not provide such rights and thus are not substitutes for customers of licenses to musical compositions. Use cases such as including a

particular song in a video require *both* a license for the sound-recording rights and a license for the musical composition. The two license types are therefore complementary, a fact acknowledged by the U.S. Copyright Board.

170.    Accordingly, a monopolist of licenses to copyrighted musical compositions could implement a small but significant increase in the price or decrease in the quality of such licenses. Customers would not switch to potential alternatives in a way that would discipline such an increase in price or decrease in quality. Defendants' behavior indicates the same—by banding together, they can force customers to take collective licenses at supracompetitive rates, as customers have no realistic alternatives to licenses to copyrighted musical compositions.

171.    The relevant geographic market is the United States. Customers of licenses to copyrighted musical compositions can seek such licenses from providers located in any U.S. state. Industry sources and market participants identify the United States as the relevant geographic market for licenses to copyrighted musical compositions. NMPA calculates market shares for licenses to copyrighted musical compositions based on U.S. revenues. There are language, economic, and regulatory differences for customers seeking to obtain licenses to copyrighted music from non-U.S. music publishers.

172.    In the alternative, the relevant geographic market is worldwide.

### 2. *Defendants' Market Power And Monopoly Power*

173.    Defendants have collectively had monopoly power since at least 2019.

174.    Defendants account for the vast majority of revenues for licenses to copyrighted music. Industry sources estimate the combined market share of the Majors alone in a worldwide market for licenses to copyrighted musical compositions has exceeded 55% since 2019 and has exceeded 60% since 2022. The collective market share of the Majors, as well as the next largest Music Publishers (Kobalt and BMG) exceeds 70%.

175.    Defendants' market share in the United States is even higher. *Billboard*, a leading industry source, estimated the market share of just the Majors for the third quarter of 2024 to be nearly 70%.  The Majors and Defendants Kobalt, BMG, Reservoir, Concord, Big Machine, and Hipgnosis have a collective market share exceeding 90%.

176.    Mr. Israelite relied on *Billboard*'s market share estimates in a sworn statement submitted to the U.S. Copyright Office.

177.    There are significant barriers to entry and expansion in the market for licenses for copyrighted musical compositions. To successfully license rights to its catalog, a music publisher needs a breadth of works that customers want to license. The scale of the Majors (and, to some extent, the large Non-Majors like Kobalt and BMG) allows those Music Publishers to secure rights to works by up-and-coming performers and to promote those artists more broadly, creating more demand for their music catalogs. New entrants lack the resources to compete to sign new talented artists (and obtain the rights to their music) and face the threat of losing their talented artists to the Majors, which can offer much more lucrative deals.

### 3.    *Defendants' Conduct Has Caused Anticompetitive Effects*

178.    Defendants' conduct has harmed competition in the market for licenses to copyrighted musical compositions—and thus has also harmed consumers, who lose out on the competitive pricing and innovation that a competitive market fosters. In a competitive market, the Music Publishers would compete, not collude. Each Music Publisher would compete to offer X (and other customers) the best terms to secure a licensing agreement, because that would create a revenue stream for that Music Publisher. The Music Publishers would also be encouraged to innovate in order to make it more likely that X (and other customers) would license musical works from them. And each Music Publisher would be incentivized to secure a license before its competitors because X has a finite need for licenses.

179.    The Music Publishers that negotiated first could also potentially extract advantageous licensing terms—such as exclusive use of a particular Music Publisher's musical composition with certain X features—which would be unavailable for later-negotiated licenses. They also would not miss out on a license because X had agreements with a sufficient number of Music Publishers to cover its musical-composition-license needs.

180.    Rather than making individual decisions about licensing and competing on licensing terms, the Music Publishers agreed that they would not negotiate with X individually and would target X's most popular users. This harms competition. Moreover, to get the licenses to musical compositions they want, customers like X and others are forced to take licenses they do not want. Being forced to pay for unwanted licenses results in an effective increase in the price of licenses. Defendants' repetition of their anticompetitive conduct against some of the largest customers in the industry has caused a marketwide increase in prices for licenses and facilitated the Music Publishers' ability to charge supracompetitive fees. Defendants' scheme has also reduced output, as some customers who want to license works from some, but not all, Music Publishers end up taking no licenses.

181.    Defendants have previously employed their collective monopoly power to extract supracompetitive prices from their customers. In August 2022, NMPA touted on Instagram that it had agreed with digital platforms (including Amazon, Google, and Apple) to "the highest royalty rate in the history of streaming anywhere in the world." Purchasers of licenses for copyrighted musical compositions had to pay the highest *prices* "in the history of streaming"—a 43.8% price increase. Defendants' collective ability to extract a 43.8% increase in fees from Amazon, Google, and Apple is direct evidence of Defendants' collective market and monopoly power.

182.    There are no procompetitive benefits that offset the harm of Defendants'

collusion. The Music Publishers can effectively negotiate licenses and send takedown notices

without cooperating with their competitors. And NMPA, on behalf of its members, has argued to

the U.S. Department of Justice Antitrust Division that "[e]ven small publishers, with adequate

technology, can efficiently engage in direct licensing" with potential customers. Far from serving

a procompetitive purpose, the conspiracy perpetrated by NMPA on behalf of all the Music

Publishers is designed to force X to license musical compositions, at supracompetitive prices.

### 4.  *Defendants' Conduct Has Injured X And The Public*

183.    Defendants' anticompetitive conduct has harmed competition for licenses to

copyrighted musical compositions, which has harmed X.

184.    Defendants' refusal to negotiate individually and the supracompetitive

prices achieved through their collusive conduct have prevented X from taking licenses at

competitive rates.

185.    According to Mr. Israelite, X is the "only major social media company that has

not licensed" music from Defendants. In a but-for world where Defendants compete instead of

collude (and thus do not exercise monopoly power), X would have the option to take licenses

from individual music publishers and at more competitive prices. In turn, those more competitive

rates and terms would provide value to X and its users. These benefits do not exist in the

actual world.

186.    Defendants carried out their conspiracy by aiming to harm X's most popular users

and consequently caused a decline in value for X's platform.

187.    The Majors' catalogs cover publishing rights for most of today's popular music.

Their entry into the conspiracy substantially amplified Defendants' ability to target X's most

popular users, causing a decline in posts and in the value of X's user base.

188.    Because X fully complies with the requirements of the DMCA by expeditiously removing complained-of content when it receives a DMCA notice and suspending users who repeatedly receive copyright-infringement notices, the loss of content and users from X caused X to lose advertising revenue. Advertisers buy ads on digital platforms to show ads to the users they are targeting. Platforms that lose users have reduced appeal to advertisers, as advertisers can no longer reach the users they are trying to target. As X lost users, it became less attractive to advertisers who reduced their advertising spend on X.

189.    By burying X in takedown notices, Defendants hurt X's response time to requests from other copyright holders. This was particularly true during peak moments on X, such as during the Olympics and national elections.

190.    Accordingly, and as it was designed to do, Defendants' conspiracy harmed X's ad revenue, which, in turn, harms X's ability to innovate on its platform.

191.    In contrast to X's significant decline in ad revenue, the Majors saw tremendous increases in revenue and profitability since the conspiracy began. Sony's 2023 operating income for its "Music segment" increased approximately 25%, with its music publishing business's revenue increasing 38%; Warner Chappell's 2023 operating income for its publishing business increased 44%, to $200 million; and Universal's 2024 adjusted EBITDA for its publishing business increased 14.6%, to over $500 million.

192.    Defendants' anticompetitive conduct has also harmed X's users and thus the public at large by chilling content posted on X. Users rely on the platform to follow and stay informed about musicians as well as engage with the broader music community, such as through trends like #NewMusicFriday, posts reacting to a new album, or conversations with fellow fans speculating when a single will drop or which cities will be included in an upcoming tour. As X is

forced to remove music-related content, even in instances of incidental or fair use, these important music communities are harmed, and X's users lose out on a valuable part of their experience on the platform.

193.    In turn, musicians are harmed as their own musical content is removed from the platform or discouraged due to Defendants' scheme, and as the X music communities are harmed, leading them to miss out on opportunities to use X to build an audience and launch their career. Websites such as ArtistRack and iMusician advise musicians on how to use X to build their fanbases and interact with fans—particularly important points for smaller acts looking to gain exposure. The more artists fear using X, the more difficult it is for them to cultivate and grow their audience. Musicians and songwriters have thus urged NMPA not to take a "sledgehammer approach" in its takedown actions and cause harm to the musicians themselves, and have criticized NMPA for "play[ing] only on the publishers' team."

194.    Users that post on X also now have to fear that if they become popular enough, they will be targeted by the largest names in music. This leads to less content being posted, which not only hurts X as a platform, but also hurts users of X who visit the platform to be exposed to different types of opinions, different forms of self-expression, and different ways to connect with other users.

## CAUSES OF ACTION

### First Claim For Relief: Unlawful Agreement In Violation of Section 1 Of the Sherman Act 15 U.S.C. § 1
### (Against All Defendants)

195.    X incorporates the allegations of paragraphs 1 through 194 above.

196.    Defendants, by and through their officers, directors, employees, or other representatives, entered into an unlawful conspiracy with each other in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

197.    The Music Publishers, coordinated through NMPA, conspired to leverage their combined market power and coerce X into taking licenses to musical works from the industry as a whole, denying X the benefit of competition between music publishers. Defendants acted upon this conspiracy by, among other things, coordinating and sending baseless takedown notices to X.

198.    Defendants' conspiracy to refuse to deal individually with X constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Their anticompetitive agreement has no purpose other than to reduce competition between music publishers and, as a result, use their collective market power against X.

199.    Additionally, Defendants' conspiracy has caused substantial harm to competition in a relevant market, outweighing any potential procompetitive benefits. X's injury flows from that harm to competition.

200.    Licenses for copyrighted musical compositions in the United States, or alternatively worldwide, is a relevant antitrust market. The Music Publishers collectively have market power and monopoly power in that market.

201.    Defendants' conspiracy caused significant anticompetitive effects in the market for licenses to copyrighted musical compositions. Defendants' conspiracy has reduced competition between music publishers, causing harm to customers through supracompetitive prices, reduced output, and reduced innovation.

202.    Defendants' conduct lacks any procompetitive justification that offsets the harm of their conspiracy.

203.    X has been injured, and continues to be injured, as a proximate cause of Defendants' conspiracy. It has been damaged by a loss in the value of its user base as well as a

loss in advertising revenue. It has also been unable to secure a license from Defendants on competitive terms.

***Second Claim For Relief: Unlawful Conspiracy To Monopolize the Market for Licenses To Copyrighted Musical Compositions, In Violation of Section 2 Of The Sherman Act 15 U.S.C. § 2 (Against All Defendants)***

204.    Plaintiff X incorporates the allegations of paragraphs 1 through 203 above.

205.    Licenses for copyrighted musical compositions in the United States, or alternatively worldwide, is a relevant antitrust market. The Music Publishers collectively have monopoly power in that market.

206.    Defendants, by and through their officers, directors, employees, or other representatives, have conspired to leverage their combined monopoly power to coerce X into taking licenses to musical works from the industry as a whole, denying X the benefit of competition between music publishers. Defendants acted upon this conspiracy by, among other things, coordinating and sending baseless takedown notices to X.

207.    Defendants' intent in engaging in the conspiracy was to monopolize the market for licenses to copyrighted musical compositions in the United States. The Music Publishers account for over 90% of that market. Their anticompetitive agreement has no purpose other than to reduce competition between music publishers and, as a result, use their collective monopoly power against X.

208.    Defendants' conspiracy caused significant anticompetitive effects in the market for licenses to copyrighted musical compositions. Defendants' conspiracy has reduced competition between music publishers, causing harm to customers through supracompetitive prices, reduced output, and reduced innovation.

209.    Defendants' conduct lacks any procompetitive justification that offsets the harm

of their conspiracy.

210.    X has been injured, and continues to be injured, as a proximate cause of

Defendants' conspiracy to monopolize. It has been damaged by a loss in the value of its user

base as well as a loss in advertising revenue. It has also been unable to secure a license from

Defendants on competitive terms.

***Third Claim For Relief: Monopolization Of The Market For Licenses To Copyrighted Musical
Compositions, In Violation of Section 2 Of the Sherman Act
15 U.S.C. § 2
(Against All Defendants)***

211.    Plaintiff X incorporates the allegations of paragraphs 1 through 210 above.

212.    Licenses for copyrighted musical compositions in the United States, or

alternatively worldwide, is a relevant antitrust market. The Music Publishers jointly possess

monopoly power in that market.

213.    The Music Publishers have willfully maintained their monopoly power through

anticompetitive behavior, including efforts to coerce X into taking licenses to musical works

from the industry as a whole, denying X the benefit of competition between music publishers and

causing harm through supracompetitive prices, reduced output, and reduced innovation.

214.    The Music Publishers' conduct lacks any procompetitive justification that offsets

the harm of its conduct.

215.    X has been injured, and continues to be injured, as a proximate cause of the Music

Publishers' monopolization. It has been damaged by a loss in the value of its user base as well as

a loss in advertising revenue. It has also been unable to secure a license from the Music

Publishers on competitive terms.

***Fourth Claim For Relief: Attempted Monopolization Of the Market For Licenses To Copyrighted Musical Compositions, In Violation of Section 2 Of The Sherman Act 15 U.S.C. § 2
(Against All Defendants)***

216.    Plaintiff X incorporates the allegations of paragraphs 1 through 215 above.

217.    Licenses for copyrighted musical compositions in the United States, or alternatively worldwide, is a relevant antitrust market. The Music Publishers jointly possess monopoly power in that market. Alternatively, even if the Music Publishers lack monopoly power in the market for licenses, the Music Publishers collectively have substantial power in that market and have a dangerous probability of monopolizing that market.

218.    The Music Publishers, coordinated through NMPA, have attempted to leverage their combined market power to coerce X into taking licenses to musical works from the industry as a whole, denying X the benefit of competition between music publishers.

219.    The Music Publishers had the intent to monopolize the market for licenses to copyrighted musical compositions in the United States. The Music Publishers account for over 90% of that market, and NMPA held itself out as the representative of the Music Publishers in sending takedown notices on their behalf and seeking to open licensing negotiations.

220.    The Music Publishers' conduct caused significant anticompetitive effects in the market for licenses to copyrighted musical compositions, causing harm through supracompetitive prices, reduced output, and reduced innovation.

221.    The Music Publishers' conduct lacks any procompetitive justification that offsets the harm of its conduct.

222.     X has been injured, and continues to be injured, as a proximate cause of the Music Publishers' attempt to monopolize. It has been damaged by a loss in the value of its user base as well as a loss in advertising revenue. It has also been unable to secure a license from the Music Publishers on competitive terms.

### Fifth Claim For Relief: Civil Conspiracy
### (Against All Defendants)

223.     Plaintiff X incorporates the allegations of paragraphs 1 through 222 above.

224.     Defendants, by and through their officers, directors, employees, or other representatives, conspired to force X to take licenses to musical works from the industry as a whole, denying X the benefit of competition between music publishers, and forcing X to pay supracompetitive rates.

225.     Defendants acted upon this conspiracy, in violation of the antitrust laws, by (i) threatening X with a takedown campaign if it did not take industrywide licenses; (ii) sending voluminous, weekly takedown notices to X designed to force X into taking industrywide license at supracompetitive rates; and (iii) refusing to negotiate for individual licenses with X.

226.     Defendants' conspiracy has resulted in ongoing injury to X, which has been damaged by a loss in the value of its user base as well as a loss in advertising revenue. X has also been unable to secure a license from Defendants on competitive terms.

### Sixth Claim For Relief: Unfair Competition
### (Against All Defendants)

227.     Plaintiff X incorporates the allegations of paragraphs 1 through 226 above.

228.     Defendants, through their conspiracy, have committed one or more illegal acts, including violations of antitrust law.

229.    Defendants' conspiracy is contrary to honest practice in commercial matters and has interfered with X's ability to conduct its business, including X's ability to attract and retain users and advertisers.

230.    Defendants' wrongful conduct has caused and will continue to cause X significant commercial harm.

### Seventh Claim For Relief: Violations Of Texas Free Enterprise & Antitrust Act (Against All Defendants)

231.    Plaintiff X incorporates the allegations of paragraphs 1 through 230 above.

232.    Defendants' conduct violates Texas Business and Commerce Code § 15.01 *et seq*, including § 15.05(a), because Defendants have engaged in a contract, combination, or conspiracy in restraint of trade.

233.    Defendants wrongful conduct has caused and will continue to cause X significant commercial harm.

### Eighth Claim For Relief: Violations Of Texas Free Enterprise & Antitrust Act (Against Music Publishers)

234.    Plaintiff X incorporates the allegations of paragraphs 1 through 233 above.

235.    Defendants' aforementioned conduct violates Texas Business and Commerce Code § 15.01 et seq, including § 15.05(b), because Music Publishers have monopolized, attempted to monopolize, and/or conspired to monopolize the relevant markets.

236.    Defendants wrongful conduct has caused and will continue to cause X significant commercial harm.

237.    Defendants' conduct has been willful. Music Publishers, using NMPA, have joined together to exercise their collective monopoly power to harm competition and customers. Their targeting of X with takedowns to force industrywide licenses reflects anticompetitive intent.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff X prays that the Court grant the following relief:

a.    A permanent injunction enjoining Defendants from repetition of acts similar to the wrongful acts described above;

b.    A money judgment against Defendants for that amount of ordinary damages, trebled damages, punitive damages, and/or restitution, in an amount to be determined at trial;

c.    Pre- and post-judgment interest;

d.    Costs of the suit, including reasonable attorneys' fees and expenses; and

e.    Such other relief as the Court deems equitable and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff X hereby demands a trial by jury.

Dated:   January 9, 2026

Respectfully submitted,

/s/ Alex More
Alex More
TX Bar No. 24065789
Monica E. Gaudioso
TX Bar No. 24084570
CARRINGTON, COLEMAN, SLOMAN &
BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, TX 75202
T: (214) 855-3000
amore@ccsb.com
mgaudioso@ccsb.com

Bradley Justus*
DC Bar No. 1007988
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
T: 202-912-4700
bjustus@axinn.com

*application for admission pending

Craig M. Reiser*
NY State Bar No. 4886735
Scott A. Eisman*
NY State Bar No. 4905287
Christopher Erickson*
NY State Bar No. 5800628
Isabella Schwarze*
NY State Bar No. 6224331
AXINN, VELTROP & HARKRIDER LLP
630 Fifth Avenue, 33rd Floor
New York, NY 10111
T: (212) 728-2200
creiser@axinn.com
seisman@axinn.com
cerickson@axinn.com
ischwarze@axinn.com

*Attorneys For Plaintiff X Corp.*