**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

|  |  |
|---|---|
| X CORP.,<br><br>    *Plaintiff*,<br><br>    v.<br><br>NATIONAL MUSIC PUBLISHERS'<br>ASSOCIATION, INC., *et al.*,<br><br>    *Defendants*. | Case No. 3:26-cv-00047-B |

**DEFENDANTS' MEMORANDUM
<u>IN SUPPORT OF THEIR MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................... 1

II.   BACKGROUND ................................................................................................ 4

III.  LEGAL STANDARD ........................................................................................ 8

IV.   ARGUMENT ..................................................................................................... 9

      A.    X Has Not Suffered Antitrust Injury ......................................................... 9

      B.    X Does Not Plausibly Plead a "Group Boycott" or Agreement Not to
            Negotiate. ............................................................................................... 12

            1.    X Engages in Impermissible Group Pleading. .............................. 13

            2.    X Fails to Allege a Refusal to Deal. ............................................. 14

            3.    X Fails to Allege an Agreement. ................................................... 16

                  a.    X Fails to Plead Direct Evidence of a Conspiracy. ....................... 17

                  b.    X Fails to Plead Parallel Conduct and Factual
                        Enhancements. ................................................................. 18

                  c.    X's Allegations as to the Majors Doom Its Claims Against
                        Them. ................................................................................ 24

                  d.    X's Claims Against the Non-Majors Similarly Fail. ..................... 26

            4.    Legitimate Copyright Enforcement Activity Cannot Support X's
                  Conspiracy Claim. ....................................................................... 26

                  a.    DMCA Copyright Enforcement Activity Is Protected by the
                        Noerr-Pennington Doctrine. .............................................. 27

                  b.    X Does Not and Cannot Allege that Defendants' DMCA
                        Notices Were a Sham. ....................................................... 29

      C.    X Does Not State a Per Se Claim. ............................................................ 32

      D.    X Fails to State a Section 2 Monopolization Claim. ................................. 34

            1.    X Does Not Allege Exclusionary Conduct. .................................. 35

            2.    X's Monopolization and Attempted Monopolization Claims Fail
                  Because X Does Not Allege Individual Monopoly Power. ........... 37

i

3.     X's Conspiracy to Monopolize and Attempted Monopolization Claims Fail Because X Does Not Allege Specific Intent to Monopolize. ................................................................38

4.     X's Conspiracy to Monopolize Claim Fails for Want of Conspiracy. ................................................................38

E.     X's State Law Claims Fail for the Same Reasons as Its Federal Antitrust Claims. ................................................................39

1.     Texas Free Enterprise & Antitrust Act .......................................................39

2.     Civil Conspiracy ......................................................................................39

3.     Unfair Competition ..................................................................................40

V.     CONCLUSION ......................................................................................... 41

# TABLE OF AUTHORITIES[*]

**Page(s)**

**CASES**

*Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n,*
  776 F.3d 321 (5th Cir. 2015) ...................................................................................39, 40

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.,*
  300 F.3d 620 (5th Cir. 2002) ...................................................................................16, 39

*Arista Recs. LLC v. Lime Grp. LLC,*
  532 F. Supp. 2d 556 (S.D.N.Y. 2007)..............................................................................33

*ASAP Paging Inc. v. CenturyTel of San Marcos Inc.,*
  137 F. App'x 694 (5th Cir. 2005) ....................................................................................37

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)........................................................................................................8, 19

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
  472 U.S. 585 (1985)..............................................................................................................36

*Austin Legal Video, LLC v. Deposition Sols., LLC,*
  2024 WL 5184485 (W.D. Tex. 2024)..............................................................................14

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.,*
  2016 WL 3880989 (N.D. Cal. 2016) ...............................................................................33

*Baylor Scott & White v. Project Rose MSO, LLC,*
  633 S.W.3d 263 (Tex. App.—Tyler 2021, pet. denied)............................................40

*Bayou Fleet, Inc. v. Alexander,*
  234 F.3d 852 (5th Cir. 2000) .............................................................................29, 30, 32

*Bayou Fleet, Inc. v. Alexander,*
  26 F. Supp. 2d 894 (E.D. La. 1998)................................................................................32

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)............................................................................................... *passim*

*Bourbon, Inc. v. Willie's Chicken Shack, LLC,*
  2020 WL 587886 (E.D. La. 2020) ...................................................................................30

---

[*] Unless otherwise noted, all emphasis added, capitalizations conformed without brackets, and internal citations and quotation marks omitted.

iii

*Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*,
748 F.3d 631 (5th Cir. 2014) ................................................................................2

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*,
49 F.4th 520 (5th Cir. 2022) ...............................................................................16

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*,
563 F. Supp. 3d 578 (W.D. La. 2021)............................................................19, 26

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)..............................................................................................9

*Cal. Motor Transport Co. v. Trucking Unlimited*,
404 U.S. 508 (1972)............................................................................................29

*Caller–Times Pub. Co., Inc. v. Triad Commc'ns, Inc.*,
826 S.W.2d 576 (Tex. 1992)...............................................................................39

*Cedra Pharmacy Houston, LLC v. UnitedHealth Grp., Inc.*,
2019 WL 1433600 (S.D. Tex. 2019) ...................................................................41

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
168 F.3d 119 (3d Cir. 1999)................................................................................31

*City of Columbia v. Omni Outdoor Advert., Inc.*,
499 U.S. 365 (1991).............................................................................................29

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*,
92 F.4th 381 (2d Cir. 2024) ................................................................................22

*Cliff Food Stores, Inc. v. Kroger, Inc.*,
417 F.2d 203 (5th Cir. 1969) ..............................................................................37

*Coastal States Mktg., Inc. v. Hunt*,
694 F.2d 1358 (5th Cir. 1983) ......................................................................27, 28

*Coleman v. ESPN, Inc.*,
764 F. Supp. 290 (S.D.N.Y. 1991) ......................................................................31

*Concord Music Grp., Inc. v. X Corp.*,
No. 23-cv-00606 (M.D. Tenn. June 14, 2023)...................................................4, 7

*Consol. Metal Prods., Inc. v. Am. Petroleum Institute*,
846 F.2d 284 (5th Cir. 1988) ..............................................................................34

*Corr Wireless Commc'ns, L.L.C. v. AT & T, Inc.*,
893 F. Supp. 2d 789 (N.D. Miss. 2012)..............................................................17

ii

*CSMN Invs., LLC v. Cordillera Metro. Dist.*,
  956 F.3d 1276 (10th Cir. 2020) ..................................................................................31

*CVB, Inc. v. Corsicana Mattress Co.*,
  604 F. Supp. 3d 1264 (D. Utah 2022)..........................................................................31

*Dealer Comput. Servs. v. Ford Motor Co.*,
  2006 WL 801033 (S.D. Tex. 2006) ..............................................................................36

*DeSantis v. Wackenhut Corp.*,
  793 S.W.2d 670 (Tex. 1990)........................................................................................39

*Dexon Computer, Inc. v. Cisco Sys., Inc.*,
  2023 WL 2941414 (E.D. Tex. 2023) ............................................................................38

*Downtown Music Publ'g LLC v. Peloton Interactive, Inc.*,
  436 F. Supp. 3d 754 (S.D.N.Y. 2020)..........................................................................23

*Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961)......................................................................................................27

*Enttech Media Grp. LLC v. Okularity, Inc.*,
  2020 WL 6888722 (C.D. Cal. 2020).............................................................................27

*EuroTec Vertical Flight Sols., LLC v. Safran Helicopter Engines S.A.S.*,
  2019 WL 3503240 (N.D. Tex. 2019).............................................................................40

*FTC v. Indiana Fed'n of Dentists*,
  476 U.S. 447 (1986)......................................................................................................33

*Ginzburg v. Mem'l Healthcare Sys., Inc.*,
  993 F. Supp. 998 (S.D. Tex. 1997)...............................................................................33

*Greater Guide, Inc. v. SAPS LLC*,
  2025 WL 3039228 (E.D. La. 2025) ..............................................................................30

*Hard 2 Find Accessories, Inc. v. Amazon.com, Inc.*,
  2014 WL 6452173 (W.D. Wash. 2014).........................................................................27

*Dr.'s Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
  123 F.3d 301 (5th Cir. 1997) .........................................................................................9

*Dr.'s Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
  897 F. Supp. 290 (E.D. La. 1995)...........................................................................11, 12

*Houston Mercantile Exch. Corp. v. Dailey Petroleum Servs. Corp.*,
  1993 WL 322901 (Tex. App.—Houston [14th Dist.] 1993, no pet.)...............................41

iii

*Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*,
602 F.3d 237 (3d Cir. 2010).................................................................................38

*In re Adderall XR Antitrust Litig.*,
754 F.3d 128 (2d Cir. 2014)................................................................................36

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999)................................................................................17

*In re Canadian Imp. Antitrust Litig.*,
470 F.3d 785 (8th Cir. 2006) ..............................................................................11

*In re Citric Acid Litig.*,
191 F.3d 1090 (9th Cir. 1999) ............................................................................16

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*,
28 F.4th 42 (9th Cir. 2022) ................................................................................21

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007)..................................................................................36

*In re Katrina Canal Breaches Litig.*,
495 F.3d 191 (5th Cir. 2007) ................................................................................8

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ............................................................................18

*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*,
997 F. Supp. 2d 526 (N.D. Tex. 2014) (Boyle, J.)....................................... *passim*

*In re Travel Agent Comm'n Antitrust Litig.*,
583 F.3d 896 (6th Cir. 2009) ..............................................................................20

*Indivior Inc. v. Alvogen Pine Brook LLC*,
681 F. Supp. 3d 275 (D.N.J. 2023) .....................................................................30

*Jebaco Inc. v. Harrah's Operating Co., Inc.*,
587 F.3d 314 (5th Cir. 2009) ................................................................................9

*JSW Steel (USA) Inc. v. Nucor Corp.*,
2025 WL 832801 (5th Cir. 2025) ...............................................................11, 13, 19

*JSW Steel (USA) Inc. v. Nucor Corp.*,
586 F. Supp. 3d 585 (S.D. Tex. 2022) ........................................................ *passim*

*Kelsey K. v. NFL Enters., LLC*,
254 F. Supp. 3d 1140 (N.D. Cal. 2017) ..............................................................20

*Lamar Cnty. Elec. Co-op. Ass'n v. Rayburn Country Elec. Co-op., Inc.*,
  330 F. Supp. 2d 763 (E.D. La. 2002) ...................................................................30

*Loren Data Corp. v. GXS, Inc.*,
  501 F. App'x 275 (4th Cir. 2012) ........................................................................36

*Love Terminal Partners, L.P. v. City of Dallas, Tex.*,
  527 F. Supp. 2d 538 (N.D. Tex. 2007) .................................................................32

*Marucci Sports, LLC v. Nat'l Collegiate Athletic Ass'n*,
  751 F.3d 368 (5th Cir. 2014) ....................................................................11, 16, 33

*Mayor and City Council of Baltimore v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013).................................................................................12

*Meadows v. Hartford Life Ins. Co.*,
  492 F.3d 634 (5th Cir. 2007) ...............................................................................40

*Mercer Publ'g, Inc. v. Smart Cookie Ink, LLC*,
  2012 WL 12863934 (W.D. Wash. 2012)...............................................................28

*Meyer v. Macmillan Pub. Co.*,
  526 F. Supp. 213 (S.D.N.Y. 1981) .......................................................................18

*Mid Texas Commc'ns Sys., Inc. v. Am. Tel. & Tel. Co.*,
  615 F.2d 1372 (5th Cir. 1980) .............................................................................35

*MM Steel, L.P. v. JSW Steel (USA) Inc.*,
  806 F.3d 835 (5th Cir. 2015) ..........................................................................33, 34

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984)..............................................................................................13

*Morris Commc'ns Corp. v. PGA Tour, Inc.*,
  364 F.3d 1288 (11th Cir. 2004) ...........................................................................36

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
  883 F.3d 32 (2d Cir. 2018)...................................................................................18

*N. Miss. Commc'ns v. Jones*,
  792 F.2d 1330 (5th Cir. 1986) .............................................................................35

*New York Mercantile Exch., Inc. v. Intercontinental Exch., Inc. ("NYMEX")*,
  323 F. Supp. 2d 559 (S.D.N.Y. 2004)...................................................................36

*Novell v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) (Gorsuch, J.).......................................................36

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
    472 U.S. 284 (1985)...................................................................................................33, 34

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018).........................................................................................................33

*Olympia Equip. Leasing Co. v. Western Union Tel. Co.*,
    797 F.2d 370 (7th Cir. 1986) (Posner, J.) ......................................................................36

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
    555 U.S. 438 (2009).........................................................................................................35

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
    310 F. Supp. 3d 1002 (E.D. Mo. 2018)...........................................................................21

*Philadelphia Taxi Ass'n, Inc v. Uber Techs., Inc.*,
    886 F.3d 332 (3d Cir. 2018).............................................................................................38

*Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*,
    642 F. App'x 665 (9th Cir. 2016) ....................................................................................39

*Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*,
    2013 WL 3873074 (S.D. Cal. 2013).................................................................................39

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc. ("PRE")*,
    508 U.S. 49 (1993).......................................................................................27, 29, 30, 31

*Reliable Ambulance Serv., Inc. v. Mercy Hosp. of Laredo*,
    2003 WL 21972724 (Tex. App. San Antonio. 2003, pet. denied) (Mem. Op.).................41

*Rossi v. Motion Picture Ass'n of Am. Inc.*,
    391 F.3d 1000 (9th Cir. 2004) .........................................................................................32

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*,
    391 F. App'x 59 (2d Cir. 2010) .......................................................................................36

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*,
    661 F. Supp. 2d 218 (E.D.N.Y. 2009) .............................................................................36

*Seidenstein v. Nat'l Med. Enters., Inc.*,
    769 F.2d 1100 (5th Cir. 1985) .........................................................................................37

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*,
    33 F. Supp. 3d 14 (D.D.C. 2014).....................................................................................21

*Skidmore Energy, Inc. v. KPMG LLP*,
    2004 WL 3019097 (N.D. Tex. 2004)................................................................................14

*Southway Theatres, Inc. v. Georgia Theatre Co.*,
   672 F.2d 485 (5th Cir. 1982) ........................................................................19, 25

*Spectators' Commc'n Network Inc. v. Colonial Country Club*,
   253 F.3d 215 (5th Cir. 2001) ..............................................................................12

*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447 (1993)......................................................................................35, 37

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
   782 F. Supp. 2d 1059 (E.D. Cal. 2011)...............................................................38

*Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., Inc.*,
   200 F.3d 307 (5th Cir. 2000) ..............................................................................37

*Taylor Publ'g Co. v. Jostens Inc.*,
   216 F.3d 465 (5th Cir. 2000) ........................................................................35, 40

*Taylor v. Christus St. Joseph Health Sys.*,
   2006 WL 1582097 (E.D. Tex. 2006) ...................................................................11

*Thimes Sols., Inc. v. TP Link USA Corp.*,
   2022 WL 1125628 (9th Cir. 2022) ......................................................................28

*Times–Picayune Pub. Co. v. United States*,
   345 U.S. 594 (1953)............................................................................................38

*Tricon Precast, Ltd. v. Easi Set Indus., Inc.*,
   395 F. Supp. 3d 871 (S.D. Tex. 2019) ................................................................32

*Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*,
   496 F.3d 403 (5th Cir. 2007) ..............................................................................34

*Ultraclear Epoxy, LLC v. Epodex USA Corp.*,
   2024 WL 966876 (M.D. Tenn. 2024)..................................................................28

*United States v. Am. Airlines, Inc.*,
   743 F.2d 1114 (5th Cir. 1984) ............................................................................37

*United States v. Broad. Music, Inc.*,
   720 F. App'x 14 (2d Cir. 2017) ............................................................................5

*United States v. Colgate & Co.*,
   250 U.S. 300 (1919)............................................................................................13

*Veritext Corp. v. Bonin*,
   417 F. Supp. 3d 778 (E.D. La. 2019)..................................................................27

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)........................................................................................................13, 35

*Whirlpool Corp. v. Shenzhen Sanlida Electrical Tech. Co.*,
    2024 WL 1298357 (E.D. Tex. 2024) ........................................................................41

*Wickfire, LLC v. Trimax Media, Inc.*,
    2016 WL 4119917 (W.D. Tex. 2016).......................................................................41

*Wiltfong v. Cal. State Bd. of Accountancy*,
    2018 WL 935398 (W.D. Tex. 2018).....................................................................14, 21

*Workers of Am. v. Pennington*,
    381 U.S. 657 (1965)....................................................................................................27

*X Corp. v. World Fed'n of Advertisers*,
    2026 WL 833900 (N.D. Tex. 2026) (Boyle, J.).................................................. passim

*Yoder Bros. v. California-Fla. Plant Corp.*,
    537 F.2d 1347 (5th Cir. 1976) ..................................................................................38

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Article 1, § 8, cl. 8 ...............................................................................................19

**STATUTES**

15 U.S.C. § 1 (Sherman Act) ........................................................................................12, 16, 39

15 U.S.C. § 2 (Sherman Act) ....................................................................................4, 9, 35, 39, 41

17 U.S.C. § 512 (Digital Millennium Copyright Act) ............................................................ *passim*

Tex. Bus & Comm. Code § 15.04...............................................................................................39

**RULES**

Fed. R. Civ. P. 8 ........................................................................................................................8

Fed. R. Civ. P. 12 ......................................................................................................................8

## I.    INTRODUCTION

X's Complaint is notable in what it does not allege.  X purports to bring antitrust claims resulting from a concerted refusal to deal, alleging the Defendant Music Publishers refused to engage in individual discussions with X to license the Music Publishers' copyrighted music.  Yet, as in another case this Court recently dismissed with prejudice, X fails to allege antitrust injury.  *X Corp. v. World Fed'n of Advertisers*, 2026 WL 833900, at *24 (N.D. Tex. 2026) (Boyle, J.) ("*WFA*").  Specifically, X does not allege that any participant in the alleged conspiracy is its competitor, a necessary requirement for antitrust injury to flow from an alleged refusal to deal.  *Id.* at *25 ("If the claim does not directly or indirectly involve the plaintiff's competitor, it does not state an antitrust injury.").  This failure alone is fatal.

But X's pleading failures permeate every facet of the Complaint.  X does not identify any request it made to negotiate that was refused, let alone an agreement to refuse such requests.  The Complaint barely even mentions most individual Defendants by name.  X also says the alleged conspiracy was effectuated through Digital Millennium Copyright Act ("DMCA") notices and copyright litigation, but fails to allege any facts that would transform routine, legitimate copyright enforcement into an antitrust conspiracy.  Finally, X purports to bring a refusal to deal monopolization claim, but fails to allege essential elements of such a claim: a prior voluntary course of profitable dealing or that any Music Publisher possesses monopoly power.

The paucity of factual allegations supporting an antitrust claim is no accident.  X's motivation in filing suit was different: retaliation and leverage for the copyright suit the Music Publishers filed against it, which is currently pending in Tennessee federal court.  The Complaint should be dismissed.

*X Fails to Allege Antitrust Injury.*  In *WFA*, this Court dismissed with prejudice X's lawsuit attempting to transform various advertisers' purported refusal to deal into an antitrust

1

claim.  The same result holds here.  As this Court noted, "[a]ntitrust injury … is a useful filter at an early stage of litigation for weeding out faux antitrust lawsuits."  *WFA*, 2026 WL 833900, at *24.  X's claims here are certainly faux.  It does not allege that any participant in the alleged conspiracy is its competitor, a necessary requirement for antitrust injury to flow from an alleged refusal to deal.  *Id.* at *25 ("If the claim does not directly or indirectly involve the plaintiff's competitor, it does not state an antitrust injury.").

***X Fails to Allege Conspiracy.***  X concocts its conspiracy theory, not from any actual agreement between the Music Publishers or even evidence suggestive of one, but from a single word in a single pre-litigation email sent by the National Music Publishers' Association ("NMPA") to X in October 2021.  NMPA's President notified X that NMPA was preparing DMCA notices but expressed that his "preference is not to go down that road, but instead to develop a partnership."  He concluded, "If you are interested in engaging in such a conversation, please let me know.  If you choose not to do so, then please know ***we*** are open to starting a conversation at any point during the future process."  App. 007-008.[2]  From the penumbras of that one word—"we"—X would conjure conspiracy.  X argues that by using the word "we," NMPA meant that X could only deal with the Music Publishers collectively for a license and that no individual Music Publisher would negotiate separately.  That inference is not only implausible, it is completely devoid of factual basis or allegation.  An antitrust claim cannot rest on such a tenuous thread.

X instead turns to impermissible group pleading and vacuous allegations of trade association activity, motive, and economic interest, none of which can withstand *Twombly*.  The

---

[2] X's Complaint selectively crops, paraphrases, and misconstrues the email.  The full email chain is attached as Exhibit A.  The Court may consider documents that "are referred to in the pleadings and are central to a plaintiff's claims."  *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014).

Complaint cites no communication in which any Music Publisher agreed with any other to refuse to negotiate with X.  It pleads the opposite: specific, ongoing, unilateral outreach, by at least Warner Chappell Music, Inc. ("Warner") and others, to engage with X in licensing discussions that X declined to pursue, Cmplt. ¶ 108, and willingness by others, including Sony and Universal,[3] to reach individual licensing deals with X.  *See id.* ¶¶ 11, 104-10.  Nor does X identify any demand for a forced "industrywide license," or an instance in which any Music Publisher refused to negotiate individually when asked.  In short, the Complaint alleges none of the "who, what, when, where, and how" of a concerted (or other) refusal to deal, and offers no facts that could transform routine DMCA notices into a *per se* unlawful boycott.

*X Alleges Only Routine, Legitimate Copyright Enforcement.*  To combat rampant infringement on X's platform, the Music Publishers asserted their rights under the DMCA with takedown notices issued through NMPA.  X now retaliates, complaining it has to respond to the notices, remove infringing content, and de-platform repeat infringers, as required by the DMCA.  But X does not claim that the notices are entirely baseless and unrelated to any valid assertion of copyright rights, or that they in any way harm competition.  To the contrary, the notices led to an ongoing, years-long copyright infringement suit.  The conduct X attacks—pre-suit DMCA takedown notices—is classic petitioning and enforcement activity protected by the First Amendment and the Supreme Court's *Noerr-Pennington* doctrine.  The antitrust laws do not permit X to punish copyright owners for invoking the remedies Congress gave them.  X's attempt

---

[3] "Universal," as used in the complaint, refers to the following set of Defendants, collectively: Defendants Polygram Publishing, Inc., Universal Music Corp., Universal Music – MGB NALLC, Universal Music – Z Tunes LLC, Universal Musica, Inc., and Songs of Universal, Inc.  These Defendants are collectively the "Universal Music Defendants."

to characterize routine, statutorily authorized notice-and-enforcement activity into a supposed industrywide "boycott" should be rejected.

*X's Monopolization Claims Fail.*  X's theories under Section 2 of the Sherman Act fare no better because they rest on the same lawful DMCA enforcement and trade-association advocacy, while failing to plead monopoly power by any individual defendant, exclusionary conduct, or specific intent to monopolize.

*X's State-Law Claims Fail.*  Because X's federal antitrust claims fail, its Texas antitrust, civil conspiracy, and unfair competition claims fail as well.  The state antitrust theories are coextensive, the civil-conspiracy claim is derivative, and Texas recognizes no freestanding unfair competition tort on the conduct alleged.

The Court should dismiss each of the Complaint's eight counts, with prejudice.

## II.    BACKGROUND

*The Music Publishing Business.*  The very existence of music depends on the hard work of composers and songwriters.  And it is music publishers that make possible the global distribution and commercialization of that music.  To provide worldwide access to music, "[m]usic publishers provide licenses to musical compositions" so that others may, for instance, record, perform, or otherwise exploit them for the enjoyment of audiences, listeners, and fans; and to enhance films, advertisements, and video; including on X.  *See* Cmplt. ¶¶ 162-63.  Each Music Publisher has a different music catalog and songwriter roster.  X says it "does not need to license works from all Music Publishers."  *Id*. ¶¶ 6, 147.  Which licenses X wants (or needs) is up to X, and which Music Publisher (or Music Publishers) hold the rights.[4]

---

[4] For instance, if a user on X wants to create a video using Ed Sheeran's "Shape of You," it must get a license from BMG, Sony, Universal, and Warner, because each publisher has an ownership interest in the composition (called fractional ownership).  *See* Ex. A to Cmplt., *Concord Music Grp., Inc. v. X Corp.*, No. 23-cv-00606 (M.D. Tenn. June 14, 2023), ECF No. 1-1 (showing 455

*The Music Publishers Enforce Their Copyrights Being Infringed on X.* As a platform for user-generated content, X has asserted it is eligible for the DMCA's safe harbor. In order to maintain eligibility for safe harbor protections, the DMCA requires X to, among other things, maintain and enforce a policy of "removing infringing content upon being notified by the copyright holder" and "deplatforming repeat infringers." Cmplt. ¶ 5; *see also* 17 U.S.C. § 512(c), (i). Rather than obtain licenses, X has "long relied on the safe harbor" and allowed unlicensed use of music on its platform. Cmplt. ¶ 5. As the Music Publishers took notice of the infringing uses on X (f/k/a Twitter), they turned to the DMCA and issued takedown notices. Cmplt. ¶ 156.

To assist its members to combat the massive scope of infringement on X, NMPA developed a program that would facilitate members' ability to issue DMCA takedown notices, which are notices to the platform (X) to take down infringing content. Cmplt. ¶ 77. The DMCA contemplates that takedown notices can be sent and signed by "a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed." 17 U.S.C. § 512(c)(3)(A)(i), (vi) (requiring "[a] statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed").

Before it initiated the program, NMPA reached out to X. David Israelite, President and CEO of NMPA, wrote:

> I write to you in hopes that we can have a productive conversation about the use of music on Twitter.
>
> NMPA is preparing to initiate a massive program of notices to Twitter under the Digital Millennium Copyright Act (DMCA), which will quickly turn many of your

---

musical compositions where multiple Music Publishers own the copyright) (cited at Cmplt. ¶ 115). Music Publishers may hold only a "fractional interest[] of exclusive ownership" in a composition and "offer[] a license to only that share." *See United States v. Broad. Music, Inc.*, 720 F. App'x 14, 16 (2d Cir. 2017).

most popular users into repeat infringers. It will be on a scale larger than any previous effort in DMCA history. We also are prepared to challenge any repeat infringer policy that does not meet the minimum statutory requirements.

My preference is not to go down that road, but instead to develop a partnership, similar to what many other social media companies have done, including YouTube, Facebook, Instagram, TikTok, Snap, Twitch, Triller, Roblox, etc.…

If you are interested in engaging in such a conversation, please let me know. If you choose not to do so, then please know we are open to starting a conversation at any point during the future process.

App. 007-008; *see also* Cmplt. ¶¶ 7-8, 94-97 (quoting portions of email attached as Exhibit A).

X responded by recognizing and affirming the Music Publishers' rights and X's obligations under the DMCA, noting: "If your members identify works which have been uploaded to the Twitter service without the necessary permission, they may continue to notify us in accordance with DMCA procedures." App. 006-007. The Music Publishers, using NMPA's DMCA notice program, did just that, and began notifying X of the infringing music on its platform (the "Non-Majors" beginning in 2021, and the "Majors" in 2023). *See* Cmplt. ¶¶ 9, 99-100, 110-11. From December 2021 through December 7, 2022, Defendants notified X of over 200,000 posts containing infringing uses of music on the X platform. *Id*. ¶¶ 10, 100, 115. Because the infringement on X continued, X says it "continues to [receive] hundreds of pages of takedown notices nearly every week, each listing hundreds (and, in many cases, thousands) of instances of allegedly infringing material." Cmplt. ¶¶ 10, 118.

*X Fails to Obtain Licenses*. With no additional facts in support, X claims Mr. Israelite's invitation to "develop a partnership" was a demand for "industrywide licenses" and a refusal by all of the Music Publishers "to deal individually with X." Cmplt. ¶¶ 8, 71. Of course, platforms like X can obtain licenses to make available licensed music to their users for use on the platform. *See* Cmplt. ¶ 6. And X admits it was engaged in active licensing negotiations with at least one Music Publisher, Warner, at the time of Mr. Israelite's email. Cmplt. ¶ 105; *see also* App. 007

6

(noting X "had some engagement with some [NMPA] individual members in the past, such as Universal Music Publishing Group, Sony Music Publishing and Warner Chappell Music"). X claims Warner sent a proposed license in May 2021, and after no engagement from X, followed up in March 2022, to which X responded, "We are in the initial steps of our licensing strategy and are implementing it as quickly as we can." Cmplt. ¶ 108. Warner followed up again, but X still did not engage. *Id.* As a result, Warner began enforcing its copyrights through NMPA's DMCA program. *Id.* ¶ 109. Similarly, X says the other Music Publishers attempted to negotiate individual licenses with X for *years*, but to no avail. *Id.* ¶¶ 104-11. Neither Sony, Universal, Warner, nor any other Music Publisher was able to secure a license with X, so they enforced their copyrights under the DMCA.

*X Fosters Infringement.* Upon X's failure to comply with its DMCA requirements, the Music Publishers sued X for rampant copyright infringement on the X platform. Cmplt. ¶¶ 110, 112, 115 (Publishers' complaint "listed approximately 1,700 works that they said X had infringed"); *see also* Complaint ¶ 1, *Concord*, No. 23-cv-00606 (M.D. Tenn. Jan. 13, 2025), ECF No. 115 (alleging "Twitter fuels its business with countless infringing copies of musical compositions, violating Publishers' and others' exclusive rights under copyright law.") (the "Concord © Cmplt."). X admits that "[m]usic is among the most popular topics of discussion on X." Cmplt. ¶ 70. After the Music Publishers' contributory claim survived a motion to dismiss (*Id.* ¶ 116), the case proceeded to discovery. *See* Order, *Concord*, No. 23-cv-00606 (M.D. Tenn. Jan. 27, 2025), ECF 91.

Apparently unwilling to obtain licenses, or abide by its obligations under the DMCA, X filed this retaliatory antitrust suit based on the Music Publishers' efforts to protect and enforce their copyrights. It seeks to end, under the guise of antitrust, the Music Publishers' ability to pursue

7

and enforce their rights under the Copyright Act.  It claims every Music Publisher has refused to negotiate individual licenses with X and instead insisted on an industrywide license.  But far from alleging that the Music Publishers engaged in a conspiracy, X does not identify a single instance where it sought an individual license and a Music Publisher denied that request, or where a Music Publisher (or NMPA) insisted on an industrywide license.

## III.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Federal Rule of Civil Procedure 12(b)(6) authorizes motions to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted."  In considering a Rule 12(b)(6) motion to dismiss, a "court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).  To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  By contrast, a pleading that only "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).  "The plausibility standard … asks for more than a sheer possibility that a defendant has acted unlawfully…. Where a Complaint pleads facts that are '*merely consistent* with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  Thus, when the alleged facts allow an "obvious alternative explanation," *Iqbal*, 556 U.S at 682, for the defendant's conduct, then the Complaint must be dismissed.

IV.    ARGUMENT

X's Complaint should be dismissed in its entirety.  *First*, X fails to plead the threshold requirement of antitrust injury, or any injury flowing from harm to competition, because it does not compete with the Music Publishers.  *Second*, X fails to plead any "group boycott" because X's conspiracy claims rely on improper group pleading, lack plausible direct or indirect allegations of conspiracy, and improperly seek to use the antitrust laws to quell legitimate copyright enforcement activity.  *Third*, X fails to state claims for actual or attempted monopolization because X has not alleged that any Defendant has monopoly power or a dangerous probability of achieving it, does not plead exclusionary conduct, and fails to allege specific intent to monopolize.  *Fourth*, X does not plead a conspiracy to monopolize under Section 2 of the Sherman Act.  And *fifth*, X's state-law claims fail for the same reasons as its federal antitrust claims.

### A.    *X Has Not Suffered Antitrust Injury.*

X cannot bring an antitrust action because X has not suffered an antitrust injury.  Antitrust standing is a threshold pleading-stage requirement.  *Jebaco Inc. v. Harrah's Operating Co., Inc.*, 587 F.3d 314, 319 (5th Cir. 2009) ("Antitrust injury must be established for the plaintiff to have standing under section 1 or section 2 of the Sherman Act"); *WFA*, 2026 WL 833900, at *24 (similar).  To establish antitrust injury, a plaintiff must plead injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  This requirement is a "'useful filter at an early stage of litigation' for weeding out faux antitrust lawsuits …." *WFA*, 2026 WL 833900, at *24 (quoting *Dr.'s Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 306 (5th Cir. 1997)).  That filter should be applied here because X does not meet this threshold pleading requirement.

9

X's group boycott theory—like its group boycott theory this Court rejected in *WFA*—requires X, at a minimum, to plead the involvement of "a competitor at some level who seeks to restrain competition against an outsider to the agreement." *WFA*, 2026 WL 833900, at *24. As this Court recently explained in dismissing X's similar group boycott claim in *WFA*, this can arise in two types of situations, neither of which is present here. *See id.* at *25.

*First*, a plaintiff might allege that its competitor(s) are conspiring with upstream suppliers to boycott the plaintiff, cut off access to supply, and allow the conspiring competitor to corner the downstream market. *Id.* Here, that would mean the likes of Facebook, Instagram, TikTok, or other social media platforms conspiring with the Music Publishers to restrict X's access to music licenses so that X's competitors could enjoy exclusive access to licensed music. X alleges no such thing. Nor could it.

*Second*, a plaintiff might allege that downstream competitors are boycotting an upstream supplier in an effort to "cut off the supplier's direct access to other downstream customers." *Id.* at *26. As the Court recently described it, this is a "do not dare go around us restriction." *Id.* But again, X does not allege that the Music Publishers—which are upstream, and not competitors, of X—have prevented X from reaching X's customers, or even that the Music Publishers could do so by withholding licenses. To the contrary, X has never held music publishing licenses and has nonetheless grown into one of the world's most popular social media sites.

As in *WFA*, "X has not alleged that … one of X's competitors[] directed the Defendants' [alleged] boycott," "[n]or has X alleged that [the Music Publishers] sought to become … a new social media company[] themselves." *Id.* Put simply, "[i]f the claim does not directly or indirectly involve the plaintiff's competitor, it does not state an antitrust injury." *Id.* at *25. Here, X does not, and cannot, allege that the Music Publishers compete with X. Nor does it allege that the

10

alleged decision not to negotiate individual licenses has anything to do with X's competitors. X's claims suffer from the same exact flaw that led this Court to dismiss X's *WFA* case with prejudice.

Further, the antitrust laws are "designed to protect competition" as a whole, not individual participants. *See Marucci Sports, LLC v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 376 (5th Cir. 2014). But X only alleges injury to itself in the form of "loss in the value of its user base," "loss in advertising revenue," increased compliance costs, and the inability to obtain preferred licenses. Cmplt. ¶¶ 183, 186, 188, 203, 210. Harm to a single platform is not cognizable antitrust injury. *Marucci*, 751 F.3d at 376 (dismissing complaint for lack of antitrust injury due to plaintiff's "misguided" "predominate focus on its own injury"); *Taylor v. Christus St. Joseph Health Sys.*, 2006 WL 1582097, at *2 (E.D. Tex. 2006) (dismissing complaint for failure to plead harm to competition rather than harm to the plaintiff).

Nor does X's assertion of "harm to users" that infringed the Music Publishers' copyrights establish antitrust injury. *E.g.*, Cmplt. ¶¶ 13-14. X's takedown of content in response to DMCA notices is part and parcel of the framework for addressing copyright infringement in the digital context created by federal law, not harm to competition. *JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 599-601 (S.D. Tex. 2022), *aff'd*, 2025 WL 832801, at *4-5 (5th Cir. 2025) (plaintiff failed to allege antitrust injury where the injury "stem[med] fundamentally from the U.S. [g]overnment's national security tariffs" and "not from any antitrust violation"); *In re Canadian Imp. Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006) (affirming dismissal of antitrust claim because the alleged injury was "caused by the federal statutory and regulatory scheme adopted by the United States government, not by the conduct of the defendants").

X's conclusory reference to "marketwide increase in prices for licenses" (Cmplt. ¶ 180) cannot support an inference of competitive harm. *See Dr.'s Hosp. of Jefferson, Inc. v. Se. Med.*

11

*All., Inc.*, 897 F. Supp. 290, 293 (E.D. La. 1995) (rejecting plaintiff's "speculative statements about anticompetitive effects [as] insufficient to create antitrust injury" where "the mere likelihood that prices will increase … falls short of the strict Fifth Circuit standard for showing antitrust injury").

Because X has not alleged antitrust injury, its antitrust claims should be dismissed. *JSW Steel*, 586 F. Supp. 3d at 601. Indeed, if facts of antitrust injury existed, "X would have pleaded" them. *WFA*, 2026 WL 833900, at *27. It did not do so. Dismissal should be with prejudice, for the same reasons as in *WFA*. This alone is dispositive of X's claims, but the Complaint suffers from numerous additional fatal flaws.

### B.      *X Does Not Plausibly Plead a "Group Boycott" or Agreement Not to Negotiate.*

X claims Defendants entered a "conspiracy to refuse to deal individually with X." Cmplt. ¶ 198. To do so, Plaintiffs must allege that Defendants "(1) engaged in a conspiracy (2) that restrained trade (3) in a particular market." *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 220 (5th Cir. 2001). Because Section 1 of the Sherman Act prohibits only *conspiracies*, not individual action, "the crucial question" in assessing a Section 1 claim "is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553.

"The ultimate existence of an 'agreement' under antitrust law, however, is a legal conclusion, not a factual allegation," which means bare allegations of an agreement are not to be taken as true. *Mayor and City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 134-35 (2d Cir. 2013). As a result, a Section 1 claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. But, "[w]ithout more," allegations of "parallel conduct do[] not suggest conspiracy," which means plaintiffs must plead sufficient facts to "raise[] a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 556-57.

This requirement is particularly important for group boycott claims because "[t]he Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)).  Accordingly, a company "'generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently.'" *JSW Steel*, 2025 WL 832801, at *4 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984)) (affirming dismissal of claims of a concerted refusal to deal).

Applying these standards, X's complaint suffers from three mutually reinforcing defects. *First*, X makes broadside allegations against Defendants as a group, rather than making plausible allegations about each individual Defendant's participation in the conspiracy.  *Second*, X does not actually allege any refusal to deal by any Defendant, concerted or otherwise.  *Third*, X fails to allege an agreement between the Defendants.  This dooms any conspiracy claim.

### 1.   *X Engages in Impermissible Group Pleading.*

As an initial matter, X engages in impermissible group pleading.  X alleges that each Music Publisher agreed with the others to refuse to deal with X individually.  But other than basic corporate identity, NMPA membership, and filing copyright litigation against X, the Complaint does not contain any specific allegations as to Defendants ABKCO, Anthem, Big Machine, BMG, Concord, Downtown, Kobalt, Lyric, Mayimba, Payday, Peer, Reservoir, Royalty Network, Wixen, any of the Sony entities, or any of the Universal entities.  As to Warner, the only facts alleged concern Warner's failed attempt to negotiate a license agreement with X.  X alleges no communications between any of the Defendants, let alone any agreement between them.  Nor does it allege that X ever reached out to them seeking a license agreement, or that they declined to even negotiate such a license agreement.

Instead, X couches virtually all of its allegations in terms of the conduct of the "Music Publishers" and "Defendants."  But an antitrust plaintiff "cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group." *Austin Legal Video, LLC v. Deposition Sols., LLC*, 2024 WL 5184485, at *5 (W.D. Tex. 2024); *Wiltfong v. Cal. State Bd. of Accountancy*, 2018 WL 935398, at *2 (W.D. Tex. 2018) (same).  Otherwise, it is "impossible to determine who is allegedly conspiring with whom, when they agreed to conspire, [and] the scope of the conspiracy." *Wiltfong*, 2018 WL 935398, at *2.

Rather, the "complaint must specify how these defendants were involved in the alleged conspiracy, without relying on indeterminate assertions against all defendants." *Id.* at *3 (dismissing Sherman Act claim where plaintiff pleaded "in general terms" against 127 defendants without specifying each defendant's role in the alleged conspiracy). *Austin Video* dismissed claims against defendants whose alleged participation in the conspiracy was based only on membership in a defendant trade organization, conclusory allegations about refusals to deal, or the assumption that a trade association can either be held liable for the acts of its members or is inherently a facilitator of conspiracies among them.  2024 WL 5184485, at *5-9.  And in *Skidmore Energy, Inc. v. KPMG LLP*, this Court insisted on a defendant-by-defendant analysis of allegations against each on a motion to dismiss an antitrust conspiracy.  2004 WL 3019097, at *8 (N.D. Tex. 2004) (dismissing antitrust claims where plaintiffs "failed to allege a single fact specifically identifying either Defendant and connecting it to a conspiracy or agreement to restrain trade").  The same is true here.

### 2.    *X Fails to Allege a Refusal to Deal.*

X purports to assert a refusal to deal claim, making the bold assertion that "[s]ince the Majors joined the conspiracy, none of the Music Publishers have moved forward with individual licensing negotiations with X."  Cmplt. ¶ 11.  To begin with, X concedes that the Majors declined

to join the alleged conspiracy until 2023—and therefore by X's own account *did* unilaterally negotiate with X at least until then. More generally, X identifies no actual refusal by any Music Publisher. Indeed, X concedes that "certain Music Publishers" have been negotiating individual licenses, although X does not identify which ones or the status of those negotiations. *Id.* And although X tries to sweep aside this inconvenient, if not fatal, fact by claiming it was "in the context of discussing a resolution of the Tennessee litigation," *id.*, that is irrelevant. Fundamentally, X's group boycott claim lacks both a group and a boycott.

The only Music Publisher communications X identifies were with Warner and they show the opposite of a refusal to deal. For nearly two years, Warner unsuccessfully sought to secure a license with X. In May 2021, "Warner Chappell emailed X an initial 'experimental license proposal.'" *Id*. ¶ 105. Then, after waiting ten months, Warner tried again, noting X "had been negotiating licenses with record labels" but not publishers, though licenses from both are necessary to lawfully use music. *Id.* ¶¶ 107, 168. As X notes, obtaining "licenses to sound recordings" is "not a substitute for[] licenses to copyrighted musical compositions." *Id.* ¶ 168. They are two different copyrights held by completely different entities. Warner wanted to make sure it was not being ignored.

Warner had "underst[ood] that [X] would be engaging with [Warner] simultaneously with the [record] label discussions." Cmplt. ¶ 108. At the time, X conceded it was still in "the initial steps of our licensing strategy and are implementing it as quickly as we can." *Id.* After additional months passed, and X still had failed to engage, *id.*, Warner explained *its independent business judgment decision* to X: "we've chosen not to be involved in any NMPA takedown activities to date … but we are getting regular inquiries from senior management about [X's] licensing status." *Id.* X alleges that this was the catalyst for Warner to "join the conspiracy." But all X's allegations

15

show are unilateral attempts *by Warner* to engage in licensing negotiations, only to be rebuffed by X.

Additionally, X admits that it "is not interested in licensing musical compositions from every Music Publisher." *Id.* ¶ 147. X never identifies the Music Publishers with which it is interested in entering into a license agreement. It only alleges its own failure to negotiate with Warner. X does not allege it sought an individual license from any Music Publisher and was rejected. Nor does it allege any refusal by any Music Publisher to engage in licensing discussions or any actual demand by any Publisher (or NMPA) to enter an industry-wide license agreement.

There cannot be a refusal to deal without any refusal. The claim fails.

### 3.    *X Fails to Allege an Agreement.*

Any Sherman Act Section 1 claim requires plausible allegations of agreement, "as opposed to an ordinary, self-interested decision." *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 525, 528 (5th Cir. 2022); *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 627-30 (5th Cir. 2002) (affirming dismissal of refusal to deal claim). X must therefore plausibly allege facts showing a "conscious commitment" and a "meeting of the minds" among Defendants to refuse individual license negotiations with X. *Marucci*, 751 F.3d at 374-75. It is not enough for X to allege facts "consistent" with an agreement, it must allege facts that tend to "exclude the possibility of independent action." *Twombly*, 550 U.S. at 554-57.

A plaintiff can satisfy this pleading burden in one of two ways. One, it can plead direct evidence of an agreement, such as communications between defendants establishing the agreement. *E.g.*, *In re Citric Acid Litig.*, 191 F.3d 1090, 1093-94 (9th Cir. 1999). Or, it can allege parallel conduct by the defendants, bolstered by "factual enhancement[s]" that push the allegations out of "neutral territory." *Twombly*, 550 U.S. at 557. X fails to meet this bar under either method.

16

### a.    X Fails to Plead Direct Evidence of a Conspiracy.

X has not pled any direct evidence.  Aside from vague and conclusory references to groups of Defendants supposedly "joining" the alleged conspiracy, there are no factual allegations of any agreement between any of the Defendants.  Instead, X's conspiracy claim relies on unfounded extrapolations from two allegations: NMPA's October 2021 email and participation in NMPA's DMCA notice program.  Neither supports a conspiracy claim.  *See Corr Wireless Commc'ns, L.L.C. v. AT & T, Inc.*, 893 F. Supp. 2d 789, 805 (N.D. Miss. 2012) ("Allegations of direct evidence of an unlawful agreement must be 'explicit and require[] no inferences to establish the proposition or conclusion being asserted.'" (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999)).

*The October 2021 Email Is Not Evidence of a Conspiracy.*  In its effort to turn a pre-litigation email into evidence of conspiracy, X makes a strained effort to interpret the word "we" as having conspiratorial meaning.  X asserts that when NMPA wrote, "please know we are open to starting a conversation at any point during the future process," it actually meant all of the Music Publishers (including Warner, Sony, and Universal) which X concedes were attempting to negotiate with X at the time, would not negotiate individual licenses with X.  Cmplt. ¶¶ 7-8, 94-97.  That is not a plausible reading.  The most natural reading is straightforward: "we" simply meant NMPA and that NMPA was open to a conversation with X.  Nothing in the email even hints that no Music Publisher would henceforth negotiate individually with X.

In any event, Mr. Israelite's email is a communication from NMPA to X, not a communication *among competitors* about a refusal to license individually.  Nor can a trade association's advocacy on behalf of its members act as evidence of conspiracy or agreement.  *See, e.g., In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) (dismissing Section 1 claim, and explaining that "trade associations often serve legitimate

17

functions, such as providing information to industry members, conducting research to further the goals of the industry, and promoting demand for products and services" (quoting *In re Citric Acid*, 191 F.3d at 1098)); *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc*., 883 F.3d 32, 40 (2d Cir. 2018) ("Not every action by a trade association is concerted action by the association's members, [and] even though a trade association by its nature involves collective action by competitors, a trade association is not by its nature a 'walking conspiracy.'"). The fact that NMPA advocated for its members—the function of a trade association—does not turn that advocacy into conspiracy. *Cf. Meyer v. Macmillan Pub. Co.*, 526 F. Supp. 213, 217 (S.D.N.Y. 1981) ("A trade association is created by its members precisely for the purpose of representing them. It is normally their agent, their alter ego, created … to handle litigation, among other things, on its members' behalf.").

*Copyright Enforcement Is Not Evidence of a Conspiracy.* As explained further below, sending DMCA takedown notices is First Amendment-protected pre-litigation activity that cannot be the basis for antitrust liability. But regardless, sending them through NMPA's notice program is not indicative of conspiracy to refuse to negotiate individual licenses. X claims that the Music Publishers sent DMCA notices, not to address infringing conduct on X (which X does not dispute exists), but to coerce X into negotiations for an industry-wide license. But nowhere does X allege that NMPA or any Music Publisher offered, required, or demanded, an industry-wide license or industry-wide terms.

### b.    X Fails to Plead Parallel Conduct and Factual Enhancements.

X also has not pled either the parallel conduct or the factual enhancements (or "plus factors") necessary to plausibly allege a conspiracy. *JSW Steel*, 586 F. Supp. 3d at 596. X's theory seems to be that "parallel" conduct in the form of DMCA takedown notices sent through NMPA evidences conspiracy to boycott. But legitimate enforcement activity is no basis to infer a

18

conspiracy. The "obvious" and "natural" explanation for sending such notices is not *conspiracy*, but merely the rational business conduct of copyright owners to protect statutory and constitutionally protected rights in the face of rampant infringement on X. *Iqbal*, 556 U.S. at 679; *see also* U.S. Const. art. 1, sec. 8, cl. 8 (securing to "Authors and Inventors the exclusive Right to their respective Writings and Discoveries").

This "obvious alternative explanation" is entirely consistent with each Music Publisher's independent self-interest, and requires dismissal. *Twombly*, 550 U.S. at 567-68; *see also Southway Theatres, Inc. v. Georgia Theatre Co.*, 672 F.2d 485, 494 (5th Cir. 1982) ("[T]he inference of a conspiracy is always unreasonable when it is based solely on parallel behavior that can be explained as the result of the independent business judgment of the defendants."); *JSW Steel*, 2025 WL 832801, at *4-5 (holding that "conspiratorial inference" of refusal to deal based on parallel conduct that "could just as well be independent action" was insufficient to "establish a concerted effort to boycott").

*Online Travel* is instructive on this point. There, this Court dismissed antitrust conspiracy claims against hotels and online booking services because defendants' conduct in entering into bilateral contracts setting the minimum price for hotel rooms on online services could be explained by each defendant's "rational business interests" and therefore did not "actually suggest a conspiracy was formed." *In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526, 538-39 (N.D. Tex. 2014) (Boyle, J.); *see also BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 563 F. Supp. 3d 578, 598-99 (W.D. La. 2021) (similar). The same rationale applies here. "Just because Defendants' rational business interests can be recast in a suspicious light does not mean the allegations actually suggest a conspiracy was formed." *In re OTC Hotel Booking*, 997 F. Supp. 2d at 539.

19

In an attempt to turn copyright enforcement into conspiracy, X turns to so-called "plus-factor" or "factual enhancement" evidence.  None conjure conspiracy.

***Enforcement Mechanism.***  X cannot turn the DMCA notice program into a mechanism to enforce the conspiracy and identify and punish defectors.  The fact that "no Music Publisher's works have stopped appearing in the takedown notices" simply indicates the infringement on X has not abated.  Cmplt. ¶ 155.  X has not alleged any facts suggesting otherwise.  X's "enforcement" allegations are thus mere unsupported "rhetorical spin."  *See Kelsey K. v. NFL Enters., LLC*, 254 F. Supp. 3d 1140, 1146 (N.D. Cal. 2017).

***Opportunity to Conspire***.  X cites to various NMPA events without providing any further factual allegations about any of them.  X then concludes, based on these vague and conclusory allegations, that NMPA was a vehicle to "set a collective strategy."  Cmplt. ¶¶ 137-41.  But "common attendance at trade association meetings is insufficient to infer a conspiracy." *JSW Steel*, 586 F. Supp. 3d at 597 ("It is not sufficient to allege simply that some defendants may have conversed with other defendants; there must be factual support that those conversations were for the intent and purpose of reaching an agreement to unreasonably restrain trade."); *In re OTC Hotel Booking*, 997 F. Supp. 2d at 541 ("Twombly recognized that just because a defendant belonged to the same trade guild or association as one of its competitors when the parallel behavior occurs does not, without more, suggest a conspiracy formed."); *In re Travel Agent Comm'n Antitrust Litig*., 583 F.3d 896, 911 (6th Cir. 2009) ("A mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement because [defendants'] presence at such trade meetings is more likely explained by their lawful, free-market behavior.").

Nor do allegations that executives from some Music Publishers sit on the NMPA board (Cmplt. ¶ 137) support X's conspiracy claim. *See In re Dynamic Random Access Memory (DRAM)*

20

*Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 52 (9th Cir. 2022) (affirming dismissal because plaintiffs did "not allege facts demonstrating that Defendants actually communicated or exchanged information" at trade association meetings); *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 310 F. Supp. 3d 1002, 1015 (E.D. Mo. 2018) (rejecting allegation that defendants' presence on same board of directors supported inference of conspiracy); *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 33 F. Supp. 3d 14, 19-20 (D.D.C. 2014) ("Merely pleading that multiple entities hold positions on a board of directors does not establish a horizontal agreement for purposes of section 1."); *see also Wiltfong*, 2018 WL 935398, at *2 (sitting on a board does not plausibly allege group boycott). And of course, the fact that the executives of Music Publishers that X alleges *did not join the conspiracy* sit on the NMPA board undermines any inference that board membership equals participation in the conspiracy. *See* Cmplt. ¶¶ 4, 104-10, 137.

***Information Exchange.*** X's allegation that "[t]he Music Publishers have also exchanged sensitive pricing information through most-favored nation ("MFN") clauses" is not only conclusory but also completely disconnected from the alleged conspiracy. *Id*. ¶¶ 143-44. The allegation is both irrelevant and insufficient.

***Conduct Against Self-Interest***. X claims the Music Publishers' "conduct makes no economic sense" absent a conspiracy. *Id*. ¶¶ 146-51. X imagines a world in which it is engaged in robust negotiation with at least some unidentified Music Publishers. *Id.* ¶¶ 146-47. But it alleges only its own failure to negotiate with Warner. All that is left of X's Complaint is the Music Publishers' efforts to enforce their copyright interests, which is unequivocally important to each Music Publisher's unilateral business and economic interests. X's "conclusive assertion is [thus] undermined both by common economic experience and facts in the Complaint itself." *In re OTC Hotel Booking*, 997 F. Supp. 2d at 539.

21

X argues that "[s]haring NMPA's resources to pursue takedowns makes economic sense only if the objective is not actually to enforce an individual Music Publisher's copyrights." Cmplt. ¶ 151. X's position makes no sense at all. X concedes Defendants' works are used on its platform without licenses. An obvious, economically rational response is to take steps to enforce Defendants' rights. X's claim is also undermined by X's own contradictory allegation that the DMCA notice program resulted in a more efficient and more effective copyright enforcement because it "allowed the Music Publishers to ensure that they could include thousands of purportedly infringing posts each week." *Id.* ¶ 158.

*Shared Motive*. X alleges that "Music Publishers share a common motive in refraining from dealing individually with X." *Id.* ¶ 159. This is logically flawed. If a Music Publisher has rights to a musical composition that X wishes to license, the Music Publisher has every incentive to negotiate an agreement for that license—not to refuse simply because X may or may not also negotiate with other Music Publishers for different works. What is true, and X does not dispute, is that the Music Publishers share a common motive to protect their copyrights. *See City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 409 (2d Cir. 2024) ("It is decidedly not indicative of a conspiracy that a group of similarly situated market participants would object, individually and separately, to a significant market development that could cut into their profits."). That is not a conspiratorial motive.

*Licenses With Other Platforms.* X says other platforms were somehow duped or forced into industry-wide licenses. Cmplt. ¶¶ 81-92. X does not allege which of the Music Publishers were allegedly involved in each of these separate, anecdotal examples. And as in this case, X alleges nothing more than copyright enforcement and bilateral license agreements.

22

*Twitch.*  After unnamed music publishers enforced their rights to address infringement on Twitch, Twitch reached an agreement to, in its words, "build productive partnerships between the service and music publishers."  *Id*. ¶ 86.

*Roblox.*  Like X, Roblox was the subject of a copyright infringement lawsuit.  *Id*. ¶¶ 87-89.  Roblox entered into licensing agreements with individual publishers.  In June 2022, Roblox "announced it had inked a licensing deal with BMG."[5]  Similarly, the press release X quotes includes a statement from Roblox that it was "delighted to have come to terms with *select* NMPA members, *building on our existing relationships with major publishers*."[6]  Roblox also entered into "an industry-wide opt-in open to all eligible NMPA publishers."  Cmplt. ¶ 89.  That was not a forced industry-wide license, but a voluntary framework any publisher could utilize to address infringement on Roblox.  Nowhere does X provide facts to support that an industry-wide license was offered through this "opt-in."  It was not.[7]

*Peloton*.  X repeats allegations that Peloton made in a counterclaim against NMPA and others, which was dismissed.  *Compare* Cmplt. ¶¶ 90-91, *with Downtown Music Publ'g LLC v. Peloton Interactive, Inc.*, 436 F. Supp. 3d 754 (S.D.N.Y. 2020).  Peloton's dismissed allegations neither hold relevance nor support X's claims.

---

[5] Roblox and Twitch Are Gaming the System Against Songwriters, Nat'l Music Publishers' Ass'n, https://www.nmpa.org/roblox-and-twitch-are-gaming-the-system-against-songwriters-guest-op-ed/  (cited at Cmplt. ¶¶ 87-88).

[6] NMPA and Roblox Strike Industry-Wide Agreement, Nat'l Music Publishers' Ass'n (Sept. 27, 2021),    https://www.nmpa.org/nmpa-and-roblox-strike-industry-wide-agreement/    (cited    at Cmplt. ¶ 89).

[7] The NMPA and Roblox Strike Industry-Wide Agreement press release, *supra* n. 6, clearly states that the opt-in "settles claims filed by NMPA members, offers an industry-wide opt-in open to all eligible NMPA publishers and opens a negotiation period for members to engage individually in new go-forward licensing deals with the Roblox global platforms."  *Id.*

*Snap*.  X alleges in a single paragraph that "in or around May 2025, NMPA 'flex[ed] [its] muscle' in securing industrywide licensing agreements from Snap."  Cmplt. ¶ 92.  Yet the article X quotes from unambiguously undermines its theory.  The article explains that the Snap arrangement was a "re-up of a longstanding licensing agreement," and that the Music Publishers who wished to negotiate their own individual deals did so:  "The biggies have already structured separate contracts, including Sony Music Publishing, EMI Music Publishing, Kobalt Music Publishing, Universal Music Publishing Group, Warner Chappell Music, and BMG Rights Management." [8]

### c.    X's Allegations as to the Majors Doom Its Claims Against Them.

X specifically pleads itself out of a claim as to Universal, Sony, and Warner—the three "Majors" identified in its Complaint.  Cmplt. ¶¶ 104-11.  With respect to each of the Majors, X affirmatively alleges and concedes that it "*declined to participate in the conspiracy*."  Cmplt. ¶¶ 4, 104-11 (emphasis added).  Having conceded that each of the Majors "declined" to participate in the alleged conspiracy, X fails to include "allegations plausibly suggesting (not merely consistent with)," *Twombly*, 550 U.S. at 557, the assertion that they each later reversed course and joined the purported conspiracy.

With respect to Warner, Universal, and Sony, X does not allege the Majors *ever* declined to negotiate with it. Nor does X even attempt to describe any communications whatsoever between X and Universal or Sony, any proposals X ever made to Universal or Sony, or any proposals X solicited from Universal or Sony.  *See* Cmplt. ¶¶ 104-11. With respect to Warner, X affirmatively

---

[8] Paul Resnikoff, Snapchat Finalizes a Broad Number of Music Publisher Licensing Agreements — Very Much Unlike Twitter/X, Digital Music News (May 7, 2025), https://www.digitalmusicnews.com/2025/05/07/snapchat-music-publisher-agreements/ (cited at Cmplt. ¶ 92).

24

alleges that Warner proposed a license to X, but that X failed to pursue negotiations. *See* Cmplt. ¶ 108 (describing response from X to Warner).

Instead, X's conclusory allegation that each of the Majors *later* joined the purported conspiracy is based solely on the assertion that, in "early 2023"—more than a year into the alleged conspiracy—the "NMPA's takedown notices began including posts allegedly infringing on works by [Universal and Sony]." Cmplt. ¶ 110.  X concedes, in that very same paragraph, that this only occurred after each of Universal, Warner, and Sony were unable to "secure[] a musical-composition license agreement" with X. *Id*.  That's *all* there is about Universal and Sony's conduct in the Complaint—no communications, no statements, no alleged veiled threats, no refusals to negotiate; just an admission they did not initially join the conspiracy and a suggestion they later each began enforcing their rights.  The same is true of Warner, with the only additional allegation that Warner proposed a license to X but was then ignored by X.

All X's allegations show here is that the Majors eventually sought to enforce their rights when licensing negotiations with X failed.  Cmplt.  ¶¶ 104-11.  The "common sense" explanation for this conduct is not *conspiracy*, but merely the rational business conduct of copyright owners to protect statutory and constitutionally protected rights.  This "obvious alternative explanation" for each of the Major's actions, which is entirely consistent with its independent self-interest, requires dismissal of the claims against each of Universal, Sony, and Warner. *Twombly*, 550 U.S. at 567-68; *see also Southway Theatres*, 672 F.2d at 494.

For example, in *In re OTC Hotel Booking*, the Court dismissed antitrust conspiracy claims against hotels and online booking services because defendants' conduct in entering into bilateral contracts setting the minimum price for hotel rooms on online services could be explained by each defendant's "rational business interests" and therefore did not "actually suggest a conspiracy was

25

formed." *In re OTC Hotel Booking*, 997 F. Supp. 2d at 539; *see also BRFHH Shreveport*, 563 F. Supp. 3d at 584 (applying similar rule). So too here. Although X claims that the Majors' conduct is explained by a conspiracy, the obvious alternative explanation is that they are enforcing their copyrights in the face of X's ongoing infringement. "Just because Defendants' rational business interests can be recast in a suspicious light does not mean the allegations actually suggest a conspiracy was formed." *In re OTC Hotel Booking*, 997 F. Supp. 2d at 539.

### d.    X's Claims Against the Non-Majors Similarly Fail.

X says even less of the Non-Majors, barely even mentioning them. Like the Majors, X does not allege any of the Non-Majors *ever* declined to negotiate with it. Nor does X even attempt to describe any communications with the Non-Majors. All that is left regarding the Non-Majors is statutorily ratified enforcement of their copyrights in the face of widespread infringement on X. Because X does not allege any agreement, or any facts that would allow a plausible inference of agreement, its conspiracy claim fails. *E.g.*, *In re OTC Hotel Booking*, 997 F. Supp. 2d at 537 ("*Twombly* held that a § 1 complaint must contain 'enough factual matter (taken as true) to *suggest* that an agreement was made ..., not merely parallel conduct that could just as well be independent action.'").

### 4.    Legitimate Copyright Enforcement Activity Cannot Support X's Conspiracy Claim.

Throughout its Complaint, X tries to rely on NMPA's DMCA takedown notice program. For example, X says the conspiracy began in December 2021 when it first began receiving takedown notices from NMPA on behalf of the Music Publishers. Cmplt. ¶¶ 99, 156-57. Likewise, the Majors, X says, refused to participate in the alleged conspiracy until "early 2023" when they began making use of NMPA's program. *Id.* ¶ 110. According to X, the takedown notices were the Music Publishers' "threat" and "coercion" to force an industry-wide license that X nowhere

specifies or even says was offered. *See id.* ¶ 7. The takedown program is also supposedly the enforcement mechanism of X's alleged conspiracy. *Id.* ¶¶ 152-55. But there is no logical connection between copyright enforcement activity and X's alleged refusal to deal. And in any event, sending DMCA notices is statutorily authorized and *Noerr Pennington* protected.

### a. DMCA Copyright Enforcement Activity Is Protected by the Noerr-Pennington Doctrine.

Under the *Noerr-Pennington* doctrine, an antitrust defendant is "generally immune from antitrust liability" for certain categories of protected activity, regardless of the anticompetitive motivation or effect of such activity. *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993) ("*PRE*"); *see also Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington,* 381 U.S. 657 (1965). This protection extends to litigation and to "pre-suit threats to litigate, such as cease-and-desist letters." *Veritext Corp. v. Bonin*, 417 F. Supp. 3d 778, 787 (E.D. La. 2019). As the Fifth Circuit has explained, "[g]iven that petitioning immunity protects joint litigation, it would be absurd to hold that it does not protect those acts reasonably and normally attendant upon effective litigation." *Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir. 1983).

This petitioning activity is precisely what the First Amendment protects, and *Noerr-Pennington* immunizes from antitrust liability. As many courts have held, DMCA notices qualify as protected pre-suit conduct. *See, e.g.*, *Enttech Media Grp. LLC v. Okularity, Inc.*, 2020 WL 6888722, at *3 (C.D. Cal. 2020) ("DMCA take-down notices and pre-litigation settlement demands constitute protected activities because, like cease-and-desist and demand letters, such activities are also incidental to a lawsuit."); *Hard 2 Find Accessories, Inc. v. Amazon.com, Inc.*, 2014 WL 6452173, at *2 (W.D. Wash. 2014) ("Apple has immunity from suit" where "Plaintiff's claims against Apple are predicated on a single infringement notice that Apple sent to Amazon in

June of 2013…."); *Mercer Publ'g, Inc. v. Smart Cookie Ink, LLC*, 2012 WL 12863934, at \*1, 4 (W.D. Wash. 2012) (dismissing consumer protection claims based on false DMCA notices because the "right to use judicial and pre-litigation procedures to resolve purported copyright disputes is protected activity"); *see also Coastal States*, 694 F.2d at 1367 ("Given that petitioning immunity protects joint litigation, it would be absurd to hold that it does not protect those acts reasonably and normally attendant upon effective litigation.").

Indeed, a takedown notice is by definition a "notification of claimed infringement." 17 U.S.C. § 512(c)(3)(A). As to service providers like X, the DMCA contemplates direct litigation to enforce the service provider's obligations in responding to takedown notices. *Id.* § 512(j). This is exactly what NMPA's October 2021 emails to X stated: we will "closely monitor Twitter's adherence to it[s] legal responsibilities…." App. 006. And as we know, litigation did indeed ensue. Thus, X challenges conduct indistinguishable from cease-and-desist letters, which are protected under *Noerr-Pennington*. *See*, *e.g.*, *Ultraclear Epoxy, LLC v. Epodex USA Corp.*, 2024 WL 966876, at \*10 (M.D. Tenn. 2024) ("A cease-and-desist letter is a demand that the alleged infringer take action [and] for the rights holder to actually stop him, that rights holder will have to go to court—the activity that *Noerr-Pennington* protects.").

Out-of-circuit cases treating takedown notices as outside *Noerr-Pennington* protection are distinguishable. Unlike here, those cases involved no "propos[al] or threat[] [of] litigation" and applied only to "intentional interference and consumer protection-based claims on behalf of the alleged primary infringer," or "one business asking another business to stop selling a competing product." *See Ultraclear Epoxy*, 2024 WL 966876, at \*10-11; *see also Thimes Sols., Inc. v. TP Link USA Corp.*, 2022 WL 1125628, at \*2 (9th Cir. 2022) (finding *Noerr-Pennington* did not apply to takedown notices, "which were *delivered solely to a third party and which did not propose or*

*threaten litigation*.").  Here, in contrast, we have antitrust claims by a platform against the copyright holders who did file litigation based in part on X's failure to adequately respond to the DMCA notices at issue.

As the Supreme Court held, "it would be destructive of rights of association and of petition to hold that groups … may not, without violating the antitrust laws, use the channels and procedures of … courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-à-vis their competitors."  *Cal. Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510-11 (1972).  The same is true here.

### b.    *X Does Not and Cannot Allege that Defendants' DMCA Notices Were a Sham.*

The *only* exception to *Noerr-Pennington* is when the petitioning is a "sham."  *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 861 (5th Cir. 2000).  This exception applies where the defendants have used "process itself—as opposed to the outcome of that process—as an anticompetitive weapon," in other words, where a defendant's petitioning is "not genuinely aimed at procuring favorable government action at all."  *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991).  In the litigation context, this requires the plaintiff to show that the lawsuit is (1) "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and (2) the lawsuit "conceals an attempt to interfere *directly* with the business relationships of a competitor through the use of the governmental *process*—as opposed to the outcome of that process—as an anticompetitive weapon."  *PRE*, 508 U.S. at 60-61.

Here, setting aside conclusory buzzwords like "baseless" and "pretextual," Cmplt. ¶¶ 10, 13, there are no allegations in the Complaint that would establish that the takedown notices are a sham.  *See Bourbon, Inc. v. Willie's Chicken Shack, LLC*, 2020 WL 587886, at *4 (E.D. La. 2020) ("The defendants' continued iteration that the plaintiff's actions are objectively baseless does not

29

make them so."); *see also Greater Guide, Inc. v. SAPS LLC*, 2025 WL 3039228, at *4 (E.D. La. 2025) (plaintiffs' characterizations of defendants' complaints as "indiscriminate," "fake," "fabricated," and "objectively baseless" were insufficient to allege objective baselessness).

*X Does Not Allege Objective Baselessness.*  A petition is only objectively baseless if "no reasonable litigant could realistically expect success on the merits." *PRE*, 508 U.S. at 60.  In its attempt to allege baselessness, X relies on buzzwords, not facts.  *See, e.g.*, Cmplt. ¶ 10 ("Defendants nevertheless continue to serve their baseless takedown notices.…"); *id*. ¶ 13 ("Defendants' pretextual takedown notices .…"); *id*. ¶ 117 ("NMPA's blunderbuss takedown notices").  X acknowledges that the Music Publishers' copyright lawsuit against it involves at least "1,700 works that … X had infringed" and were previously subject to DMCA notices.  *Id.* ¶ 115. X does not claim that a single one of those DMCA notices is baseless.  That omission alone is enough to find that X cannot meet the *Noerr-Pennington* exception.  *See Bayou Fleet*, 234 F.3d at 862 (plaintiff "does not assert that the [defendants'] endeavors were objectively unreasonable" where "a reasonable private citizen could expect to secure favorable" result); *see also, e.g.*, *Lamar Cnty. Elec. Co-op. Ass'n v. Rayburn Country Elec. Co-op., Inc.*, 330 F. Supp. 2d 763, 766 (E.D. La. 2002) ("A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham."); *Indivior Inc. v. Alvogen Pine Brook LLC*, 681 F. Supp. 3d 275, 297 (D.N.J. 2023) (holding that "Plaintiffs' success at the district court level" was a factor that "destroys any notion that no reasonable litigant could realistically expect success").[9]

X's baselessness claim is even more implausible given X allegedly treated some of the notices as legitimate.  It claims that it "suspend[ed] more than 50,000 users because of claims of

---

[9] The fact that the Music Publishers decided not to bring suit on all the DMCA notices they had sent says nothing of those notices' merits or reasonableness, nor does X allege anything unreasonable or baseless about those notices. *See* Cmplt. ¶ 114.

copyright infringement."  Cmplt. ¶ 101.  It further alleges that it has removed posts, including "from popular accounts."  *Id.* ¶ 103.

X points to only five examples, of the thousands of pages of notices, that purportedly "demonstrate that the takedown campaign orchestrated by NMPA on behalf of the Music Publishers is pretext."  Cmplt. ¶ 128.  Even if credited, five examples cannot remove *Noerr-Pennington* immunity.[10]  Objective reasonableness does not require perfection.  *E.g.*, *CSMN Invs.*, 956 F.3d at 1284 ("unsuccessful suits can still have been objectively reasonable").  In any event, X's examples are faulty.  For three of them, X does not even allege that the posts were subject to takedown notices at all.  Cmplt. ¶¶ 119-24.  As to the remaining two, X claims one involved a "de minimis" use of music or "incidental background music."  Cmplt. ¶¶ 125-27.  But whether or not the infringer could make out a successful de minimis defense to infringement does not make the DMCA notice a sham.  And infringing use of incidental background music is still infringing.  *E.g.*, *Coleman v. ESPN, Inc.*, 764 F. Supp. 290, 294 (S.D.N.Y. 1991) ("Whether ESPN broadcast certain compositions unintentionally because they constituted spontaneous crowd noise is immaterial [to] copyright infringement.").

*X Does Not Allege Subjective Baselessness.*  Because X has not shown objective baselessness, Defendants' motivation need not be considered.  *See PRE*, 508 U.S. at 50; *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 122 (3d Cir. 1999) ("Evidence of anticompetitive intent or purpose alone cannot transform otherwise legitimate activity into a sham."); *Bayou Fleet*, 234

---

[10] *See, e.g.*, *CSMN Invs., LLC v. Cordillera Metro. Dist.*, 956 F.3d 1276, 1287-88 (10th Cir. 2020) (affirming dismissal when appeal was "partially successful" and thus, not objectively baseless); *CVB, Inc. v. Corsicana Mattress Co.*, 604 F. Supp. 3d 1264, 1277 (D. Utah 2022) (rejecting plaintiff's argument that *Noerr-Pennington* immunity extends only "when a party completely wins the underlying petition" because "[t]he fact that the agencies did not adopt all of Defendants' allegations or arguments does not suggest the Petitions were baseless").

F.3d at 862 ("*Noerr–Pennington* applies to all genuine lobbying efforts, despite subjective intent and the net effects on a competitor's First Amendment rights.").  In any event, X alleges no facts that would establish subjective baselessness.

The DMCA addresses the subjective belief of the sender: takedown notices must include a statement provided under penalty of perjury that the sender has "a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law."  17 U.S.C. § 512(c)(3)(A)(v)-(vi); *see also Rossi v. Motion Picture Ass'n of Am. Inc.*, 391 F.3d 1000, 1004-05 (9th Cir. 2004) (holding that the DMCA "good faith belief" standard is subjective).  X does not allege that the takedown notices lacked this required statement or that the statement was somehow fraudulent.

Defendants' conduct is protected by *Noerr-Pennington*, and X's claims should be dismissed.  *See, e.g.*, *Tricon Precast, Ltd. v. Easi Set Indus., Inc.*, 395 F. Supp. 3d 871, 883, 886 (S.D. Tex. 2019) (granting motion to dismiss because "the *Noerr-Pennington* doctrine bars [plaintiff's] claims as a matter of law"); *Love Terminal Partners, L.P. v. City of Dallas, Tex.*, 527 F. Supp. 2d 538, 552 (N.D. Tex. 2007) (dismissing antitrust claim because "the protection afforded by *Noerr–Pennington* appears plainly on the face of plaintiffs' complaint").[11]

### C.    X Does Not State a Per Se Claim.

Even if X could allege an agreement, or a refusal to deal, its *per se* claim would fail because not all refusal to deal claims are deemed *per se* unlawful.  X's claim is certainly not.  *See Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 293-94, 296 (1985)

---

[11] X's state law claims should also be dismissed under *Noerr-Pennington* for the same reasons. *See JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 601 (S.D. Tex. 2022) ("[T]he *Noerr-Pennington* doctrine applies to [plaintiff's] state-law claims just the same as it does to [plaintiff's] federal claim."); *Bayou Fleet, Inc. v. Alexander*, 26 F. Supp. 2d 894, 897 (E.D. La. 1998) ("The *Noerr–Pennington* doctrine applies to antitrust actions premised on state law.").

(the *per se* standard should not be applied to the "[t]he act of expulsion from a wholesale cooperative").

Only a small group of restraints that are "so pernicious and devoid of redeeming virtue" that they can be condemned without further inquiry qualifies for *per se* treatment. *Marucci Sports, LLC v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 374 (5th Cir. 2014); *see also Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (holding that *per se* treatment is limited to a "small group" of restraints that "always or almost always" harm competition). When it comes to refusal to deal claims, *per se* condemnation is reserved for cases "in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor.'" *Ginzburg v. Mem'l Healthcare Sys., Inc.*, 993 F. Supp. 998, 1025 (S.D. Tex. 1997) (quoting *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458 (1986)). And as this Court recently explained, a group boycott claim requires the group boycott to either "directly or indirectly involve the plaintiff's competitor." *WFA*, 2026 WL 833900, at *25; *see MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 848 (5th Cir. 2015); *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 2016 WL 3880989, at *12 (N.D. Cal. 2016) ("Plaintiffs must allege a horizontal agreement between companies to disadvantage direct competitors in order to invoke the *per se* approach.").

As discussed above, X does not allege that Defendants acted to disadvantage one of their direct competitors, or that the alleged boycott involves any of its competitors. *See Arista Recs. LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 575 n.24 (S.D.N.Y. 2007) (*per se* treatment for alleged group boycott was not proper because the "mandatory licensing requirement" at issue was "not aimed at excluding horizontal competitors").

In the rare instances where courts have allowed a *per se* group boycott theory to proceed in the absence of a conspiracy to harm a competitor, they have required the plaintiff to show that

33

defendants control access to an input necessary for the plaintiff to compete. *See Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 413-14 (5th Cir. 2007); *see also MM Steel*, 806 F.3d at 850. But X has not alleged Defendants "cut off [X's] access to a supply, facility, or market necessary to enable [it] to compete." *Nw. Wholesale Stationers*, 472 U.S. at 294; *Consol. Metal Prods., Inc. v. Am. Petroleum Institute*, 846 F.2d 284, 291 (5th Cir. 1988) (the Supreme Court "emphasized that the denial of necessary business relations is crucial to *per se* illegality"). X does not allege that it has been cut off from anything. To the contrary, X alleges—repeatedly—that it does not need licenses but rather can rely on the DMCA safe harbor if it wishes, as it has apparently done for over a decade. *E.g.*, Cmplt. ¶ 5. X cannot run from its admission that it *does not need* what it says is being denied.

Nor is there any allegation that X's ability to compete is somehow harmed. It is fully available to users. *See Consol. Metal Prods.*, 846 F.2d at 292 (holding that defendant "is still free to sell its products and consumers are free to buy them"). To the extent X complains of lost "popular users," a "decline in value," or reduced attractiveness to advertisers, those alleged harms stem from widespread infringement on X's platform and X's decision to rely on the DMCA safe harbor rather than obtaining licenses. Simply put, the ability to host infringing posts is not necessary to X's ability to compete.

Any *per se* claim fails.

### D.      X Fails to State a Section 2 Monopolization Claim.

X asserts claims for monopolization, attempted monopolization, and conspiracy to monopolize under Section 2 of the Sherman Act. Cmplt. ¶¶ 204-22. The challenged anticompetitive conduct, though, is the same for all three: an alleged refusal to deal. A claim for conspiracy to monopolize requires: (1) the existence of a combination or conspiracy, (2) an overt act in furtherance of the conspiracy, and (3) specific intent to monopolize. *N. Miss. Commc'ns v.*

34

*Jones*, 792 F.2d 1330, 1335 (5th Cir. 1986).  A claim for monopolization requires that the defendant (1) possess monopoly power in the relevant market and (2) has acquired, enhanced, or maintained that power by the use of exclusionary conduct as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *Trinko*, 540 U.S. at 407.  Attempted monopolization requires (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize, and (3) a dangerous probability of achieving monopoly power.  *Taylor Publ'g Co. v. Jostens Inc.*, 216 F.3d 465, 474 (5th Cir. 2000).  X's allegations fall short.

### 1.     *X Does Not Allege Exclusionary Conduct.*

A monopolization claim requires allegations that a defendant "abused its monopoly power by acting in an unreasonably exclusionary manner relative to its competitors."  *Mid Texas Commc'ns Sys., Inc. v. Am. Tel. & Tel. Co.*, 615 F.2d 1372, 1387 (5th Cir. 1980); *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) (attempted monopolization requires, among other things, "that the defendant has engaged in predatory or anticompetitive conduct").

Refusals to deal ordinarily cannot satisfy the exclusionary conduct element because "[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."  *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009).  The sole exception requires threading the "narrow-eyed needle" of *Aspen Skiing*, a case "at or near the outer boundary" of antitrust law.  *Novell v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) (Gorsuch, J.); *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).[12]

---

[12] Courts have repeatedly rejected any duty to deal.  *E.g.*, *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 135 (2d Cir. 2014) (no duty to share intellectual property); *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 283 (4th Cir. 2012) (no duty to provide access to electronic data exchange in the way plaintiff preferred); *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295-

X cannot meet the "heavy doctrinal burden to capture *Aspen Skiing*'s narrow exception." *Dealer Comput. Servs. v. Ford Motor Co.*, 2006 WL 801033, at \*4 (S.D. Tex. 2006).  It is limited to the rare case where a profitable course of dealing with a competitor arises in a competitive market and the defendant unilaterally terminates the course of dealing after the defendant acquires its monopoly power. *Aspen Skiing*, 472 U.S. at 603; *Western Union*, 797 F.2d at 377.  The doctrine is limited to refusals to deal with competitors. *See also WFA*, 2026 WL 833900, at \*25 (holding same in the Section 1 context).  Here, X and the Music Publishers are not competitors, so X's claim "is simply not a recognized antitrust claim under the Supreme Court's existing refusal to deal precedents." *RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 228 (E.D.N.Y. 2009), *aff'd*, 391 F. App'x 59 (2d Cir. 2010).

*Aspen Skiing* also requires a prior course of dealing.  *Dealer Comput. Servs.*, 2006 WL 801033, at \*4; *see also, e.g.*, *Adderall*, 754 F.3d at 135 (no duty to deal where "Shire did not terminate any prior course of dealing"); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (same); *NYMEX*, 323 F. Supp. 2d at 571 (same).  That too is fatal here.  X does not allege any prior individual license negotiations other than its own failure to engage with Warner.  *See ASAP Paging Inc. v. CenturyTel of San Marcos Inc.*, 137 F. App'x 694, 698 (5th Cir. 2005) (affirming dismissal of a Section 2 claim predicated on refusal to deal for failure to allege facts falling within exception).  Nor is there any allegation that Defendants are sacrificing short-term profits to obtain larger long-term profits from the exclusion of competition.  *Id.* (affirming

---

96 (11th Cir. 2004); *New York Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*, 323 F. Supp. 2d 559, 571 (S.D.N.Y. 2004) ("*NYMEX*") (no duty to share settlement prices used in futures trading); *Olympia Equip. Leasing Co. v. Western Union Tel. Co.*, 797 F.2d 370, 375-76 (7th Cir. 1986) (Posner, J.).

dismissal where plaintiff failed to allege that defendants had a prior profitable arrangement with plaintiff or that the termination involved foregoing short-term profits for long-term gains).

### 2. *X's Monopolization and Attempted Monopolization Claims Fail Because X Does Not Allege Individual Monopoly Power.*

To maintain an actual or attempted monopolization claim, X must plead monopoly power—"the power to control price or exclude competition"—or a dangerous probability of achieving monopoly power, respectively. *See, e.g.*, *Seidenstein v. Nat'l Med. Enters., Inc.*, 769 F.2d 1100, 1105-06 (5th Cir. 1985); *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 207-08 (5th Cir. 1969) (affirming dismissal of attempted monopolization claim where complaint failed to allege facts demonstrating that Kroger had a dangerous probability of obtaining monopoly power in the Dallas grocery store market). These are "single firm" claims. *Spectrum Sports*, 506 U.S. at 454. That is, the monopoly power inquiry focuses on a single defendant, and cannot be satisfied by aggregating defendants together. *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., Inc.*, 200 F.3d 307, 315-16 (5th Cir. 2000) (no actual or attempted monopolization claim if no single defendant "individually wields the power to control prices or exclude competition").[13]

Here, X does not allege that any single Music Publisher has the power to control prices or exclude competition. It does not even allege any single Music Publisher's market share. *Cf. Yoder Bros. v. California-Fla. Plant Corp.*, 537 F.2d 1347, 1367 (5th Cir. 1976) (defendant's market share of "less than 20% [is] clearly not enough for monopolization" and did not support attempted monopolization either). Instead, X again resorts to impermissible group pleading, alleging only that Defendants "collectively have monopoly power" because "[t]he Majors and Defendants

---

[13] By contrast, in the Fifth Circuit, monopoly power may be aggregated for purposes of a conspiracy-to-monopolize claim. *See United States v. Am. Airlines, Inc.*, 743 F.2d 1114 (5th Cir. 1984). But as explained, that claim fails for want of conspiracy, among other reasons.

37

Kobalt, BMG, Reservoir, Concord, Big Machine, and Hipgnosis have a collective market share exceeding 90%." Cmplt. ¶¶ 175, 205. This cannot sustain a monopolization or attempted monopolization claim.

### 3. *X's Conspiracy to Monopolize and Attempted Monopolization Claims Fail Because X Does Not Allege Specific Intent to Monopolize.*

To plead a claim for attempt or conspiracy to monopolize, X must also "plausibly allege specific intent by [each Defendant] to monopolize the relevant market." *Dexon Computer, Inc. v. Cisco Sys., Inc.*, 2023 WL 2941414, at *21 (E.D. Tex. 2023). This means the "specific intent to destroy competition or build monopoly." *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 626 (1953). Courts routinely dismiss Section 2 claims where, as here, the allegations of specific intent are conclusory and the only conduct alleged is not anticompetitive. *See Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 258 (3d Cir. 2010) (affirming dismissal of Section 2 claim); *Philadelphia Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 341 (3d Cir. 2018) (same); *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 782 F. Supp. 2d 1059, 1079 (E.D. Cal. 2011) (dismissing Section 2 conspiracy claim due to conclusory nature of allegations of intent).

Here, X has at most alleged that the Music Publishers had an interest in securing licenses with X individually, not that any Defendant intended individually (or even collectively) to monopolize the alleged U.S. or worldwide market for copyrighted musical compositions. Nor could they, absent acquisition of all, or substantially all, of the compositions in the world. Of course, X has alleged no such thing.

### 4. *X's Conspiracy to Monopolize Claim Fails for Want of Conspiracy.*

For all the reasons discussed above, X fails to allege any conspiracy. X's conspiracy to monopolize claim should be dismissed for the same reasons. Because X cannot establish the existence of a conspiracy under Section 1 of the Sherman Act, it necessarily cannot establish the

conspiracy element of its Section 2 claim. *Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*, 2013 WL 3873074, at *16 (S.D. Cal. 2013), *aff'd*, 642 F. App'x 665 (9th Cir. 2016) (dismissing Section 2 Sherman Act claim where "[plaintiff] has failed to plead the existence of a conspiracy for Section 1 violation, and thus has also failed to satisfy the first element for conspiracy to monopolize under Section 2").

### E.    X's State Law Claims Fail for the Same Reasons as Its Federal Antitrust Claims.

#### 1.    Texas Free Enterprise & Antitrust Act

The Texas Free Enterprise and Antitrust Act ("TFEAA") is "modeled after" federal antitrust law, *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002), and the statute instructs courts to "interpret the TFEAA in harmony with federal judicial interpretations of equivalent federal laws." *Id.* (citing Tex. Bus. & Comm. Code § 15.04); *see also DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 687 (Tex. 1990) ("We look to federal judicial interpretations of section 1 of the Sherman Act in applying section 15.05(a) of our state antitrust law."); *Caller-Times Pub. Co., Inc. v. Triad Commc'ns, Inc.*, 826 S.W.2d 576, 580 (Tex. 1992) ("Because section 15.05(b) of the Texas Antitrust Act is comparable to Section 2 of the Sherman Antitrust Act, we look to federal law…."). Accordingly, X's TFEAA claims should be dismissed for the same reasons its Sherman Act claims fail. *See Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 325 n.1 (5th Cir. 2015) ("Because the Texas Free Enterprise and Antitrust Act utilizes the same standards as the Sherman Act for establishing a violation, the Sherman Act analysis applies to Plaintiffs' state law claims as well"); *JSW Steel*, 586 F. Supp. 3d at 601 (same).

#### 2.    Civil Conspiracy

It is well-settled that a civil conspiracy is not an independent claim. *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 640 (5th Cir. 2007). Rather, a "defendant's liability for conspiracy

39

depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *Baylor Scott & White v. Project Rose MSO, LLC*, 633 S.W.3d 263, 284 (Tex. App.—Tyler 2021, pet. denied).  So "[i]f a plaintiff fails to state a separate underlying claim on which the court may grant relief, then a claim for civil conspiracy necessarily fails." *Meadows*, 492 F.3d at 640.

X's civil conspiracy claim is premised on its antitrust claims, Cmplt. ¶¶ 223-26, and because X fails to allege an antitrust claim, its civil conspiracy claim necessarily fails. *See EuroTec Vertical Flight Sols., LLC v. Safran Helicopter Engines S.A.S.*, 2019 WL 3503240, at *25 (N.D. Tex. 2019) (dismissal of underlying antitrust claims compelled dismissal of civil conspiracy claim).

### 3.    *Unfair Competition*

Texas does not recognize a freestanding tort of unfair competition.  Rather, an unfair competition claim "requires that the plaintiff show an illegal act by the defendant which interfered with the plaintiff's ability to conduct its business." *Taylor*, 216 F.3d at 486.

Here, X fails to state a viable unfair competition claim under Texas law for at least two independent reasons.  *First*, X hinges its unfair competition claim on the allegation that Defendants coordinated to send takedown notices to X.  Cmplt. ¶ 228.  But only certain causes of action "fall under the penumbra of unfair competition under Texas law," and this is not a recognized basis for an unfair competition claim.  *See, e.g.*, *Wickfire, LLC v. Trimax Media, Inc.*, 2016 WL 4119917, at *8 (W.D. Tex. 2016) (recognizing the Fifth Circuit has identified only a limited set of Texas unfair competition causes of action, including "trade-secret law … passing off, and misappropriation"); *see also Reliable Ambulance Serv., Inc. v. Mercy Hosp. of Laredo*, 2003 WL 21972724, at *2 (Tex. App.-San Antonio. 2003, pet. denied) (Mem. Op.) (declining to recognize unfair competition claim premised on violation of federal anti-kickback statute); *Houston*

40

*Mercantile Exch. Corp. v. Dailey Petroleum Servs. Corp.*, 1993 WL 322901, at \*4 (Tex. App.-Houston [14th Dist.] 1993, no pet.) (dismissing unfair competition claim where plaintiffs alleged that defendant "attempted to harass and intimidate them and their potential customers by filing these lawsuits and threatening further litigation").

*Second*, the failure of X's antitrust claims means X's unfair competition claim must fail for lack of an underlying illegal act. *See Cedra Pharmacy Houston, LLC v. UnitedHealth Grp., Inc.*, 2019 WL 1433600, at \*12 (S.D. Tex. 2019) ("Here, while Plaintiffs have alleged RICO claims and anti-trust claims, those claims are not, for the reasons set forth above, plausible. In the absence of those claims, there is no wrongful conduct upon which to base Plaintiff's claim of unfair competition under Texas law."); *Whirlpool Corp. v. Shenzhen Sanlida Electrical Tech. Co.*, 2024 WL 1298357, at \*3 (E.D. Tex. 2024) ("Finding that claims for monopolization and attempted monopolization under Section 2 of the Sherman Act have not been pleaded, it follows that the underlying tort or illegal conduct required to satisfy a claim for unfair competition has not been met.").

## V.   CONCLUSION

For all the reasons set forth above—including X's failure to allege antitrust injury, failure to allege a refusal to deal, failure to allege an agreement not to engage in individual licensing, failure to allege monopoly, and allegation of protected copyright enforcement and petitioning activity—the Complaint should be dismissed with prejudice, in its entirety, as to all Defendants.

Dated:  April 2, 2026

Respectfully submitted,

Leigha Simonton
Tex. Bar No. 24033193
DYKEMA GOSSETT PLLC
Comerica Bank Tower
1717 Main Street, Suite 4200
Dallas, TX 75201
Telephone: (214) 462-6444

*/s/ Christopher E. Ondeck*
Christopher E. Ondeck\*
DC Bar No. 454014
Jaclyn Phillips\*
DC Bar No. 1035068
PROSKAUER ROSE LLP
1001 Pennsylvania Ave, NW, Suite 600 S

Facsimile: (855) 261-8725
lsimonton@dykema.com

Washington, DC 20004
Telephone: (202) 416-6800
Facsimile: (202) 416-6899
condeck@proskauer.com
jphillips@proskauer.com

David A. Munkittrick*
NY Bar No. 4918678
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
dmunkittrick@proskauer.com

*Attorneys for Defendants
National Music Publishers' Association,
Inc., ABKCO Music, Inc., Anthem
Entertainment, L.P., Big Machine Music,
LLC, BMG Rights Management (US)
LLC, Concord Music Group, Inc.,
Downtown Music Publishing LLC, Kobalt
Music Publishing America, Inc., Lyric
Copyright Services, LP, Mayimba Music,
Inc., Payday Music Publishing, LLC, Peer
International Corporation, Peermusic,
Ltd., Peermusic III, Ltd., Peertunes, Ltd.,
Reservoir Media Management, Inc., Songs
of Peer, Ltd., Southern Music Publishing
Co., Inc., The Royalty Network, Inc.,
Warner Chappell Music, Inc., and Wixen
Music Publishing, Inc.*

*Admitted Pro Hac Vice*

*/s/ Kuruvilla J. Olasa*
Kuruvilla J. Olasa*
Glenn D. Pomerantz*
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
50th Floor
Los Angeles, CA 90071-3426
Telephone: (213) 683-9100
kuruvilla.olasa@mto.com
glenn.pomerantz@mto.com

42

Helen E. White*
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500E
Washington, DC 20001
Telephone: (202) 220-1100
helen.white@mto.com

Jeffrey M. Tillotson
State Bar No. 20039200
TILLOTSON JOHNSON & PATTON
1201 Main Street, Suite 1300
Dallas, Texas 75202
214-382-3040
jtillotson@tillotsonlaw.com

*Attorneys for Defendants Polygram
Publishing, Inc., Songs of Universal, Inc.,
Universal Music Corp., Universal Music –
MGB NA LLC, Universal Music – Z Tunes
LLC, Universal Musica, Inc.*

*\*Admitted Pro Hac Vice*

<u>*/s/ D. Bruce Hoffman*</u>
D. Bruce Hoffman (admitted *pro hac vice*)
Jacob M. Coate (admitted *pro hac vice*)
CLEARY GOTTLIEB STEEN & HAMILTON
LLP
2112 Pennsylvania Ave, NW
Washington, DC 20037
bhoffman@cgsh.com
jcoate@cgsh.com

E. Leon Carter
Texas Bar No. 03914300
lcarter@carterarnett.com
Linda R. Stahl
Texas Bar No. 00798525
Maria Zermeno
Texas Bar No. 24144700
mzermeno@carterarnett.com
CARTER ARNETT PLLC
8150 N. Central Expressway, Suite 500
Dallas, Texas 75206
T: 214.550.8188 | F. 214.550.8185

43

*Attorneys for Colgems-EMI Music Inc., EMI April Music Inc., EMI Blackwood Music Inc., EMI Consortium Music Publishing, Inc., EMI Consortium Songs, Inc., EMI Entertainment World Inc., EMI Feist Catalog Inc., EMI Mills Music Inc., EMI U Catalog Inc., Famous Music LLC, Hipgnosis Songs Group, LLC, Jobete Music Co., Inc., Screen Gems-EMI Music Inc., Sony Music Publishing (US) LLC, Stone Agate Music, Stone Diamond Music Corp.*

## <u>CERTIFICATE OF SERVICE</u>

I certify on this 2nd day of April 2026, I caused the foregoing to be electronically filed and served through the Court's ECF System.

Dated: April 2, 2026

<u>*/s/ Christopher E. Ondeck*</u>
Christopher E. Ondeck

45