**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| X CORP.,<br><br>       *Plaintiff*,<br><br>   v.<br><br>NATIONAL MUSIC PUBLISHERS'<br>ASSOCIATION, INC., *et al*.,<br><br>      *Defendants*. | Case No. 3:26-cv-00047-B |

**PLAINTIFF X CORP.'S OPPOSITION TO DEFENDANTS'**
**<u>MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM</u>**

Bradley Justus
AXINN, VELTROP &
HARKRIDER LLP
1901 L Street NW
Washington, DC 20036

Craig M. Reiser
Scott A. Eisman
Christopher Erickson
Isabella Schwarze
AXINN, VELTROP &
HARKRIDER LLP
630 Fifth Avenue, 33rd Floor
New York, NY 10111

Alex More
Monica E. Gaudioso
CARRINGTON,COLEMAN,
SLOMAN & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, TX 75202

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ....................................................................................................................... 5

ARGUMENT............................................................................................................................. 10

    I.    X ALLEGES ANTITRUST INJURY
        FROM DEFENDANTS' PER SE UNLAWFUL CONDUCT ............................ 12

        A.    X Alleges Antitrust Injury in the Relevant Market.................................. 13

        B.    X Alleges Harm to Competition ............................................................. 17

    II.    X ALLEGES THAT DEFENDANTS UNLAWFULLY REFUSED
         TO DEAL INDIVIDUALLY WITH X IN VIOLATION OF SECTION 1 ......... 20

        A.    X Alleges That Each Defendant
            Agreed Not to Deal With X Individually.................................................. 20

            1.    X Alleges Direct Evidence Of The Conspiracy ........................... 21

            2.    X Alleges Indirect Evidence Of The Conspiracy ........................ 24

        B.    X Alleges That Defendants' Agreement
            Is An Unreasonable Restraint Of Trade.................................................... 30

            1.    X Alleges That Defendants' Agreement Is *Per Se* Unlawful ....... 31

            2.    Defendants' Agreement Is
               Unlawful Even Under The Rule of Reason ................................. 34

        C.    The Majors' Decision To Join The Conspiracy
            Later Does Not Imply A Conspiracy Does Not Exist............................... 35

    III.    X ALLEGES THAT DEFENDANTS
          VIOLATED SECTION 2 OF THE SHERMAN ACT ....................................... 36

        A.    X Alleges Exclusionary Conduct............................................................. 36

        B.    The Fifth Circuit Does Not Require
            X To Allege "Individual Market Power"................................................... 38

        C.    X Alleges Specific Intent To Monopolize ............................................... 39

    IV.    DEFENDANTS CANNOT ESCAPE LIABILITY BY
         MISCHARACTERIZING X'S COMPLAINT AND THEIR MISCONDUCT... 40

        A.    X's Complaint Does Not Engage in Impermissible "Group Pleading".... 40

        B.    Certain Music Publishers' Willingness to Engage
            With X on Settling Copyright Infringement Claims
            Underscores Their Collective Refusal to Deal With X on Licenses......... 42

        C.    The Noerr-Pennington Doctrine Does
            Not Immunize Defendants' Anticompetitive Conduct ............................ 43

V.      X ALLEGES THAT DEFENDANTS'
        CONDUCT VIOLATES STATE LAW .................................................................. 47

VI.     IF ANY OF X'S CLAIMS ARE DEEMED
        INSUFFICIENT, X SHOULD BE ALLOWED TO AMEND ............................ 48

CONCLUSION .......................................................................................................................... 48

## TABLE OF AUTHORITIES

**Cases**                                                                           **Page(s)**

*A2D Techs. Inc. v. MJ Sys., Inc.*,
   269 F. App'x 537 (5th Cir. 2008) ........................................................................10

*Acad. of Allergy & Asthma in Primary Care v. La. Health Serv. & Indem. Co.*,
   No. CV 18-399, 2020 WL 4050243 (E.D. La. July 17, 2020),
   *reconsideration granted in part on other grounds*, No. CV 18-399,
   2021 WL 5029418 (E.D. La. May 14, 2021)...........................................................22

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
   37 F.3d 996 (3d Cir. 1994)....................................................................................23

*Am. Cent. E. Tex. Gas Co. v. Union Pac. Res. Grp., Inc.*,
   93 F. App'x 1 (5th Cir. 2004) ...........................................................................3, 14

*Am. Tobacco Co. v. United States*,
   328 U.S. 781 (1946)...............................................................................................44

*Amaretto Ranch Breedables v. Ozimals, Inc.*,
   No. C 10-05696, 2010 WL 5387774 (N.D. Cal. Dec. 21, 2010)............................44

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...............................................................................................10

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985)..........................................................................................37, 38

*Austin Legal Video, LLC v. Deposition Sols., LLC*,
   No. 1:23-CV-00421-DAE, 2024 WL 5184485 (W.D. Tex. July 19, 2024) ......................41, 42

*Baylor Scott & White v. Proj. Rose MSO, LLC*,
   633 S.W.3d 263 (Tex. Ct. App. 2021) ...................................................................48

*Bell Atl. Corp. v. Twombly*
   550 U.S. 544 (2007)......................................................................................4, 20, 29

*BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*,
   176 F. Supp. 3d 606 (W.D. La. 2016)...................................................................37

*In re Broiler Chicken Antitrust Litig.*,
   No. 16 C 8637, 2022 WL 2028237 (N.D. Ill. May 4, 2022) ..................................42

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)..........................................................................................10, 14

*Cascades Comput. Innovation LLC v. RPX Corp.*,
No. 12-CV-1143, 2013 WL 6247594 (N.D. Cal. Dec. 3, 2013)......................................25, 27

*Centennial Bank v. Holmes*,
717 F. Supp. 3d 542 (N.D. Tex. 2024) ........................................................................47

*Churchill Downs Inc. v. Thoroughbred Horsemen's Grp., LLC*,
605 F. Supp. 2d 870 (W.D. Ky. 2009).........................................................................18

*City of Moundridge v. Exxon Mobil Corp*,
471 F. Supp. 2d 20 (D.D.C. 2007) ..............................................................................40

*Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.*,
611 F.3d 495 (9th Cir. 2010) ......................................................................................18

*Coastal States Mktg., Inc. v. Hunt*,
694 F.2d 1358 (5th Cir. 1983) ....................................................................................44

*Colum. Pictures Indus., Inc. v. Pro. Real Est. Invs., Inc.*,
944 F.2d 1525 (9th Cir. 1991) ....................................................................................42

*Concord Music Grp., Inc. v. X Corp.*,
No. 23-cv-00606 (M.D. Tenn. May 11, 2026), Dkt. No. 192........................................9

*Cont'l Airlines, Inc. v. Am. Airlines, Inc.*,
824 F. Supp. 689 (S.D. Tex. 1993) .............................................................................38

*Cont'l Airlines, Inc. v. United Air Lines, Inc.*,
120 F. Supp. 2d 556 (E.D. Va. 2000) .........................................................................30

*Cox Communications, Inc. v. Sony Music Entertainment*,
146 S. Ct. 959 (2026).....................................................................................................9

*CSR Ltd. v. Fed. Ins. Co.*,
40 F. Supp. 2d 559 (D.N.J. 1998) ...............................................................................30

*Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
961 F.2d 1148 (5th Cir. 1992) ....................................................................................20

*Dinosaur Fin. Grp. LLC v. S&P Glob., Inc.*,
22 Civ. 1860 (KPF), 2023 WL 4562031 (S.D.N.Y. July 14, 2023) ............................37

*Downtown Music Publishing LLC v. Peloton Interactive Inc.*,
436 F. Supp. 3d 754 (S.D.N.Y. 2020)..........................................................................45

*Drs. Hosp. of Laredo v. Cigarroa*,
782 F. Supp. 3d 406 (W.D. Tex. 2025)........................................................................25

iv

*Drs. Hosp. of Laredo v. Cigarroa*,
　SA-21-CV-01068-XR, 2022 WL 3567353 (W.D. Tex. Aug. 17, 2022) ................................38

*EQMD, Inc. v. Farm Bureau Gen. Ins. Co. of Mich.*,
　No. 19-13698, 2021 WL 843145 (E.D. Mich. Mar. 5, 2021)................................................45

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
　720 F.3d 33 (1st Cir. 2013)...........................................................................................22, 27

*Fashion Originators' Guild of Am. v. Fed. Trade Comm'n*,
　312 U.S. 457 (1941)...............................................................................................................37

*FMC v. Svenska Amerika Linien*,
　390 U.S. 238 (1968)...............................................................................................................31

*Foman v. Davis*,
　371 U.S. 178 (1962)...............................................................................................................48

*FTC v. Superior Court Trial Lawyers Ass'n*,
　493 U.S. 411 (1990)....................................................................................................... *passim*

*Gainesville Utilities Dep't v. Fla. Power & Light Co.*,
　573 F.2d 292 (5th Cir. 1978) ................................................................................................24

*Ginzburg v. Mem'l Healthcare Sys., Inc.*,
　993 F. Supp. 998 (S.D. Tex. 1997) .......................................................................................33

*Glen Holly Ent., Inc. v. Tektronix, Inc.*,
　352 F.3d 367 (9th Cir. 2003) ...............................................................................13, 14, 15, 17

*Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd.*,
　525 F. Supp. 3d 1145 (S.D. Cal. 2021)................................................................................44

*Impax Lab'ys, Inc. v. FTC*,
　994 F.3d 484 (5th Cir. 2021) .....................................................................................18, 34, 35

*Interstate Circuit v. United States*,
　306 U.S. 208 (1939)...............................................................................................................35

*JSW Steel (USA) Inc. v. Nucor Corp.*,
　586 F. Supp. 3d 585 (S.D. Tex. 2022) ..................................................................................43

*Kjessler v. Zaappaaz, Inc.*,
　No. 4:18-0430, 2019 WL 3017132 (S.D. Tex. Apr. 24, 2019).............................21, 24, 25, 28

*LEGO A/S v. ZURU, Inc.*,
　No. 3:18-CV-2045(AWT), 2020 WL 13145135 (D. Conn. Apr. 22, 2020)..........................19

*Love Terminal Partners, L.P. v. City of Dallas, Tex.*,
   527 F. Supp. 2d 538 (N.D. Tex. 2007) ...................................................................43

*LY Berditchev, Corp. v. Truss Cosms. Corp.*,
   No. CV 22-04242, 2023 WL 334539 (D.N.J. Jan. 20, 2023) ..................................45

*MacDermid Printing Sols. LLC v. Cortron Corp.*,
   833 F.3d 172 (2d Cir. 2016)....................................................................................18

*Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*,
   751 F.3d 368, 372 (5th Cir. 2014) .....................................................................19, 20

*Miami Prods. & Chem. Co. v. Olin Corp.*,
   449 F. Supp. 3d 136 (W.D.N.Y. 2020)...................................................................27

*MM Steel, L.P. v. JSW Steel (USA) Inc.*
   806 F.3d 835 (5th Cir. 2015), 2026 WL 833900 ........................................14, 16, 17

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984)........................................................................................20, 22

*Morrone Co. v. Barbour*,
   241 F. Supp. 2d 683 (S.D. Miss. 2002)...................................................................47

*N. Pac. Ry. v. United States*,
   356 U.S. 1 (1958).....................................................................................................31

*Nat'l Bancard Corp. v. VISA U.S.A., Inc.*,
   779 F.2d 592 (11th Cir.1986) .................................................................................30

*Nelson v. United States*,
   415 F.2d 483 (5th Cir. 1969) ..................................................................................35

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*,
   472 U.S. 284 (1985)....................................................................................15, 16, 17

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
   572 U.S. 545 (2014)................................................................................................43

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018)................................................................................................34

*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*,
   997 F. Supp. 2d 526 (N.D. Tex. 2014) ...................................................................29

*Open Cheer & Dance Championship Series, LLC v. Varsity Spirit, LLC*,
   No. 2:23-CV-0155, 2024 WL 1218573 (N.D. Tex. Mar. 21, 2024)................31, 37

*Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*,
   81 F. Supp. 3d 1 (D.D.C. 2015)............................................................................39, 40

*Palmer v. BRG of Ga., Inc.*,
   498 U.S. 46 (1990)....................................................................................14, 17, 31

*PepsiCo, Inc. v. Cont'l Cas. Co.*,
   640 F. Supp. 656 (S.D.N.Y. 1986).................................................................................15

*In re Plywood Antitrust Litig.*,
   655 F.2d 627 (5th Cir. 1981) .......................................................................................24

*Pro. Real Est. Invs., Inc. v. Colum. Pictures Indus., Inc.*,
   508 U.S. 49 (1993)..............................................................................................45, 46

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
   615 F.3d 412 (5th Cir. 2010) .......................................................................................34

*Quadvest, L.P. v. San Jacinto River Auth.*,
   No. 4:19-CV-4508, 2020 WL 5034155 (S.D. Tex. Aug. 14, 2020),
   *aff'd*, 7 F.4th 337 (5th Cir. 2021).............................................................................20

*Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*,
   364 U.S. 656 (1961)....................................................................................................17

*Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*,
   745 F.3d 343 (9th Cir. 2014) .......................................................................................46

*Rx Sols., Inc. v. Caremark, L.L.C.*,
   164 F.4th 436 (5th Cir. 2026) .................................................................................3, 13

*Sony Elecs. Inc. v. Soundview Techs., Inc.*,
   157 F. Supp. 2d 180 (D. Conn. 2001)...........................................................................44

*Spectators' Communication Network Inc. v. Colonial Country Club*,
   253 F.3d 215 (5th Cir. 2001) .......................................................................................16

*St. Paul Fire & Marine Ins. Co. v. Barry*,
   438 U.S. 531 (1978)....................................................................................................13

*Stewart Glass & Mirror, Inc. v. U.S.A. Glass, Inc.*,
   940 F. Supp. 1026 (E.D. Tex. 1996).............................................................................39

*Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., Inc.*,
   200 F.3d 307 (5th Cir. 2000) .......................................................................................39

*Taylor Publ'g Co. v. Jostens, Inc.*,
   216 F.3d 465 (5th Cir. 2000) .......................................................................................47

*Taylor v. Christus St. Joseph Health Sys.*,
No. 5:04-CV-153-DF, 2006 WL 1582097, at *2 (E.D. Tex. 2006)..........................................19

*Teso LT, UAB v. Luminati Networks Ltd.*,
No. 2:20-CV-00073, 2020 WL 7364606 (E.D. Tex. Dec. 15, 2020) ......................................43

*Texas v. BlackRock, Inc.*,
No. 6:24-CV-437-JDK, 2025 WL 2201071 (E.D. Tex. Aug. 1, 2025) .......................25, 30, 35

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) ...........................................................................................28

*Torrey v. Infectious Diseases Soc'y of Am.*,
No. 5:17-CV-00190-RWS, 2018 WL 10124894 (E.D. Tex. Sept. 27, 2018)....................38, 41

*In re Travel Agent Comm'n Antitrust Litig.*,
583 F.3d 896 (6th Cir. 2009) ...........................................................................................25

*TravelPass Grp., LLC v. Caesars Ent. Corp.*,
No. 5:18-CV-153-RWS-CMC, 2019 WL 5691996 (E.D. Tex. Aug. 29, 2019),
rep. & reccomendation adopted, 2019 WL 4727425
(E.D. Tex. Sept. 27, 2019)  ...............................................................12, 13, 22, 41

*Tunica Web Advert. v. Tunica Casino Operators Ass'n*,
496 F.3d 403 (5th Cir. 2007) ............................................................................. *passim*

*Ultraclear Epoxy, LLC v. Epodex USA Corp.*,
No. 3:23-cv-00715, 2024 WL 966876 (M.D. Tenn. Mar. 6, 2024).........................................44

*United States v. Am. Airlines, Inc.*,
743 F.2d 1114 (5th Cir. 1984) .....................................................................................11, 38

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam) ..............................................................37

*United States v. Realty Multi-List, Inc.*,
629 F.2d 1351 (5th Cir. 1980) ...........................................................................................10

*United States v. Topco Assocs., Inc.*,
405 U.S. 596 (1972)..........................................................................................................18

*Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc.*,
No. CIV.A. SA-15-CA-32, 2015 WL 6994438 (W.D. Tex. Oct. 15, 2015)......................17, 40

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
627 F.3d 85 (3d Cir. 2010)...............................................................................................21

*W&T Offshore, Inc., v. Endurance Assurance Corp.*,
No. 4:24-cv-3047, 2026 WL 1271389 (S.D. Tex. Apr. 10, 2026)..............................21, 28, 34

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*,
648 F3d 452 (6th Cir. 2011) ...................................................................................29

*Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co.*,
No. 2:22-cv-00027-JRG-RSP, 2024 WL 1298357 (E.D. Tex. Mar. 5, 2024),
*rep. & recommendation adopted*, 2024 WL 1289687
(E.D. Tex. Mar. 26, 2024).......................................................................................48

*Wiltfong v. Cal. State Bd. of Accountancy*,
No. EP-17-CV-0355-PRM, 2018 WL 935398 (W.D. Tex. Feb. 16, 2018)...........................41

**Statutes and Other Authorities**

Digital Millennium Copyright Act, 17 U.S.C. § 512................................................ *passim*

Fed. R. Civ. P. 12(b)(6)............................................................................ *passim*

Fed. R. Civ. P. 15(a)(2)...........................................................................................48

Sherman Act, 15 U.S.C. §§ 1, 2....................................................................... *passim*

Texas Free Enterprise & Antitrust Act, Bus. & Com. §§15.01, et seq. ..............................2, 12, 47

## PRELIMINARY STATEMENT

In 2016, NMPA and its member Music Publishers instituted a campaign to force social media and other online platforms, like X, to take industrywide licenses for their musical works.[1] Rather than compete to offer licenses individually, the Music Publishers agreed—as NMPA President and CEO David Israelite urged—to "work together 'to expand the pie,' and not turn[] on one another to try and get a bigger piece of the pie."

In an effort to force X to take an industrywide license, Defendants deployed a playbook they have used against other platforms: collectively refusing individual licensing negotiations and weaponizing the Digital Millennium Copyright Act ("DMCA") to coerce industrywide negotiations. Although the DMCA is designed to *shield* platforms like X from copyright infringement liability and foster their growth, Defendants have wielded it as a sword by sending takedown notices of a magnitude intended to force X to accede to their collective demand.

In October 2021, after Defendants succeeded in coercing other major platforms to take industrywide licenses and obtaining "the highest royalty rate in the history of streaming anywhere in the world," they set their sights on X. Writing on behalf of "all music publishers," NMPA emailed X threatening a "massive program" to flood X with DMCA takedown notices "on a scale larger than any previous effort in DMCA history" and to "quickly turn many of [X's] most popular users into repeat infringers" if X did not take an industrywide license. Defendants then made good on that threat: the Music Publishers authorized NMPA to send, on their collective behalf, notices listing *hundreds of thousands* of posts that NMPA identified for the Music Publishers as

---

[1] "X" refers to Plaintiff X Corp. and "Defendants" refers collectively to the National Music Publishers' Association ("NMPA") and the music publisher defendants (the "Music Publishers"). Defendants' brief in support of their motion to dismiss, Dkt. No. 87, is referred to as the "Motion" or "MTD." Unless otherwise noted, internal quotation marks have been omitted, and all emphasis has been added.

infringing—including posts for which there is no credible argument of infringement. This collective action has forced X to remove content and suspend users, harming both X and its users.

Tellingly, although the Music Publishers have been willing to individually discuss settling a copyright infringement lawsuit with X, since this scheme began, not a single Music Publisher has been willing to individually negotiate a license with X outside that context. NMPA's communications to X leave no doubt about why: the Music Publishers—direct competitors—have agreed among themselves to negotiate only collectively with X for an industrywide license. As Mr. Israelite's initial email plainly stated, "*we*"—i.e., NMPA's members, collectively—were "open to starting" negotiations for an industrywide license if X wanted to avoid Defendants' coercive conduct. Echoing the position that the Music Publishers will act only collectively, a senior executive of one of the largest Music Publishers, Warner Chappell, issued an unmistakable warning to X that publishers should "not be[] treated as an afterthought," that "any music framework and licensing scheme [with record labels] will also require the input of music publishers," and that X should avoid "a licensing framework that won't be approved by publishers"—i.e., not just Warner Chappell, but all of them. This admonition from an industry giant was a clear threat that the Music Publishers—collectively—could veto any licensing agreement X might try to reach with record labels for separate rights to those labels' copyrighted works.

Collectively refusing to deal with a customer to extract supracompetitive prices is a textbook violation of the antitrust laws, under both Section 1 and Section 2 of the Sherman Act, as well as the Texas Free Enterprise & Antitrust Act. It also violates the common law. Defendants' scattershot arguments provide no basis for dismissing any of X's claims:

**X alleges antitrust injury.** Relying solely on this Court's decision in *X Corp. v. World Federation of Advertisers* ("*WFA*"), Defendants wrongly argue that only competitors of alleged

2

conspirators can suffer antitrust injury. That position is directly contrary to controlling law, which holds that "[c]ompetitor status is not requisite to establish [antitrust] standing." *Am. Cent. E. Tex. Gas Co. v. Union Pac. Res. Grp., Inc.*, 93 F. App'x 1, 7 (5th Cir. 2004) (citing *Almeda Mall, Inc. v. Hou. Lighting & Power Co.*, 615 F.2d 343, 354 (5th Cir. 1980)). Neither *WFA* nor the cases on which it relied involved a customer (like X) being boycotted by suppliers (like the Music Publishers). Applying *WFA* to hold that X has not alleged antitrust injury here, where X is a customer for licenses to musical compositions, would turn antitrust law on its head because the fundamental "question underlying antitrust injury is whether *consumers*—not *competitors*—have been harmed." *Rx Sols., Inc. v. Caremark, L.L.C.*, 164 F.4th 436, 444 (5th Cir. 2026).

***X alleges that each Defendant participated in the unlawful conspiracy.*** X's Complaint alleges numerous facts showing that Defendants have collectively refused to deal with X individually in order to coerce an industrywide license. For example:

- NMPA President Israelite urged the Music Publishers to "work together 'to expand the pie,' and not turn[] on one another to try and get a bigger piece of the pie." Compl. ¶ 73.

- Although some Music Publishers have been willing to individually discuss settlement, not a single one of them has been willing to engage in any individual license negotiations with X, despite their individual economic incentives to do so. *Id.* ¶¶ 11, 114, 146-151.

- Throughout the entire conspiracy, the Music Publishers, all members of NMPA, were in close contact through regular NMPA-coordinated events, attended by the Music Publishers' most senior business executives. *Id.* ¶¶ 139-141.

- NMPA wrote X "on behalf of" all Defendants threatening to inundate X with a "massive program" of takedown notices. *Id.* ¶¶ 7, 94.

- In that same email, NMPA stated that "*we*"—the Music Publishers collectively—"are open to starting conversation." *Id.* ¶ 97.

- Each Defendant authorized NMPA to identify allegedly infringing works and send takedown notices on its behalf to target X and deluge it with thousands of collective notices to try to force X to negotiate an industrywide license. *Id.* ¶¶ 99, 110-111.

- This concerted action was an abrupt departure from prior practice. In prior years, each Music Publisher had sent takedown notices individually, if at all, and the notices typically concerned a handful of allegedly infringing posts at a time. *Id.* ¶¶ 156-158.

3

Horizontal agreements to boycott a purchaser are *per se* illegal under the Sherman Act. *See FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 434-436 (1990). But even if analyzed under the rule of reason, Defendants' conspiracy is illegal because it stifles competition among the Music Publishers while offering no procompetitive benefit—a point Defendants do not dispute. Taken together, these and other allegations of the Complaint more than suffice to "nudge [X's] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly* 550 U.S. 544, 570 (2007).

***The Noerr-Pennington doctrine does not immunize Defendants' unlawful conduct.*** The Music Publishers engaged in an illegal group boycott, which *Noerr-Pennington* does not immunize. The fact that they used a bad-faith barrage of DMCA takedown notices as one way of implementing their illegal conspiracy does not change that. Multiple cases have held that the *Noerr-Pennington* doctrine does not shield the senders of DMCA takedown notices from antitrust liability. Nor can they, given that the takedown notices here neither petition the government nor threaten litigation. Indeed, NMPA, which sent the takedown notices, does not own the Music Publishers' copyrights and therefore cannot bring copyright litigation itself. Thus, to the extent Defendants argue their conduct is shielded by *Noerr-Pennington*, they are wrong. And, regardless, *Noerr-Pennington* is an affirmative defense that may not be resolved at this stage.

***Fifth Circuit case law condemns joint monopolies.*** Defendants' Motion ignores controlling case law condemning joint monopolies. Contrary to Defendants' position, the law forbids them from banding together to offer X a choice between negotiating for an industrywide license or no license at all. The Court should deny Defendants' Motion.

4

## BACKGROUND

X is a social media platform that functions as a modern public square. It provides a forum for millions of users to share their views, follow current events, and interact with other users and their posts. Compl. ¶ 2. As part of that activity, X's users can publish text and multimedia content (including images, audio, and video) and share or repost content from third-party websites, apps, or other users. *Id*. Users of the platform promote their favorite songs, albums, and artists, and share user-generated content or videos that incorporate their music of choice. *Id*. ¶¶ 2, 14, 70.

Defendants in this case are 18 Music Publishers and NMPA, a trade association that purports to represent the Music Publishers' interests. *Id*. ¶ 19. The Music Publishers are horizontal competitors in the market for licenses to copyrighted musical compositions. Together, the Music Publishers own more than a 90% share of copyrighted music in the United States. *Id*. ¶ 134. The collective market share of the five largest Music Publishers—the three "Majors" (Warner Chappell, Sony, and Universal) plus Kobalt and BMG—exceeds 70%. *Id*.

Every Music Publisher is an NMPA member, and business executives from twelve Music Publishers sit on NMPA's board. *Id*. ¶¶ 134, 137. The board meets four times a year, and NMPA holds an Annual Meeting and social and other events every year. *Id*. ¶¶ 138-141. These events provide numerous opportunities for Defendants to collude. *Id*. The Music Publishers share sensitive pricing information by inserting into their licenses most-favored nation clauses ("MFNs"), which artificially raise license prices. *Id*. ¶¶ 143-144.

User posts on X may contain multimedia content subject to copyright. The DMCA provides a statutory process to protect X from potential copyright infringement liability arising from its users' posts. *Id*. ¶¶ 5, 77, 78. Rather than requiring online platforms like X to obtain licenses on behalf of its users, the DMCA provides a notice-and-takedown process through which copyright

5

owners can inform platforms of infringing material. *Id*. ¶ 78. As long as a platform removes allegedly infringing material and removes repeat infringers from the platform, the platform cannot be held liable for copyright infringement. 17 U.S.C. § 512(c)(1)(C); Compl. ¶ 78. The DMCA contemplates that takedown notices can be signed either by the owner of a copyright or by "a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed." 17 U.S.C. § 512(c)(3)(A)(i).

Around 2016, Defendants began a coordinated campaign to force online platforms to take industrywide licenses. Compl. ¶¶ 73, 75. The aim, as described by Defendants themselves, was to obtain higher royalties—i.e., prices—by offering and negotiating licenses collectively rather than competing with one another to offer more favorable terms individually. *Id*. ¶¶ 75, 159-160, 180-181. A keynote speech given by NMPA President Israelite, at NMPA's 2016 Annual Meeting, exemplifies Defendants' coordinated approach: Mr. Israelite "urged the entire music industry to work together . . . and not turn[] on one another to try and get a bigger piece of the pie." *Id*. ¶ 73. Other speakers likewise "urged the industry to pull together to fight for fair compensation from digital music service providers." *Id.*

Many online platforms—X included—have no need for an industrywide license for all music owned by every Music Publisher. *Id*. ¶ 147. In a competitive market, the Music Publishers would compete to be one of the Music Publishers that X selects to license their body of works by developing the best catalogs, competing on royalty rates, or offering other favorable terms. *Id*. ¶¶ 71, 170, 178. Instead, Defendants have banded together to eliminate those competitive pressures and force X, and other platforms, to take industrywide licenses from all of them. *Id*. ¶ 170.

One of the ways Defendants have forced online platforms to take industrywide licenses, beyond refusing to negotiate individually, is by weaponizing the DMCA takedown process. For

example, in 2020, NMPA, on the Music Publishers' behalf, sent Amazon's Twitch a barrage of DMCA takedown notices related to clips with background music that was purportedly copyright-protected. *Id*. ¶ 81. After having received fewer than 50 music-related DMCA notifications each year, Twitch was suddenly flooded with thousands each week. *Id*. ¶ 82. In sending these thousands of weekly notices, Defendants made plain that their goal was not to ensure that Twitch removed infringing material, but to inflict pain on Twitch and its users so that Twitch would be forced to take an industrywide license at supracompetitive rates. *Id*. ¶ 85. Mr. Israelite, who had publicly questioned whether licensees were getting too much of a "bargain," bragged that "Twitch's users have paid the price for the platform's failure to license music." *Id.* After 18 months of Defendants' coordinated attack, Twitch succumbed and took an industrywide license in September 2021. *Id*. ¶ 86. In 2018, NMPA demanded an industrywide license from Peloton. *Id*. ¶ 90. When Peloton tried to negotiate licenses with certain individual Music Publishers, NMPA refused to allow it, and all publishers ceased negotiations with Peloton at nearly the same time. *Id*. ¶ 91. Wielding their collective power through NMPA, Defendants have similarly forced each of the other major online platforms to take an industrywide license. *Id*. ¶¶ 73-92. According to Mr. Israelite, Defendants have succeeded in obtaining industrywide licenses from YouTube, Facebook, Instagram, TikTok, Snap, Twitch, Triller, and Roblox. *Id*. ¶ 97.

On October 6, 2021, Mr. Israelite emailed X expressly on behalf of "all music publishers . . . in the United States"—including the Music Publisher Defendants. *Id*. ¶ 94. In that email, NMPA threatened to initiate "a massive program of notices to [X] under the Digital Millennium Copyright Act" unless X agreed to "develop a partnership, similar to what many other social media companies have done." *Id*. ¶¶ 94, 97. And NMPA made clear that any such partnership would be with the industry collectively, writing that "*we* are open to starting a conversation." *Id.* NMPA

7

further threatened to "quickly turn many of [X's] most popular users into repeat infringers" so that they would have to be deplatformed, diminishing X's overall value and decreasing its advertising revenue. *Id*. ¶¶ 95-96.

When X did not begin negotiating on terms for an industrywide license from "all music publishers . . . in the United States," NMPA made good on its threat by bombarding X with takedown notices on behalf of the Music Publishers, covering thousands of posts nearly weekly, identifying over 200,000 posts in the first year alone. *Id*. ¶¶ 94, 98, 100. This has required X to suspend 50,000 of its users. *Id*. ¶ 101. Defendants' onslaught was a stark departure from prior practice. *Id*. ¶¶ 156-158. Before 2021, X had received only occasional takedown notices from individual music publishers covering a limited number of posts. *Id*. ¶ 156. For example, X received a takedown notice from Universal in May 2019 identifying 25 allegedly infringing posts and a notice from Warner Chappell around the same time that flagged only one allegedly infringing post. *Id*.

During the first year of Defendants' coordinated campaign against X, the Majors' copyrighted works were not included in the surge of takedown notices. *Id*. ¶ 105. Months before the conspiracy began in May 2021, one of the Majors, Warner Chappell, had initiated negotiations with X. *Id*. But although X was well within its rights to seek licenses only from Warner Chappell's competitors (or none at all), once the campaign began, Warner Chappell threatened to join the collective effort if negotiations were not successful. *Id*. ¶¶ 4, 107-109. Warner Chappell then followed through on its threat, joining the other Majors and Music Publishers to try to force X into an industrywide license. *Id*. ¶¶ 110, 114.

Not only is Defendants' "massive program" of takedown notices unreasonably voluminous, but it includes myriad notices that were sent in bad faith. For example, the takedown

8

notices have included the type of posts that NMPA's own executives have made, such as posts remixing music. *Id.* ¶¶ 119-124. They have also included posts of videos that fans have taken of concerts—videos that NMPA executives have likewise promoted. *Id.* ¶ 123. And they have included videos of high school awards ceremonies, which are facially non-infringing because they include only the *de minimis*, non-commercial use of background music. *Id.* ¶¶ 125, 126.

Not a single conspiring Music Publisher has reached out to X to initiate licensing discussions since NMPA wrote on their collective behalf to pressure X into negotiating with them as a monolith. *Id.* ¶¶ 11, 114. These facts evidence an agreement not to compete for individual licenses, and further reveal that Defendants' aim is not, and never has been, to prevent or stop copyright infringement. Their goal is instead to force X into taking an industrywide license it does not want or need, at a supracompetitive price.

In June 2023, having failed to achieve an industrywide license, the Music Publishers sued X for copyright infringement in the Middle District of Tennessee.[2] *Id.* ¶ 112. In connection with a court-ordered stay, certain Music Publishers engaged with X in settlement discussions. *Id.* ¶¶ 11, 148. But despite that demonstration that Defendants are *capable* of dealing individually with X, no Defendant has been willing to negotiate with X individually in the market after joining the conspiracy. *Id.* ¶¶ 11, 114, 148. Defendants' concerted DMCA campaign to force X to negotiate with the collective continues to this day. *Id.* ¶ 114.

Defendants' conduct has harmed competition, X, and its users. The price for licenses has been driven up while output has declined. *Id.* ¶ 180. X has been deprived of the ability to take

---

[2] On May 11, 2026, the Music Publishers filed a Second Amended Complaint in the Tennessee litigation, in light of the Supreme Court's decision in *Cox Communications, Inc. v. Sony Music Entertainment*, 146 S. Ct. 959 (2026). *See* Second Amended Complaint, *Concord Music Grp., Inc. v. X Corp.*, No. 23-cv-00606 (M.D. Tenn. May 11, 2026), Dkt. No. 192.

individual licenses at competitive rates. *Id*. ¶¶ 178-179, 183-184. And its users have been deplatformed and deprived of the ability to post popular content. *Id*. ¶ 96. Although many different individual licenses with varying rates and other terms would be on offer to X if the Music Publishers competed, Defendants' illegal agreement deprives the market of those benefits.

## ARGUMENT

The Court should deny Defendants' motion to dismiss because X has plausibly alleged that Defendants agreed to eliminate competition in the market for musical composition licenses. A motion to dismiss turns on one "narrow[] question": whether the plaintiff "plead[ed] factual matter that, if taken as true, states a claim" that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 666 (2009). This is not an onerous standard. *See, e.g.*, *A2D Techs. Inc. v. MJ Sys., Inc.*, 269 F. App'x 537, 541 (5th Cir. 2008) ("[M]otions to dismiss are viewed with disfavor and rarely granted."). Defendants nevertheless strain to challenge every one of X's claims.

As demonstrated below, Defendants' barrage of arguments—collectively asserted by all Defendants in defense of the scheme they collectively perpetrated—does nothing to undermine the plausibility of X's claims. As to X's Section 1 claim (Count 1), X plausibly alleges that Defendants conspired to eliminate competition for musical composition licenses by agreeing that the Music Publishers would not negotiate individual licenses with X. As a prospective purchaser of music licenses that would benefit from competition, X has suffered injury "of the type the antitrust laws were intended to prevent"—i.e., injury "that flows from" Defendants' unlawful agreement. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Defendants' conduct is properly construed as a *per se* unlawful group boycott, which has precluded X from obtaining the licenses it desires at competitive rates. *See United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1366 (5th Cir. 1980) (discussing cases challenging "combinations designed to influence coercively

the trade practices of boycott victims, rather than to eliminate them as competitors" as *per se* restraints of trade). Even if analyzed under the rule of reason, the conspiracy is unlawful because it deprives the market of competition while offering no corresponding procompetitive benefit.

Defendants' challenge to X's Section 2 claims (Counts 2, 3, and 4) likewise fails because Defendants ignore both X's express allegations and the Fifth Circuit's adoption of the joint monopolization doctrine. *See United States v. Am. Airlines, Inc.*, 743 F.2d 1114, 1118 (5th Cir. 1984) (recognizing joint monopoly where "power is obtained that a few persons acting together can control the prices of a commodity moving in interstate commerce"). Instead, Defendants rely on inapposite cases concerning unilateral conduct, which is not at issue here.

Defendants' other arguments likewise fail. Their claim that X has engaged in "group pleading" ignores the fact that each Music Publisher joined NMPA and acted through it to demand a collective negotiation and threaten X with a barrage of takedown notices, and has refused to try to negotiate terms of a license with X on an individual basis.[3] Contrary to Defendants' assertion, their willingness to deal with X individually only in settlement discussions does not immunize their refusal to deal in the marketplace for licenses. And their invocation of *Noerr-Pennington* fails for multiple reasons. This case is not about the Music Publishers' attempts to vindicate copyrights—particularly where they used NMPA as a vehicle to collectively abuse the DMCA process to coerce X into negotiating with all the Music Publishers collectively. This case is about an unlawful agreement among Music Publishers *not to compete*. *Noerr-Pennington* provides no cover for Defendants' unlawful conduct.

---

[3] As the Complaint alleges, certain Music Publishers—solely in the context of an ongoing copyright litigation—engaged in individual settlement negotiations with X that included license discussions. Compl. ¶¶ 11, 148. Those unsuccessful discussions have no bearing on X's antitrust claims because even if they had resulted in a license (which they did not), such discussions are not indicative of competition on the merits in the relevant market. *See* discussion *infra* at p. 44.

Finally, Defendants' anticompetitive conduct violates state law. Because the Texas Free Enterprise & Antitrust Act ("TFEAA") is interpreted "in harmony with federal judicial interpretations of equivalent federal laws," MTD at 39, the Sherman Act claims alleged by X alleges also satisfy the TFEAA. Defendants' scheme also constitutes a predicate unlawful act supporting X's state law claims for civil conspiracy and unfair competition.

## I. X ALLEGES ANTITRUST INJURY FROM DEFENDANTS' PER SE UNLAWFUL CONDUCT

X alleges in detail that the Music Publishers—acting through NMPA—refused to negotiate individually with X in an effort to coerce it into taking an industrywide license at a supracompetitive rate. Compl. ¶¶ 11, 72-74, 114, 159, 180-181. To increase the pressure on X to negotiate collectively, the Music Publishers used NMPA to send a barrage of DMCA takedown notices in bad faith. Among other harms, this scheme has deprived X, and others, of the benefit of competition among Music Publishers. *Id.* ¶¶ 3, 10, 12-15, 178, 180-181, 183-194. These allegations plead "antitrust injury" because they demonstrate that X—a customer of licenses for musical compositions—cannot obtain individual licenses at a competitive price due to Defendants' coordinated conduct. Because X is the very entity against which Defendants aimed their group boycott, it is a quintessential antitrust plaintiff that has suffered antitrust injury. *See, e.g.*, *TravelPass Grp., LLC v. Caesars Ent. Corp.*, No. 5:18-CV-153-RWS-CMC, 2019 WL 5691996 at \*18 (E.D. Tex. Aug. 29, 2019), *rep. & recommendation adopted*, 2019 WL 4727425 (E.D. Tex. Sept. 27, 2019) ("Typically, parties with antitrust injury are either competitors, *purchasers, or consumers* in the relevant market." (citing *Waggoner v. Denbury Onshore, L.L.C.*, 612 F. App'x 734, 737 (5th Cir. 2015))).

### A. <u>X Alleges Antitrust Injury in the Relevant Market</u>

X alleges that it cannot obtain a license from any Music Publisher on competitive terms because they all have colluded to require X to negotiate with them collectively. In response, Defendants declare that their concerted action is immune from scrutiny because they are not competitors of X. As they put it, no plaintiff can sustain antitrust injury unless it "plead[s] the involvement of 'a competitor at some level who seeks to restrain competition against an outsider to the agreement.'" MTD at 10 (quoting *X Corp. v. WFA*, No. 7:24-CV-0114-B, 2026 WL 833900, at \*24 (N.D. Tex. Mar. 26, 2026), *appeal docketed* (5th Cir. May 19, 2026)). That is not the law. As the Supreme Court has explained, "the Sherman Act makes it an offense for [businessmen] to agree among themselves to stop selling to particular customers." *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 544 (1978) (citation omitted). The Supreme Court did not impose any requirement that a boycott harm a competitor, instead explaining that a customer may sue to redress an antitrust injury even if that customer and "the boycotters" are "not . . . in a competitive relationship with each other." *Id*. at 543.

If Defendants' position were adopted, only competitors of conspirators and monopolists could bring antitrust claims. That rule would defeat the very purpose of the antitrust laws: to protect against harm to competition in order to protect *consumers*. *See Rx Sols.*, 164 F.4th at 444 ("[T]he question underlying antitrust injury is whether consumers—not competitors—have been harmed.").[4] That is why "parties with antitrust injury" are typically "either competitors, *purchasers*, *or consumers* in the relevant market." *TravelPass Grp.*, 2019 WL 5691996 at \*18

---

[4] "Consumers" in this context includes businesses that buy products or services. *See, e.g.*, *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 373-74 (9th Cir. 2003) (noting that "[t]he end sought by the Sherman Act[] . . . was the prevention of restraints . . . which tended to . . . *control the market to the detriment of purchasers*," and holding plaintiff corporation had antitrust standing as "a purchaser/consumer" (alteration omitted)).

(citing *Waggoner v. Denbury Onshore, L.L.C.*, 612 F. App'x 734, 737 (5th Cir. 2015)); *see also Glen Holly*, 352 F.3d at 372 ("Consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury.").

Given that consumers are archetypical antitrust plaintiffs, the Fifth Circuit has expressly held that "[c]ompetitor status is not requisite to establish [antitrust] standing," of which antitrust injury is a component. *Am. Cent. E. Tex. Gas Co. v. Union Pac. Res. Grp., Inc.*, 93 F. App'x 1, 7 (5th Cir. 2004) (upholding arbitral award in monopolization context); *see also Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 (1990) (purchasers had antitrust standing to sue providers of bar preparation courses who formed territorial allocation agreement). As a consumer of licenses to copyrighted musical compositions subjected to a scheme to inflate the price for licensing, X has suffered "injury that flows from that which makes the defendants' acts unlawful," and it has therefore suffered antitrust injury. *Brunswick Corp.*, 429 U.S. at 489.

*WFA* does not support Defendants' contrary contention. MTD at 10. The defendants in *WFA* were a group of online advertisers who were purchasers of advertising space on platforms like X. *See* 2026 WL 833900, at *4. Although X alleged that the advertisers boycotted it by collectively refusing to purchase advertising space on X, the Court held that X did not allege antitrust injury because the harm "asserted is that its customers collectively chose X's competitors over X." *Id.* at *27. As the Court instead concluded, the boycott reflected "[l]oss *from* competition itself" rather than antitrust injury. *Id.* at *24.

While X believes *WFA* was wrongly decided and has appealed that ruling, this case is fundamentally different. Defendants here are not X's *customers* who decided to purchase from X's competitors. Defendants are instead the *suppliers* of music licenses who are refusing individual negotiations with a *customer*—X—with the intent to coerce that customer into purchasing an

14

industrywide license, and at higher price than the licensors (the Music Publishers) could obtain from the would-be customer (X) if they negotiated with that customer individually. Compl. ¶¶ 3, 4, 160, 180, 197-201. Paying a higher price because of a supplier conspiracy is paradigmatic antitrust injury.

*FTC v. Superior Court Trial Lawyers Ass'n* is illustrative. 493 U.S. 411 (1990). There, providers of legal services collectively refused to sell their services to a single customer, namely, the District of Columbia. *Id*. at 419. The Supreme Court concluded that this "unquestionably" imposed "a 'naked restraint' on price and output," which amounted to a *per se* violation of the antitrust laws. *Id.* at 423. Under Defendants' ill-conceived articulation of antitrust standing, no private plaintiff would have standing to challenge this restraint, merely because the boycott targeted a customer, rather than a competitor. That distinction does not make a naked restraint of trade any less unlawful. *See, e.g.*, *PepsiCo, Inc. v. Cont'l Cas. Co.*, 640 F. Supp. 656, 663 (S.D.N.Y. 1986) (finding that boycotts and other refusals to deal "are not limited to those that have competitors as targets" but "includes refusals to deal in cases where the target is a customer of some or all of the conspirators"). In such cases, the customer suffers antitrust injury because it is "the intended beneficiar[y] of competition" and is thus "presumptively . . . injured by [the] unlawful elimination" of that competition. *Glen Holly*, 352 F.3d at 378. So too here: Defendants have prevented X "from making free choices between" Music Publishers from which to license. *Id.* at 374; Compl. ¶¶ 178-181, 183-194.

The cases that *WFA* relied on do not hold otherwise—and in fact say nothing to suggest that a plaintiff lacks antitrust standing in the circumstances alleged in detail in X's Complaint. Stating that a group boycott must involve "joint efforts by a firm or firms to disadvantage competitors" to be actionable, *WFA* cited *Northwest Wholesale Stationers, Inc. v. Pacific*

*Stationery & Printing Co.*, 472 U.S. 284 (1985), *Spectators' Communication Network Inc. v. Colonial Country Club*, 253 F.3d 215 (5th Cir. 2001), and *MM Steel, L.P. v. JSW Steel (USA) Inc.* 806 F.3d 835 (5th Cir. 2015), 2026 WL 833900, at \*24. But none of those cases are about antitrust injury and, regardless, none of them supports Defendants' assertion that a customer cannot sue to stop a group boycott unless that boycott harms the boycotters' competitors.

In *Northwest Wholesale*, the Supreme Court considered whether the defendants committed a *per se* antitrust violation by expelling a member from their cooperative, and noted that *per se* unlawful conduct "*generally* involve[s] joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." 472 U.S. at 294. The Court never "establishe[d] a bright-line rule" about what types of boycotts are *per se* unlawful, and said nothing about what constitutes antitrust injury from a group boycott. *Tunica Web Advert. v. Tunica Casino Operators Ass'n*, 496 F.3d 403, 413 (5th Cir. 2007). Nor did the Fifth Circuit in *Spectators'* limit liability for group boycotts to any particular fact pattern. *Spectators'* merely held that the defendants who claimed they were coerced into joining a group boycott violated the Sherman Act, since, as *Northwest Wholesale* recognizes, a group boycott may occur when some participants are "pressure[d]" into jointly harming a competitor. 253 F.3d at 221. And in *MM Steel*, the Fifth Circuit simply observed that group boycotts "often"—not always—involve efforts to coerce a manufacturer to refuse to deal with a competitor. 806 F.3d at 844.

In fact, the Supreme Court and Fifth Circuit have made clear that group boycotts are broader than the general statement in *Northwest Wholesale* cited by Defendants. In *Tunica*, the Fifth Circuit flatly rejected the defendants' argument that "*per se* unlawful boycotts" are limited to "those intended to harm or disadvantage a competitor." 496 F.3d at 412. As the Court explained,

16

"[n]othing in *Northwest Wholesale Stationers* or the Supreme Court's later cases . . . establishes a bright-line rule limiting the application of the *per se* rule to cases in which the victim is a competitor of at least one of the conspirators, and no such rule is justified under the Court's precedents." *Id.* at 413; *accord MM Steel*, 806 F.3d at 850 (citing *Tunica*'s holding that the "per se rule is not limited to group boycotts where the horizontal agreement is among competitors"); *see also Super. Ct. Trial Lawyers*, 493 U.S. at 422 (explaining that "a concerted refusal to serve an important customer" is "a classic restraint of trade" subject to the *per se* rule).

In short, none of the cases cited in *WFA* limits group boycotts to situations where competitors of the conspirators are harmed, much less cabins the group of plaintiffs who suffer antitrust injury from a group boycott. Under controlling case law, competitors violate the antitrust laws when they collude to harm a customer. *See Super. Ct. Trial Lawyers*, 493 U.S. at 422-23; *Palmer*, 498 U.S. at 49; *accord Glen Holly Ent.*, 352 F.3d at 372. That is exactly what X alleges Defendants did here.

## B.    X Alleges Harm to Competition

Defendants also claim that X has not alleged antitrust injury because "X only alleges injury to itself" rather than to "competition as a whole." MTD at 11. Defendants are wrong on multiple fronts. As a threshold matter, "[i]njury to competition . . . while often a necessary component to substantive liability, need not be pleaded for a plaintiff's antitrust claims to survive a motion to dismiss." *Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc.*, No. CIV.A. SA-15-CA-32, 2015 WL 6994438, at *11 (W.D. Tex. Oct. 15, 2015) (noting the "Fifth Circuit has distinguished between antitrust injury and injury to competition"); *see Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 660 (1961) (single manufacturer did not need to allege harm to competition to state a claim for a *per se* violation of Section 1). Moreover, when suppliers band

17

together and refuse to deal with a customer unless it deals with all of them, their conduct is *per se* illegal because it is a naked restraint assumed to subvert the competitive process, restrict output, and impose a fixed price. *See supra* Point I.A.; *infra* Point II.B.1. As a result, harm to competition is assumed and need not even be alleged. *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 607 (1972) (where the per se rule applies, the practice is presumed unreasonable as a matter of law "without elaborate inquiry as to the precise harm [it has] caused or the business excuse for [its] use."' (quoting *N. Pac. Ry. v. United States*, 356 U.S. 1, 5 (1958))).

Even if Defendants' conduct were not *per se* unlawful, X has alleged harm to competition under the rule of reason because Defendants' scheme caused anticompetitive effects that X has alleged in detail. *See infra* p. 35. In particular, the Complaint alleges that the Music Publishers coordinated through and with NMPA to refuse to individually negotiate with X and with other platforms, thereby raising prices and reducing supply in the relevant market. *See, e.g.,* Compl. ¶¶ 13, 134, 170, 177-182. That is textbook harm to competition. *See, e.g.*, *Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 502 (9th Cir. 2010) ("[C]oncerted action between co-conspirators to eliminate competitive bidding . . . is an actionable harm to competition."); *Churchill Downs Inc. v. Thoroughbred Horsemen's Grp., LLC*, 605 F. Supp. 2d 870, 879-80 (W.D. Ky. 2009) (group boycott case holding that allegations of "paying higher prices for a product due to a lack of competition in the market" or a "reduction of output" are sufficient to plead harm to competition (citations omitted)).

Moreover, as X alleges, Defendants' admitted success in extracting supracompetitive prices shows that competition has actually been harmed. *See Impax Lab'ys, Inc. v. FTC*, 994 F.3d 484, 493 (5th Cir. 2021) (holding that increased prices is, by definition, an anticompetitive effect that harms consumers); *see also MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172,

18

182 (2d Cir. 2016) (observing that "higher prices" are "direct evidence of harm to competition");

*LEGO A/S v. ZURU, Inc.*, No. 3:18-CV-2045(AWT), 2020 WL 13145135, at *4 (D. Conn. Apr. 22, 2020) (counterclaim plaintiffs alleged "facts sufficient to plead an antitrust injury" where alleged "actions have also caused harm to competition and consumers by . . . forcing consumers to purchase LEGO products at supracompetitive prices"). As detailed in the Complaint, Defendants' conduct enabled them to obtain "the highest royalty rate in history in the history of streaming anywhere in the world" from many of the largest platforms in the world once they began operating collectively rather than individually. Compl. ¶ 181. Indeed, according to Mr. Israelite, X is the "only major social media company that has not licensed" music from Defendants. *Id.* ¶ 185.

Defendants expressly admit they raised license prices by 43.8%. *Id.* Unable to deny the Complaint's robust allegations of harm to competition, Defendants claim—falsely—that X alleges nothing other than harm to itself. None of the inapposite cases on which they rely support their counterfactual position. MTD at 11 (citing *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 372 (5th Cir. 2014), and *Taylor v. Christus St. Joseph Health Sys.*, No. 5:04-CV-153-DF, 2006 WL 1582097, at *2 (E.D. Tex. 2006)). In *Marucci Sports*, a plaintiff baseball-bat manufacturer challenged regulations set collectively by defendants after four of plaintiff's bat models failed certification testing. 751 F.3d at 372-373. The court dismissed the claim, holding that the plaintiff did not allege a plausible conspiracy to restrain trade in the non-wood baseball-bat market, in part because it failed to allege any actionable injury to competition in that market: the plaintiff "predomin[antly] focus[ed] on its own injury" and offered only "speculation" that the plaintiff "and other unnamed 'market entrants'" would suffer, while "large manufacturers" would benefit. *Id.* at 376. *Taylor* likewise involved one party's alleged injury. *See* 2006 WL 1582097, at *3 (explaining a claim about "a single doctor . . . terminated from a single hospital" did not give

19

rise to an antitrust claim because if it did, "an antitrust claim would lie whenever any medical professional is terminated"). Here, by contrast, X has alleged harm to competition from collusion by direct competitors, resulting in supracompetitive prices to X and others, reduced output, and harm to X's users. *See supra* pp. 13, 18.

## II.    X ALLEGES THAT DEFENDANTS UNLAWFULLY REFUSED TO DEAL INDIVIDUALLY WITH X IN VIOLATION OF SECTION 1

The Complaint plausibly alleges that Defendants, coordinating through NMPA, agreed to a collective licensing conspiracy to obtain supracompetitive rates from platforms like X. Compl. ¶¶ 73-76, 81-92, 195-210. To determine whether Defendants have violated Section 1, "the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement." *Twombly*, 550 U.S. at 545. To adequately plead an agreement, a plaintiff must allege that the defendants engaged in "concerted action," in other words, a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). To survive a motion to dismiss, X "merely needs to allege that [defendants] did indeed conspire and give some factual allegations that would support such a claim." *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1159 (5th Cir. 1992), *cited with approval in Marucci Sports*, 751 F.3d at 375. X has more than done that here.

### A.    X Alleges That Each Defendant Agreed Not to Deal With X Individually

Concerted action may be shown by either direct or circumstantial evidence. *Monsanto*, 465 U.S. at 764; *Quadvest, L.P. v. San Jacinto River Auth.*, No. 4:19-CV-4508, 2020 WL 5034155, at *8 (S.D. Tex. Aug. 14, 2020), *aff'd*, 7 F.4th 337 (5th Cir. 2021). Direct evidence "is that which 'explicitly refer[s] to an understanding' between the alleged conspirators," while circumstantial

20

evidence requires additional inferences in order to support a claim of conspiracy. *Tunica*, 496 F.3d at 409. Here, X alleges both.

### 1.      X Alleges Direct Evidence Of The Conspiracy

"If a complaint includes non-conclusory allegations of direct evidence of an agreement, a court need go no further on the question whether an agreement has been adequately pled." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010). Here, the Complaint quotes express statements from Defendants evincing their collective refusal to deal with X individually. This is direct evidence sufficient to plead an agreement. *See W&T Offshore, Inc., v. Endurance Assurance Corp.*, No. 4:24-cv-3047, 2026 WL 1271389, at *7 (S.D. Tex. Apr. 10, 2026) (concluding that plaintiff alleged direct evidence of concerted action through defendants' "own words and actions" that establish "the overarching nature of the conspiracy and that the participants met to discuss their plan to collectively increase premiums, increase their collateral demands, and change the terms on which they would do business with their customers").

NMPA President David Israelite's October 2021 email is direct evidence of Defendants' unlawful agreement. *See Kjessler v. Zaappaaz, Inc.*, No. 4:18-0430, 2019 WL 3017132, at *10 (S.D. Tex. Apr. 24, 2019) ("Direct evidence of an agreement includes a document or conversation explicitly manifesting the existence of the agreement in question." (citation omitted)). That email, sent on behalf of each of the Music Publisher Defendants, expressly offered X only two options: a partnership with all NMPA members, collectively, or a crippling takedown campaign by NMPA on their behalf. Compl. ¶¶ 94, 97. Later communications from Warner Chappell confirmed the existence of this unlawful agreement and expressed Warner Chappell's intent to join the conspiracy. *Id.* ¶¶ 107-109.

21

Defendants can rewrite neither Mr. Israelite's email nor their own history of collusion. Defendants first contend that NMPA's email is not direct evidence because the reference to "we" "simply meant NMPA and that NMPA was open to a conversation with X." MTD at 17. But Defendants ignore Mr. Israelite's express statement that he wrote on behalf of "*all music publishers . . . in the United States*." Compl. ¶ 94; MTD Ex. A. In any event, Defendants may plan to offer their interpretation of Mr. Israelite's email to the fact-finder, but a factual dispute is not for the Court to resolve on a motion to dismiss. *See, e.g.*, *Monsanto*, 465 U.S. at 766 n.11 (explaining that "interpretation of . . . documents" is "properly [] left to the jury"). Defendants' suggestion of a copyright-enforcement motive, MTD at 25-26, is likewise entitled to no weight. *See, e.g.*, *TravelPass Grp.*, 2019 WL 5691996, at *31 (holding that plaintiffs stated a claim for conspiracy where defendants' alternative explanations, while plausible, did not negate contrary allegations as pleaded); *Acad. of Allergy & Asthma in Primary Care v. La. Health Serv. & Indem. Co.*, No. CV 18-399, 2020 WL 4050243, at *7 (E.D. La. July 17, 2020) ("Defendants' arguments, at bottom, amount to a contention that their proffered explanation of events is more plausible than [plaintiff's,]" but "[t]he question at the pleading stage is . . . whether there are sufficient factual allegations to make the complaint's claim plausible." (citations omitted)), *reconsideration granted in part on other grounds*, No. CV 18-399, 2021 WL 5029418 (E.D. La. May 14, 2021); *see also Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 50 (1st Cir. 2013) (overturning grant of motion to dismiss where district court "improperly . . . chose among plausible alternative theories interpreting defendants' conduct and adopted as true allegations made by defendants").

Defendants fare no better in painting Mr. Israelite's email as "a trade association's advocacy on behalf of its members," which Defendants say cannot be "evidence of conspiracy or agreement." MTD at 17. Defendants cannot immunize their anticompetitive conduct by acting

22

through "a formal organization" and acting "in one name." *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1007 (3d Cir. 1994) (reversing grant of summary judgment where the question whether defendant retailers, acting through a professional association, conspired to pressure manufacturers to eliminate plaintiffs from the marketplace, was a dispute of fact). In any event, the email, as alleged, is not mere "advocacy"; it is evidence that Defendants agreed to work together "to coerce X into taking licenses to musical works from the industry as a whole," Compl. ¶ 3, just as Defendants did with respect to other platforms.

As a last resort, Defendants claim that Mr. Israelite's email cannot serve as direct evidence of conspiracy because it was "a communication from NMPA to X, not a communication among competitors." MTD at 28. But so too was the direct evidence in *Tunica. Tunica Web Advert.*, 496 F.3d at 410 (observing that "[alleged co-conspirator defendant's] statements and emails to [plaintiff] . . . [are], if credited, direct evidence that the casinos agreed . . . to refuse to do business with [plaintiffs] individually"). Defendants were all members of NMPA and each authorized NMPA to act on its behalf. Compl. ¶¶ 94, 134. In any event, Defendants cite no case holding that direct evidence of a conspiracy is limited to communications among competitors. The email expressly articulates Defendants' "common objective" of demanding a marketwide license. Moreover, based on the facts alleged, Defendants *were indeed communicating with one another* about their agreement. Warner Chappell not only was aware of the scheme NMPA had coordinated on behalf of other Music Publishers, but also threatened to and ultimately joined in it, confirming beyond doubt the existence of Defendants' unlawful agreement. Indeed, just three months after NMPA's first collective takedown notice, in March 2022, a Warner Chappell Senior Vice President wrote to X that its lack of participation "in the NMPA takedowns" was "based on the understanding that [X] would be engaging with us simultaneously with the [record] label

discussions." *Id.* ¶ 108. Warner Chappell also warned that it sought to avoid "a licensing framework that won't be approved by publishers." *Id*. ¶ 107. Two months later, Warner Chappell raised the issue again, noting that it had "chosen not to be involved in any NMPA takedown activities *to date*." *Id.* ¶ 108. X's allegations are more than sufficient to plead direct evidence of Defendants' anticompetitive scheme.

### 2.    X Alleges Indirect Evidence Of The Conspiracy

X also alleges circumstantial evidence of a conspiracy that corroborates the direct evidence it has alleged, and is, in and of itself, sufficient to state a Section 1 claim. *See Tunica*, 496 F.3d at 409 (noting concerted action necessary to establish the existence of a conspiracy "may be shown by either direct or circumstantial evidence"); *see also Gainesville Utilities Dep't v. Fla. Power & Light Co.*, 573 F.2d 292, 300 (5th Cir. 1978) ("[P]roof of a conspiracy under § 1 . . . does not require the existence of an express agreement . . . . It is 'enough that, knowing that concerted action was contemplated and invited, the [defendants] gave their adherence to the scheme and participated in it.'" (citations omitted)); *accord In re Plywood Antitrust Litig.*, 655 F.2d 627, 634 (5th Cir. 1981). To allege a conspiracy based on circumstantial evidence, a plaintiff can rely on parallel conduct by the defendants in addition to "further factual enhancements" or "plus factors" that tend to show that defendants' parallel conduct was not merely the result of similar but independent reactions to common market dynamics. *See Kjessler*, 2019 WL 3017132, at *10 (identifying "numerous 'factual enhancements' potentially supporting the inference of a conspiracy").

X has adequately alleged parallel conduct here. Specifically, X alleges that each Defendant has refused to negotiate individually, that each Defendant authorized NMPA to submit DMCA takedown notices on its behalf, and that NMPA sent aggregated DMCA takedown notices

24

identifying thousands of posts concerning each Music Publisher's individual copyrights. Compl. ¶¶ 11, 94, 110-111, 114, 117-118, 134.

X also has plausibly alleged factual enhancements showing that Defendants agreed to act in concert, rather than respond individually to market incentives. While there is no single, dispositive list, recognized plus factors include: a common motive to conspire; changes from past practices; actions that would be against the defendants' self-interest if they were acting independently but that are consistent with their self-interest if they were acting collectively; opportunities to conspire; market concentration; sharing of competitively sensitive information; and other traditional facts suggestive of conspiracy. *Texas v. BlackRock, Inc.*, No. 6:24-CV-437-JDK, 2025 WL 2201071, at *13 (E.D. Tex. Aug. 1, 2025) (collecting cases)); *Drs. Hosp. of Laredo v. Cigarroa,* 782 F. Supp. 3d 406, 443 (W.D. Tex. 2025); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 907 (6th Cir. 2009). Although X alleges a broad course of conduct that evidences an agreement among Defendants, Defendants compartmentalize each plus factor, attacking particular allegations as insufficient to infer a conspiracy. That effort fails. X's allegations must be analyzed holistically, not piecemeal. *See Kjessler*, 2019 WL 3017132, at *10 ("The Supreme Court has warned against 'tightly compartmentalizing the various factual components' of a plaintiff's case 'and wiping the slate clean after scrutiny of each.'" (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962))).

***Common motive.*** Defendants share the motive of obtaining more favorable licensing terms by targeting X collectively to secure an industrywide license. Compl. ¶¶ 159-160. A common motive to conspire is a significant "plus factor" that weighs in favor of conspiracy. *See, e.g.*, *Cascades Comput. Innovation LLC v. RPX Corp.*, No. 12-CV-1143, 2013 WL 6247594, at *11 (N.D. Cal. Dec. 3, 2013) (finding a conspiracy plausibly alleged where public statements by trade

25

organization described its ability to achieve substantially better pricing for its members by dealing collectively, rather than individually). NMPA has been clear about Defendants' common motive since at least 2016, when Defendants began using the same tactic against other platforms, urging Defendants to "work together 'to expand the pie,' and not turn[] on one another to try and get a bigger piece of the pie," Compl. ¶ 73,[5] and touting Defendants' success in obtaining "the highest royalty rate in the history of streaming anywhere in the world," *id.* ¶ 181. Acting together (unlawfully) "ensure[s] they could all obtain licenses, rather than a select few," and "by refusing to deal individually, the Music Publishers would not risk undermining one another's licensing profits by competing against one another to offer the best terms, allowing them to enjoy supracompetitive prices for their licenses." *Id.* ¶¶ 159-160.

**Departure from prior practice.** Before 2021, each Music Publisher sent takedown notices, if any, independently and only sporadically, suggesting that those notices were responses to genuine concerns about copyright infringement. Compl. ¶ 156. In 2021, nearly all the Music Publishers began doing so en masse*,* with the remainder (i.e., the Majors) joining in over the course of 2022 and 2023. *Id.* ¶¶ 94, 98-99, 110. And when the Majors did join, it was a sharp departure from their prior practice of dealing individually with X. *Id.* ¶¶ 104-111. NMPA fostered this collective effort, threatening X with DMCA activity "on a scale larger than any previous effort in DMCA history"—and then delivering on its threat by sending thousands of notices on the Music

---

[5] While Defendants have argued that Mr. Israelite's statements refer to "publishers working with record labels to support each other's legislative and regulatory initiatives," *see* Def. Reply Br. (Dkt. 93) at 4-5, n. 3, the fact is that he expressly urged the Music Publishers (as well as record labels and performers) to "work together" to increase *royalties*. The Complaint's allegations describing Defendants' conduct make clear that they have worked together on more than just legislative initiatives. For example, they worked together in authorizing NMPA to initiate industrywide license negotiations with X, in monitoring X for infringement, and in bombarding X with takedown notices. Compl. ¶¶ 73-74, 94, 111, 117-118.

Publishers' behalf. *Id.* ¶¶ 7-8, 94; MTD Ex. A. Tellingly, Defendants' Motion does not even attempt to contest X's allegation that this collective takedown campaign was a stark departure from Defendants' prior individual practices for enforcing their copyrights.

In addition, as X alleges, no market event prompted this change in behavior. To the contrary, the behavior was the result of Defendants' decision to collectively force X into negotiating for an industrywide license. Absent their agreement, individual Music Publishers "would compete heavily to secure one of the limited licensing agreement slots" with X. Compl. ¶¶ 146-151; *see Miami Prods. & Chem. Co. v. Olin Corp.*, 449 F. Supp. 3d 136, 159-60 (W.D.N.Y. 2020) (denying motion to dismiss where plaintiffs "allege[d] Defendants took concerted action to work against what the market would otherwise dictate").

***Acts against individual interests but consistent with collective interests.*** If Defendants were acting according to their individual interests, they each "would compete to secure" their own "license [with X] . . . by offering more favorable . . . terms or negotiating sooner and gaining a first-mover advantage." *Id.* ¶ 146. The fact that *not one* Music Publisher has reached out to X about an individual license shows that each expects to reap the anticompetitive benefits of concerted action. *See Cascades*, 2013 WL 6247594, at *10 (complaint pleaded reasonable inference of conspiracy where manufacturer defendants individually "decline[d] to pursue a license" for plaintiff's patent and instead "had agreed on a concerted course of action regarding how to deal with [plaintiff]"); *see also Evergreen*, 720 F.3d at 44 (plaintiff plausibly alleged a Section 1 conspiracy where, among other things, it alleged "defendants collectively failed to meaningfully pursue 'attractive business opportunit[ies]'"). Defendants' behavior makes sense only in light of their shared motive and agreement to refrain from dealing individually with X. Indeed, Defendants' argument they have no such shared motive because they "have every incentive to

27

negotiate an agreement" for a license, MTD at 22, is belied by their universal failure to initiate *any* individual discussions with X about a license since the scheme began—something they clearly are capable of doing, given that they were willing to individually deal with X in connection with attempting to settle the parties' copyright litigation. Compl. ¶ 11.

 ***Sharing of pricing information.*** The Music Publishers also exchange competitively sensitive information through MFNs in their licensing agreements. *Id.* ¶ 143. MFNs guarantee that the licensee will have to "true up" its license price. *Id*. ¶ 144.

 ***Industry Concentration.*** The Music Publishers collectively possess 90% of the market for musical composition licenses. *Id.* ¶ 134. Courts have held that heavily concentrated markets are more conducive to conspiracy, particularly where there are high barriers to entry to keep new participants out, and where Defendants are key players that can exercise substantial control. *See e.g., Kjessler*, 2019 WL 3017132, at \*11; *W&T Offshore Inc.*, 2026 WL 1271389, at \*8 .

 ***Opportunities to conspire.*** Each Music Publisher has been a member of NMPA at all relevant times. Compl. ¶ 134. Senior business executives of twelve Music Publishers—each of the Majors and many non-Majors—are represented on NMPA's Board of Directors, *id.* ¶¶ 63, 134, and their frequent meetings provide myriad opportunities to conspire. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (finding a tight business relationship among defendants' trade association participation constitutes a "plus factor" where defendants were organization's leadership). NMPA has hosted the Music Publishers at fourteen in-person events from May 2022 to June 2025 alone, including four golf tournaments. Compl. ¶¶ 138-141.

 Unable to avoid these allegations, Defendants make the unremarkable point that "[a] mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement." MTD at 20 (quoting *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 911 (6th Cir. 2009)). But

X does not allege an opportunity to conspire "standing alone." To the contrary, X alleges that Defendants' *repeated* opportunities to conspire, along with the many other indicia of an unlawful agreement, which more than suffices to plead circumstantial evidence that Defendants violated Section 1 of the Sherman Act.[6]

Although Defendants urge the Court to interpret their unlawful concerted action as benign by casting it as "legitimate enforcement activity," MTD at 18, this is not the stage to decide which inferences are more plausible than other competing inferences. *See, e.g.*, *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F3d 452, 458 (6th Cir. 2011) ("Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage"); *see supra* p. 23. It is enough that X's "allegations of parallel conduct are . . . placed in a context that raises a suggestion of a preceding agreement." *Twombly*, 550 U.S. at 557.

Defendants' reliance on *In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526 (N.D. Tex. 2014), to argue that their conduct is explained by their independent self-interest illustrates the point. MTD at 19. Those plaintiffs challenged the defendant hotels' practice of entering into resale price maintenance contracts with online travel agents like Expedia. 997 F. Supp. 2d at 531. The Court recognized that, "[a]s a general matter, it is quite natural for a seller to want to control the online price of its product." *Id.* at 537. Here, by contrast, there is no independent explanation for Defendants' more-than-parallel conduct. Defendants argue only that they have "a rational business interest" in enforcing their copyrights. MTD at 18-19. But they

---

[6] Defendants also argue that X's allegations about other platforms show merely "bilateral license agreements," MTD at 22, but their factual claims about the nature of other platforms' licenses does not undermine an inference of conspiracy. MTD at 22-24. Not only does this argument impermissibly rely on sources outside the Complaint and raise a factual dispute that may not be decided on a motion to dismiss, but the sources Defendants cite do not refute X's contentions. *Compare* MTD at 23 (arguing that Roblox did not enter into an industrywide license), *with* MTD at 23 n.6 ("NMPA and Roblox Strike Industry-Wide Agreement").

never explain why that purported rational interest does not include the pursuit of an individual license by a single Music Publisher. Moreover, as discussed further below, the Music Publishers' prior practice of sending takedown notices individually shows that they are perfectly capable of vindicating their rights individually, but ceased doing so without explanation or justification.

In sum, X has alleged that Defendants' parallel conduct, when considered along with the attendant plus factors, supports a plausible inference that Defendants were not making independent business decisions in response to market incentives, but rather were acting in concert pursuant to an unlawful horizontal agreement. Even absent the direct evidence of Defendants' conspiracy, these allegations are sufficient to find X's conspiracy allegations plausible. *See, e.g.*, *Blackrock*, 2025 WL 2201071, at *16 ("[P]arallel conduct and plus factors" enough to "plausibly allege an agreement among Defendants").

### B.    X Alleges That Defendants' Agreement Is An Unreasonable Restraint Of Trade

Tacitly recognizing that X has alleged conduct by Defendants that, at a minimum, constitutes an unreasonable restraint of trade, Defendants seek dismissal of X's Section 1 claim to the extent that it alleges a *per se* violation of the Sherman Act. MTD at 32. At the motion-to-dismiss stage, "for the claim of *per se* illegality to survive threshold attack, it is sufficient that plaintiffs have alleged a restraint on trade in the form of a horizontal agreement among competitors not to compete . . . that is arguably analogous to horizontal agreements that have been held to be illegal *per se*." *Cont'l Airlines, Inc. v. United Air Lines, Inc.*, 120 F. Supp. 2d 556, 565 (E.D. Va. 2000); *accord Nat'l Bancard Corp. v. VISA U.S.A., Inc.*, 779 F.2d 592, 596 (11th Cir.1986); *see also CSR Ltd. v. Fed. Ins. Co.*, 40 F. Supp. 2d 559, 565 (D.N.J. 1998) ("Without discovery, the court can not make a decision as to whether the conduct alleged is such as would always or almost always tend to restrict competition and decrease output and is, thus, per se unreasonable." (citation

30

omitted)). X has alleged just that: its Complaint details that the Music Publishers—direct competitors of one another—have colluded to require X to negotiate with all of them, rather than competing to reach individual license agreements with X. And, even if the Court at a later stage were to find that Defendants' conduct is not *per se* illegal, X has adequately alleged that Defendants' conduct is illegal under the rule of reason as well.

### 1.    X Alleges That Defendants' Agreement Is *Per Se* Unlawful

Under black-letter law, Defendants' concerted refusal to deal with X in order to extract an industrywide license is *per se* illegal. Courts consider certain restraints of trade such as price-fixing, division of markets, group boycotts, and tying arrangements to be *per se* unlawful because "their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). "Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se." *Palmer*, 498 U.S. at 48 (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940)).

For decades, courts have subjected boycotts of purchasers by suppliers to *per se* condemnation. *See, e.g.*, *FMC v. Svenska Amerika Linien*, 390 U.S. 238, 250 (1968) ("[U]nder the Sherman Act, any agreement by a group of competitors to boycott a particular buyer or group of buyers is *per se* illegal."); *see also Open Cheer & Dance Championship Series, LLC v. Varsity Spirit, LLC*, No. 2:23-CV-0155, 2024 WL 1218573, at \*6 (N.D. Tex. Mar. 21, 2024) ("[T]he Supreme Court has long held that certain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as per se violations of Section 1 of the Sherman Act." (alteration omitted)).

31

Defendants seek to avoid having their conduct evaluated under the *per se* standard by relying on the same flawed argument they make in arguing that X has not suffered antitrust injury. *See* MTD at 33 (arguing that "per se condemnation is reserved for cases 'in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor'" and that "a group boycott claim requires the group boycott to either 'directly or indirectly involve the plaintiff's competitor'" (citations omitted)). As explained above, *supra* p. 14, Defendants are wrong, and their categorical assertion that group boycotts are subject to *per se* treatment *only* when targeting a competitor is squarely contradicted by Supreme Court and Fifth Circuit precedent.

In *Superior Court Trial Lawyers,* the Supreme Court upheld the FTC's finding that a group of suppliers' boycott of their customer was a "'coercive, concerted refusal to deal,' had the 'purpose and effect of raising prices,' and was illegal per se." 493 U.S. at 419. There, members of the Superior Court Trial Lawyers Association agreed to stop representing indigent defendants until the District of Columbia agreed to increase their compensation. *Id*. at 416. As the Supreme Court explained, their agreement was *per se* illegal because it was "designed to obtain higher prices" for lawyers who "[p]rior to the boycott . . . were in competition with one another," through "a concerted refusal to serve an important customer"—a "constriction of supply" that "increase[d] the price offered" and was thus "the essence of 'price-fixing.'" *Id.* at 423. The Court concluded that "[t]he horizontal arrangement among these competitors was unquestionably a 'naked restraint' on price and output," *id*., even though the lawyers' agreement did not "directly or indirectly involve the plaintiff's competitor," MTD at 33.

Like the lawyers in *Superior Court Trial Lawyers*, the Music Publishers "were in competition with one another" but then "implemented . . . a concerted refusal to serve an important

32

customer," except on specific, agreed-upon terms, thereby "agreeing upon an output." 493 U.S. at 422-423; Compl. ¶¶ 81-92 (alleging Defendants' collective activity is motivated by a desire to increase royalties and their prior coordinated campaigns against other platforms were successful in doing so). As in *Superior Court Trial Lawyers*, their conduct is *per se* unlawful.[7]

*Tunica* likewise demonstrates that Defendants' conduct is *per se* illegal. There, the Fifth Circuit expressly rejected the defendants' argument "that *per se* unlawful boycotts" are limited to "those intended to harm or disadvantage a competitor of the conspirators." 496 F.3d at 412; *see supra* p. 14. In *Tunica*, the Fifth Circuit explained that illegal boycotts come in many different varieties and enumerated three factors to determine whether any particular boycott is subject to the *per se* rule: "(1) whether the [defendants] hold a dominant position in the relevant market; (2) whether the [defendants] control access to an element necessary to enable [the plaintiff] to compete; and (3) whether there exist plausible arguments concerning pro-competitive effects." 496 F.3d at 414-15. The court expressly recognized that boycotts "directed . . . at . . . customers" are one "category of *per se* cases" meeting this test. *Id.* at 414 n.15.

Unable to challenge that their conduct is *per se* illegal under the first and third factors set forth in *Tunica*, Defendants focus only on the second factor, and insist that their conduct is not

---

[7] Defendants argue the *per se* rule is limited to cases "in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor." MTD at 33 (quoting *Ginzburg v. Mem'l Healthcare Sys., Inc.*, 993 F. Supp. 998, 1025 (S.D. Tex. 1997)). *Ginzburg* did not involve a suppliers' boycott of a customer, but instead a single physician denied admitting privileges at a single hospital. *Ginzburg* also was decided at summary judgment, in part on plaintiff's failure to offer any "evidence to justify the treatment of Defendants' alleged group boycotts as per se violations of the Sherman Act." *Id.* at 1021. X need not come forth with evidence at this stage of the proceedings. Finally, to the extent *Ginzburg* held that the *per se* rule "appl[ies] *only* in cases 'in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor,'" it has been abrogated by the Fifth Circuit's more recent holding in *Tunica* that a boycott can be *per se* illegal without targeting a competitor. *See supra* p. 14.

subject to the *per se* rule, because they do not "control access to an input necessary for the plaintiff to compete." MTD at 34. Defendants' reliance on that inapplicable factor does not help them. X's claim here is brought by a boycotted customer, rather than a boycotted competitor, so the second *Tunica* factor is inapplicable. If Defendants' position were correct, boycott cases brought by customers would never be *per se* illegal. That is not the law. *See W&T Offshore*, 2026 WL 1271389, at *4 (insured oil and gas companies plausibly alleged *per se* unlawful conspiracy by insurer defendants "not to deal with smaller oil and gas companies, including [plaintiff], by demanding collateral terms" that would harm plaintiff's business).

### 2.    Defendants' Agreement Is Unlawful Even Under The Rule of Reason

Even if Defendants' conduct were not *per se* illegal, it would still violate the Sherman Act as an unlawful restraint of trade under the rule of reason. The rule of reason "requires [courts] to consider whether the particular agreement at issue in fact operates as an unreasonable restraint on competition." *Tunica*, 496 F.3d at 411-12. In making this determination, "[courts] balance the 'anticompetitive evils of a restrictive practice . . . against any procompetitive benefits or justifications within the confines of the relevant market.'" *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 417 (5th Cir. 2010). A plaintiff can allege harm to competition by alleging direct evidence, including "actual detrimental effects . . . such as reduced output, [or] increased prices," or "[i]ndirect evidence," i.e., "proof of market power plus some evidence that the challenged restraint harms competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018); *accord Impax Lab'ys, Inc.* 994 F.3d at 493.

Here, as discussed in detail above, X has alleged harm to competition from Defendants' boycott: Defendants' demand for an all-or-nothing license has reduced output in the market for musical composition licenses. Compl. ¶¶ 180, 201. Whereas 18 individual licensors should

compete vigorously to secure one of X's licensing slots, *id*. ¶ 147, which would ensure that their artists' works are featured and promoted through discussion on X for reasonable compensation, Defendants instead refused to deal with X individually, denying X any musical licenses, *id.* ¶¶ 11, 180, 193. The express goal of Defendants' collective refusal to deal is to prevent purchasers of licenses like X from getting too much of a "bargain"—i.e., the price X would have received were the Music Publishers forced to compete with one another. *Id.* ¶ 85. Defendants instead sought supracompetitive prices—and indeed have achieved the "highest [prices in] history" from other platforms, namely, a 43.8% increase in license fees. *Id.* ¶¶ 181, 184. Defendants accomplished this by agreeing not to compete with one another. By "[e]liminating potential competition" through their conspiracy, Defendants, 90% of the market, engaged in conduct that "is, by definition, anticompetitive." *Impax Lab'ys,* 994 F.3d at 493.

### C.    The Majors' Decision To Join The Conspiracy Later Does Not Imply A Conspiracy Does Not Exist

Defendants argue that X cannot make a claim as to the Majors because X alleges the Majors did not join the conspiracy until 2023. MTD at 35. They cite no authority for this proposition, and for good reason: whether the Majors were involved at the outset is irrelevant. To the contrary, "if a person later joins an already formed conspiracy knowing of the unlawful purpose, he may be held responsible for the acts done in furtherance of the conspiracy." *Nelson v. United States*, 415 F.2d 483, 486 (5th Cir. 1969); *see also Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939) ("[A]n unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators.").

"[P]arallel conduct need not be exactly simultaneous and identical in order to give rise to an inference of agreement;" rather, "[w]hat matters is that each Defendant is alleged to have taken *similar* actions with the *same* goal." *BlackRock*, 2025 WL 2201071, at *15 (citation omitted). As

35

X demonstrated, the Majors—like the other Music Publishers—did that when they joined the conspiracy. *See supra* p. 27. After working independently, each of the Majors abandoned its individual efforts, joined the takedown campaign of its competitors, and—just like each of the other Music Publishers—never again sought to negotiate individually with X. Compl. ¶¶ 110-111, 148. Thus, it is not the case that "[a]ll X's allegations show here is that the Majors eventually sought to enforce their rights when licensing negotiations with X failed." MTD at 25. The Majors *had* been enforcing their rights, but independently, as one would expect of competitors. And in 2023 their behavior markedly changed: they began *collaborating* with their competitors to send massive, collective takedown notices, in service of a common goal to coerce a collective licensing negotiation in aid of the same industrywide license at a supracompetitive rate that Defendants boasted of having obtained from others. Compl. ¶¶ 110, 181.

## III.    X ALLEGES THAT DEFENDANTS VIOLATED SECTION 2 OF THE SHERMAN ACT

Defendants seek dismissal of X's Section 2 claims, arguing that (1) X has failed to allege "exclusionary conduct," (2) "X does not allege individual monopoly power," (3) X "does not allege specific intent to monopolize," and (4) X has failed to allege a conspiracy. MTD at 34-38. As demonstrated below, each argument fails. Indeed, Defendants' entire Section 2 argument rests on the faulty premise that X must show unilateral conduct by each Defendant. But this attack ignores the actual allegations of X's Complaint and the Fifth Circuit's adoption of the joint monopolization doctrine. As a result, Defendants' reliance on unilateral action cases has no bearing on X's Section 2 claims.

### A.    X Alleges Exclusionary Conduct

Defendants are wrong that X has not alleged "exclusionary conduct" for purposes of stating its Section 2 claims. MTD at 35. For a practice to be "condemned as exclusionary," it "must harm

the competitive process and thereby harm consumers." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc) (per curiam). Here, as X alleges in support of both its Section 1 and Section 2 claims, Defendants have eliminated the competitive process altogether by agreeing to refuse to deal with X individually, with the anticompetitive effect of reducing the supply and raising the price of licenses. Compl. ¶¶ 3, 178-180; *see supra* Point I.B. X's detailed allegations more than suffice to allege exclusionary conduct in violation of Section 2. Defendants' joint conduct, which consolidates their market power, has the same practical effect as competitor combinations or acquisitions that tend to create a monopoly, which courts have deemed to be exclusionary conduct under Section 2. *See, e.g.*, *BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 176 F. Supp. 3d 606, 621-22 (W.D. La. 2016) (acquisitions of previously independent medical groups constitute allegations of anticompetitive conduct under Section 2 of the Sherman Act sufficient to survive a motion to dismiss); *Fashion Originators' Guild of Am. v. Fed. Trade Comm'n*, 312 U.S. 457, 468-69 (1941) (finding the "purpose and object of [defendants'] combination, its potential power, its tendency to monopoly, the coercion it could and did practice . . . brought it within the policy of the prohibition declared by the Sherman and Clayton Acts").

In an effort to avoid the actual allegations of the Complaint, Defendants try to recast X's Section 2 claims as a unilateral refusal to deal governed by *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), and its progeny. But the "narrow" circumstance at issue in *Aspen Skiing*—where a single defendant unilaterally terminated a profitable prior course of dealing once it obtained monopoly power—is not what is alleged here. Instead, X alleges that "Defendants [collectively] act as a monopolist"—a situation that "do[es] not fit the mold of a unilateral refusal to deal." *Dinosaur Fin. Grp. LLC v. S&P Glob., Inc.*, 22 Civ. 1860 (KPF), 2023 WL 4562031, at *13 (S.D.N.Y. July 14, 2023); *see also Open Cheer & Dance*, 2024 WL 1218573, at *6 (Section

37

case acknowledging that where plaintiffs have asserted a concerted refusal to deal, dismissal cannot be premised on unilateral-refusal-to-deal precedent). Thus, even if Defendants are tacitly admitting a refusal to deal by urging application of *Aspen Skiing,* that case does not apply here, where the refusal was collective action, not unilateral.

### B. The Fifth Circuit Does Not Require X To Allege "Individual Market Power"

Defendants also contend that the monopoly power required for Section 2 claim "cannot be satisfied by aggregating defendants together." MTD at 37. But while Defendants "claim that 'a monopoly cannot be shared,' binding precedent says otherwise." *Drs. Hosp. of Laredo v. Cigarroa*, SA-21-CV-01068-XR, 2022 WL 3567353, at *16 (W.D. Tex. Aug. 17, 2022) (citing *Am. Airlines, Inc.*, 743 F.2d at 1118). The Fifth Circuit recognizes the concept of a "joint monopoly" when "such power is obtained that a few persons acting together can control the prices of a commodity moving in interstate commerce." *Am. Airlines, Inc.*, 743 F.2d at 1118 (citation omitted); *see also Torrey v. Infectious Diseases Soc'y of Am.*, No. 5:17-CV-00190-RWS, 2018 WL 10124894, at *11 (E.D. Tex. Sept. 27, 2018) ("[T]he Supreme Court has recently recognized that '[m]onopoly power may be equally harmful whether it is the product of joint action or individual action.'" (quoting *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010)); *Cont'l Airlines, Inc. v. Am. Airlines, Inc.*, 824 F. Supp. 689, 705 (S.D. Tex. 1993) ("To prevail on a claim of attempted joint monopolization [under Section 2], plaintiff must prove that the defendant, having specific intent to monopolize, solicited *other firms* to engage in anticompetitive conduct." (citing *Am. Airlines*, 743 F.2d at 1121)).

X alleges that Defendants collectively possess 90% of the market for musical composition licenses. Compl. ¶ 134. This is sufficient for a showing of market power for a joint monopolization claim, which merely requires a plaintiff allege "that Defendants have a market share in the

aggregate of at least fifty percent." *Stewart Glass & Mirror, Inc. v. U.S.A. Glass, Inc.*, 940 F. Supp. 1026, 1038 (E.D. Tex. 1996).[8]

### C.      X Alleges Specific Intent To Monopolize

X has alleged facts showing that Defendants specifically intended to monopolize the market for musical composition licenses. Compl. ¶¶ 3, 159, 207, 219, 237. Defendants nevertheless claim that "X has at most alleged that the Music Publishers had an interest in securing licenses with X individually, not that any Defendant intended individually (or even collectively) to monopolize the alleged U.S. . . . market for copyrighted musical compositions." MTD at 38. To the contrary, X alleges "the existence of a conspiracy" to extort major platforms into accepting all-or-nothing license terms they do not want; "overt acts done in furtherance of that conspiracy," such as demand an industrywide license on threat of a "historic" DMCA harassment campaign; and the myriad harms resulting therefrom. *See Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*, 81 F. Supp. 3d 1, 14 (D.D.C. 2015).

X also alleges that, in a competitive market, each Music Publisher would have an interest in competing to provide an individual license to X at the most favorable price it could extract, Compl. ¶¶ 178-179, but Defendants instead forgo these licenses—and the attendant revenue—as part of a concerted effort to impose supracompetitive, industrywide license terms that X (like other major platforms before it) does not want, *id.* ¶ 180. Defendants' specific intent is "apparent from

---

[8] Defendants argue that the Fifth Circuit's summary-judgment-stage decision in *Stewart Glass* supports the proposition that "monopoly power inquiry focuses on a single defendant, and cannot be satisfied by aggregating defendants together." MTD at 37. But what the Fifth Circuit actually held is that defendants' market shares could not be aggregated absent "evidence of any agreements or conspiracies" among them. *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., Inc.*, 200 F.3d 307, 315-16 (5th Cir. 2000). Here, the Complaint alleges an anticompetitive agreement among Defendants to consolidate their respective market shares with an aim to jointly monopolize the market for musical composition licenses, so the Complaint's aggregation of their market shares is proper. *See Stewart Glass*, 940 F. Supp. at 1038.

39

the character of the [D]efendants' actions[] alleged." *Oxbow*, 81 F. Supp. 3d at 14 (citing *City of Moundridge v. Exxon Mobil Corp*, 471 F. Supp. 2d 20, 43 (D.D.C. 2007)). As alleged, Defendants' conduct "has no legitimate business justification but to destroy or damage competition." *City of Moundridge*, 471 F. Supp. 2d at 42-43. That alone satisfies the specific-intent element at this stage. *Universal Hosp. Servs., Inc.*, 2015 WL 6994438, at *7 (inferring specific intent where plaintiff "plausibly alleged anticompetitive conduct" including defendants' public statements affirming their stated goal to monopolize or prevent competition); *Oxbow*, 81 F. Supp. 3d at 14 (plaintiff satisfied specific intent requirement "although the complaint states only that 'UP and BNSF intentionally conspired to afford UP a monopoly'").[9]

## IV.   DEFENDANTS CANNOT ESCAPE LIABILITY BY MISCHARACTERIZING X'S COMPLAINT AND THEIR MISCONDUCT

As a last resort, Defendants offer a grab-bag of additional arguments why X's antitrust claims supposedly fail. They assert (1) that X has engaged in impermissible "group pleading," (2) that certain Defendants' attempts to settle a copyright case against X preclude any inference of an agreement to boycott X, and (3) that the *Noerr-Pennington* doctrine immunizes their conduct. This shotgun approach fails on all counts.

### A.   X's Complaint Does Not Engage in Impermissible "Group Pleading"

Defendants' argument that "X engage[d] in impermissible group pleading" does not hold water. MTD at 24-25. "Group pleading" can be impermissible when a plaintiff merely "assemble[s] some collection of defendants and then make[s] vague, non-specific allegations

---

[9] Defendants also argue that they could not intend to monopolize "absent acquisition of all, or substantially all, of the compositions in the world." MTD at 38. But that goes too far, amounting to an unsupported claim that it is impossible to monopolize the U.S. market for copyrighted musical compositions. In any event, the Music Publishers do control substantially all—more than 90%—of copyrighted musical compositions. Compl. ¶ 134.

against all of them as a group." *Wiltfong v. Cal. State Bd. of Accountancy*, No. EP-17-CV-0355-PRM, 2018 WL 935398, at *2 (W.D. Tex. Feb. 16, 2018)). For example, a plaintiff who claims that 127 defendants conspired and alleges only "that many of the 'members of the cartel' sit on various state regulatory boards and are employed by the 'Big 4' accounting firms" engages in impermissible group pleading. *Id*. That is a far cry from X's pleading here.

The Complaint alleges that (1) each Music Publisher joined NMPA; (2) NMPA wrote on behalf of each Music Publisher to threaten a takedown campaign and demand collective negotiations; (3) each Music Publisher expressly authorized NMPA to send takedown notices on its behalf; (4) each Music Publisher participated in the takedown campaign (first the non-Majors, then the Majors); and (5) each of the Music Publishers has refused to individually negotiate with X ever since. Compl. ¶¶ 4, 7, 94-100, 106, 110-111, 114, 134. That is more than sufficient to state a claim against each Defendant.

For example, the plaintiff in *TravelPass* alleged generally that "*each* Defendant . . . ceased bidding on one another's branded keywords." 2019 WL 5691996, at *37. The court held that to be sufficient, reasoning "there is no requirement that TravelPass particularly name each defendant as having committed what TravelPass has alleged because that fact is inherent in the allegations." *Id.* And in *Torrey*, the court found it sufficient to "allege that each Insurance Defendant committed the exact same acts and . . . acted together." 2018 WL 10124894, at *19 (noting "there are no controlling cases that would compel this Court to dismiss the Complaint purely on the basis of group pleading"). As described above, X's pleading far exceeds the specificity of the allegations in those cases.[10]

---

[10] *Austin Legal Video, LLC v. Deposition Sols., LLC*, No. 1:23-CV-00421-DAE, 2024 WL 5184485, at *6 (W.D. Tex. July 19, 2024), likewise does not help Defendants here. MTD at 14. There, the court dismissed the claims against *one* of the defendants because plaintiffs "direct[ed]

41

Accordingly, X's Complaint plausibly alleges a horizontal agreement not to compete and to refuse to deal with X individually, and provides Defendants ample notice of the participants, timing, scope, conduct, and purpose of the conspiracy.

### B. Certain Music Publishers' Willingness to Engage With X on Settling Copyright Infringement Claims Underscores Their Collective Refusal to Deal With X on Licenses

Defendants argue that X "identifies no actual refusal by any Music Publisher," because the Complaint acknowledges attempts to resolve copyright disputes with certain Music Publishers. MTD at 15 (citing Compl. ¶ 11). To the contrary, these allegations underscore that there is nothing stopping the Music Publishers from dealing with X individually other than their illegal conspiracy. The fact that certain Music Publishers were willing to individually negotiate with X in connection with discussing settlement of copyright infringement claims stands in stark contrast to their conduct in the market, *i.e.*, their concerted refusal to negotiate individual licenses for use of their copyrighted material on X's platform.

Moreover, settlement negotiations are not marketplace conduct. "[F]ederal antitrust law does not speak to settlement agreements," because such agreements "do not concern the commercial transactions between plaintiffs and defendants in the operations of their businesses." *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 2028237, at *3 (N.D. Ill. May 4, 2022); *see also Colum. Pictures Indus., Inc. v. Pro. Real Est. Invs., Inc.*, 944 F.2d 1525, 1528 (9th Cir. 1991) (explaining that accepting or rejecting settlement agreements are "incidental to the prosecution of the suit" the parties are trying to settle and so are not seen as "separate and distinct activity" from that suit). Whatever certain Music Publishers may have discussed with X in

---

no allegation to all Defendants that would implicate" that one. 2024 WL 5184485, at *5. Here, by contrast, the Complaint contains numerous allegations implicating each individual defendant in the conspiracy. *See supra* at pp. 25-29.

connection with potentially resolving their ongoing copyright suit does not mitigate—much less absolve—their ongoing anticompetitive conduct in the relevant market.

### C.    The *Noerr-Pennington* Doctrine Does Not Immunize Defendants' Anticompetitive Conduct

Defendants next argue that the Complaint must be dismissed because "legitimate copyright enforcement activity cannot support X's conspiracy claim" under the *Noerr-Pennington* doctrine. That doctrine protects parties' rights to "engag[e] in conduct (including litigation) aimed at influencing decisionmaking by the government," such as lobbying activity. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014); *see also Love Terminal Partners, L.P. v. City of Dallas, Tex.*, 527 F. Supp. 2d 538, 549 (N.D. Tex. 2007) (lobbying Congress); *JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 598 (S.D. Tex. 2022) (similar). Defendants' argument fails at the threshold because "*Noerr-Pennington* . . . is an affirmative defense and thus not grounds for 12(b)(6) dismissal." *Teso LT, UAB v. Luminati Networks Ltd.*, No. 2:20-CV-00073, 2020 WL 7364606, at *7 (E.D. Tex. Dec. 15, 2020). And even if *Noerr-Pennington* could be considered at this stage, it does not apply here for three reasons:

First, Defendants' *Noerr-Pennington* argument requires a rewriting of the Complaint, as X's antitrust claims are not based on copyright enforcement. Instead, X alleges that Defendants are liable for their concerted refusal to deal with X individually in order to coerce X into taking an industrywide license. Compl. ¶¶ 71-70, 118. The takedown notices are evidence of Defendants' unlawful agreement, as well as a means of attempting to force an industrywide license on X. *Id.* ¶¶ 7-10, 81-92, 97, 117. But X does not claim that Defendants' collective use of NMPA to send notices was in and of itself illegal. When, as here, competitors band together to exert their combined power on a counterparty to try to force it to accept anticompetitive terms, their coercive use of an otherwise legal mechanism is evidence of their unlawful agreement and improper motive,

43

even if the specific means is not unlawful. *See, e.g.*, *Sony Elecs. Inc. v. Soundview Techs., Inc.*, 157 F. Supp. 2d 180, 189 (D. Conn. 2001) (refusing to apply *Noerr-Pennington* where the "counterclaim contains substantially more than mere litigation or joint action to challenge a patent, in that it alleges a conspiracy to pay a maximum price and a group boycott not to accept a license"); *see also Am. Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946) ("It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful.").

Second, the *Noerr-Pennington* doctrine does not cover the DMCA takedown notices sent by NMPA on behalf of the Music Publishers. *Noerr-Pennington* protects a party's right to petition the government, including by filing suit and, in some instances, pre-suit conduct such as sending cease-and-desist letters. *See Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir. 1983) (concluding *Noerr-Pennington* protects pre-suit conduct). But sending DMCA takedown notices is not pre-suit conduct. "A takedown notice is neither a threat of, nor a precondition to, litigation against the primary infringer." *Ultraclear Epoxy, LLC v. Epodex USA Corp.*, No. 3:23-cv-00715, 2024 WL 966876, at *10 (M.D. Tenn. Mar. 6, 2024); *accord Amaretto Ranch Breedables v. Ozimals, Inc.*, No. C 10-05696, 2010 WL 5387774, at *2 (N.D. Cal. Dec. 21, 2010) (*Noerr-Pennington* does not apply to "[t]he filing of a DMCA Takedown Notification," which "is not an offer of settlement or necessarily a pre-suit step to the bringing of an infringement action"); *see also Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd.*, 525 F. Supp. 3d 1145, 1241 (S.D. Cal. 2021) (concluding that infringement notices exchanged between private parties fall outside the scope of *Noerr-Pennington* because "there is no constitutionally protected right to 'petition' Amazon for a redress of grievances"). It is instead "simply a request for private, third party action"—i.e., "one private party asking another private party to do something." *Ultraclear*, 2024

44

WL 966876, at *10. That is especially true here, given that NMPA *does not own the copyrights* to the noticed works and is therefore not a prospective litigant.

In fact, another district court rejected an effort by NMPA and several Music Publishers to assert an identical *Noerr-Pennington* defense in an antitrust case. *See Downtown Music Publishing LLC v. Peloton Interactive Inc.*, 436 F. Supp. 3d 754, 763 (S.D.N.Y. 2020). In that case, the court noted that while good-faith, pre-litigation efforts to protect a valid copyright may be permissible conduct under *Noerr-Pennington*, a refusal to deal individually is illegal even if the defendants use DMCA takedown notices as part of their scheme. *See id.* ("'[C]opyright holders may not agree to limit their individual freedom of action in licensing future rights to sue an infringer before, during, or after' a lawsuit." (quoting *Primetime 24 Joint Venture v. Nat'l Broad., Co.*, 219 F.3d 92, 100, 102-03 (2d Cir. 2000))). The same reasoning applies here.

Third, even if *Noerr-Pennington* protected DMCA takedown notices generally, it would not protect "sham[]" takedown notices like those alleged here. *See LY Berditchev, Corp. v. Truss Cosms. Corp.*, No. CV 22-04242, 2023 WL 334539, at *9 (D.N.J. Jan. 20, 2023). The sham exception "turns on whether a *Noerr-Pennington* defendant engaged in objectively baseless activity in order to vex and harass the opposing party." *EQMD, Inc. v. Farm Bureau Gen. Ins. Co. of Mich.*, No. 19-13698, 2021 WL 843145, at *5 (E.D. Mich. Mar. 5, 2021) (citation omitted). Courts first look to whether a lawsuit is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," followed by an analysis of whether a petition evinces the "use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon," i.e., whether it is subjectively baseless. *Pro. Real Est. Invs., Inc. v. Colum. Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993).

Defendants' takedown-notice campaign is objectively baseless because it includes requests to remove X posts that "no reasonable litigant could realistically expect" contain copyrighted works. *Id.* at 60. For instance, Defendants demanded that X remove "a video of a high school's sports-award ceremony," a "video of a football team arriving to a stadium with the stadium's music playing," and a video of "soccer player in a music-playing nightclub." Compl. ¶¶ 125-128. These, and other targeted posts, are not subject to legitimate copyright claims because they constitute *de minimis*, non-commercial uses of background music. *Id.*

Defendants' takedown-notice campaign is also subjectively baseless. As the Complaint alleges, Defendants' real goal was to bully X into taking an industrywide license through a campaign of harassing and vexatious takedown requests. Defendants knew many of the identified posts were non-infringing—indeed, their own executives posted similar content. Compl. ¶¶ 123-124. The manifest purpose of Defendants' notices—as Defendants threatened before the scheme began—was to target X's monetized content from its "most popular users" to achieve the maximum impact and thereby extract the most money it could from X. *See id.* ¶¶ 7, 95.

In other words, Defendants attempted to use the *process* of takedown notices to coerce X, which included identifying obviously invalid claims to increase the burden on X. Accordingly, X plausibly alleges that Defendants' collective notices to X serve only as a pretextual means of executing their unlawful conspiracy, not bona fide petitioning activity. *See Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*, 745 F.3d 343, 353 (9th Cir. 2014) (sending cease-and-desist letters without initiating litigation shows an "attempt[] to achieve [defendant's] aim through the litigation *process* rather than through the *result* of that process, satisfying the second criterion for the sham exception").

The mere possibility that the takedown notices were a sham is sufficient to defeat a motion to dismiss. *See Morrone Co. v. Barbour*, 241 F. Supp. 2d 683, 690 (S.D. Miss. 2002) ("[W]hether the 'sham exception' to the *Noerr–Pennington* doctrine is applicable . . . can only be properly analyzed through a consideration of evidence outside of the pleadings and exhibits attached to said pleadings, and, as such, are not appropriately considered in the present Rule 12(b)(6) context."). Thus, the Complaint's allegations describing the sham nature of NMPA's blunderbuss, and overinclusive, takedown notices are—in and of themselves—sufficient to defeat Defendants' *Noerr-Pennington* arguments at this stage.

## V.    X ALLEGES THAT DEFENDANTS' CONDUCT VIOLATES STATE LAW

X alleges claims under the TFEAA, and for common-law civil conspiracy and unfair competition. Defendants argue those claims should be dismissed because they rise or fall with X's antitrust theories. MTD at 39. Because, as shown above, X has alleged plausible claims under Sherman Act Sections 1 and 2, Defendants' efforts to dismiss its state-law claims fail.

Defendants also argue that X has failed to allege an unlawful act in furtherance of a claim for unfair competition or civil conspiracy. MTD at 39-40. But any of the antitrust violations alleged by X will suffice as the predicate unlawful act for these claims. *See, e.g.*, *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000) (unfair competition is an "umbrella" for dishonest commercial conduct and merely requires plaintiffs to show "a recognized tort or illegal act" that "interfered with the plaintiffs['] ability to conduct its business"); *Centennial Bank v. Holmes*, 717 F. Supp. 3d 542, 583 (N.D. Tex. 2024) (common-law claims for civil conspiracy and unfair competition require an underlying illegal act). Thus, Defendants are wrong in contending that only a narrow set of underlying torts or illegal acts can give rise to a common-law unfair competition or civil conspiracy claim. MTD at 40-41. To the contrary, unfair competition is conduct that is

considered "contrary to honest practice in industrial or commercial matters," *Baylor Scott & White v. Proj. Rose MSO, LLC*, 633 S.W.3d 263, 286 (Tex. Ct. App. 2021), including an antitrust violation. *Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co.*, No. 2:22-cv-00027-JRG-RSP, 2024 WL 1298357, at *2 (E.D. Tex. Mar. 5, 2024), *rep. & recommendation adopted*, 2024 WL 1289687 (E.D. Tex. Mar. 26, 2024).

## VI.    IF ANY OF X'S CLAIMS ARE DEEMED INSUFFICIENT, X SHOULD BE ALLOWED TO AMEND

The Court should deny Defendants' Motion in its entirety. But if the Court dismisses any of X's claims, X respectfully requests leave to amend, which should be "freely given" in "the absence of . . . undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies . . . , undue prejudice . . . , [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see* Fed. R. Civ. P. 15(a)(2). There is no basis to assume that any amendment would be futile where X has never previously amended its Complaint. Indeed, while X has pleaded more than sufficient facts to support each of its claims, it could, for example, allege additional information regarding the MFNs the Music Publishers use to collude based on X's recent experience negotiating a settlement with certain Music Publishers, and could also allege additional information regarding the conspiracy based on communications between certain of Defendants' senior executives and X personnel.

## CONCLUSION

For all these reasons, X respectfully requests this Court deny Defendants' motion to dismiss in its entirety. In the event that the Court dismisses any of X's claims, X respectfully requests leave to amend.

Dated: June 1, 2026

Respectfully submitted,

*/s/ Bradley Justus*
Bradley Justus
N.D. Tex. Bar No. 1007988DC
DC Bar No. 1007988
AXINN, VELTROP &
HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
Telephone: (202) 912-4700
bjustus@axinn.com

*/s/ Craig M. Reiser*
Craig M. Reiser
N.D. Tex. Bar No. 4886735NY
NY State Bar No. 4886735
Scott A. Eisman
N.D. Tex. Bar No. 4905287NY
NY State Bar No. 4905287
Christopher Erickson
N.D. Tex. Bar No. 5800628NY
NY State Bar No. 5800628
Isabella Schwarze
N.D. Tex. Bar No. 6224331NY
NY State Bar No. 6224331
AXINN, VELTROP &
HARKRIDER LLP
630 Fifth Avenue, 33rd Floor
New York, NY 10111
Telephone: (212) 728-2200
creiser@axinn.com
seisman@axinn.com
cerickson@axinn.com
ischwarze@axinn.com

*/s/ Alex More*
Alex More
Tex. Bar No. 24065789
Monica E. Gaudioso
Tex. Bar No. 24084570
CARRINGTON, COLEMAN,
SLOMAN & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, TX 75202
Telephone: (214) 855-3000
amore@ccsb.com
mgaudioso@ccsb.com

## <u>CERTIFICATE OF SERVICE</u>

I certify on this 1st day of June 2026, I caused the foregoing to be electronically filed and served through the Court's ECF System.


Dated: June 1, 2026                                  */s/ Craig M. Reiser*
                                                      Craig M. Reiser